# 25-2728-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC.,

*Plaintiff-Appellant,*

— v. —

HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
THE HONORABLE MARY KAY VYSKOCIL, UNITED STATES DISTRICT JUDGE

---

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

---

JAMES A. HUNTER
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
(484) 275-2162

*Attorneys for Plaintiff-Appellant*

---

CP COUNSEL PRESS    (800) 4-APPEAL • (388055)

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc., discloses that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................i

TABLE OF AUTHORITIES ...............................................................iv

PRELIMINARY STATEMENT .........................................................1

JURISDICTIONAL STATEMENT ....................................................3

ISSUE PRESENTED FOR REVIEW ................................................4

STATEMENT OF THE CASE...........................................................4

    A.    The Parties ......................................................................4

    B.    The Hudson Bay Financing..............................................5

    C.    The Blockers....................................................................6

    D.    Hudson Bay's Plan to Evade Disclosure..........................7

    E.    The Secret Side Letter .....................................................8

    F.    Hudson Bay's Trading Program.......................................9

    G.    The Termination of the Financing...................................12

    H.    The Complaint and Rule 12(b)(6) Motion ......................12

    I.    The District Court's Opinion...........................................15

STANDARD OF REVIEW ...............................................................16

SUMMARY OF ARGUMENT .........................................................17

ARGUMENT ...................................................................................19

    I.    THE DISTRICT COURT CORRECTLY HELD THAT
BLOCKERS ARE ENFORCEABLE UNDER *LEVY* ONLY
IF THEY ARE BINDING AND EFFECTIVE................................19

    II.    THE DISTRICT COURT ERRED IN APPLYING *LEVY*
AND THE SEC'S GUIDANCE, EFFECTIVELY
ANNOUNCING A PER SE RULE THAT UNDERMINES
THE LAW OF THIS CIRCUIT ...........................................25

A.    The Complaint Plausibly Alleged That the Blockers Were Illusory Under *Levy* and the SEC's Guidance ................25

    1.    The Complaint Plausibly Alleged That the Blockers Lacked an Enforcement Mechanism ...............26

    2.    The Complaint Plausibly Alleged That the Blockers in the Common Warrants Could Be Easily Waived or Amended ...............................30

    3.    The Complaint Plausibly Alleged That the Blockers Failed in Practice, with Hudson Bay Repeatedly Exceeding the 9.99% Cap............................33

B.    The District Court Undermined *Levy* and the SEC's Guidance with a De Facto Rule That Blockers Are Enforceable Per Se ....................................41

III.    THE PLAIN TERMS OF RULE 13d-3(b) INVALIDATED HUDSON BAY'S BLOCKERS AS A MATTER OF LAW ............44

CONCLUSION ........................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*,
No. 1:24-cv-03370-MKV, 2025 U.S. Dist. LEXIS 193869,
2025 WL 2782334 (S.D.N.Y. Sept. 30, 2025) ....................................4

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006) .................................................................50

*Applied Energetics, Inc. v. Newoak Cap. Mkts., LLC*,
645 F.3d 522 (2d Cir. 2011) .................................................................32

*Auer v. Robbins*,
519 U.S. 452 (1997) .............................................................................24

*Beatty v. Guggenheim Expl. Co.*,
122 N.E. 378 (N.Y. 1919) ............................................................. 31, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................... 16, 35

*Bershad v. McDonough*,
428 F.2d 693 (7th Cir. 1970) ...............................................................23

*Citadel Holding Corp. v. Roven*,
26 F.3d 960 (9th Cir. 1994) .................................................................47

*Credit Suisse First Boston Corp. v. Pitofsky*,
824 N.E.2d 929 (N.Y. 2005) ...............................................................32

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
562 F. Supp. 2d 511 (S.D.N.Y. 2008) ............................................ 47-48

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
654 F.3d 276 (2d Cir. 2011) ........................................................ passim

*Dane v. UnitedHealthcare Ins. Co.*,
974 F.3d 183 (2d Cir. 2020) .................................................................16

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010) .................................................................25

*Egghead.com, Inc. v. Brookhaven Cap. Mgmt. Co.*,
340 F.3d 79 (2d Cir. 2003) .................................................................40

*Feder v. Frost*,
220 F.3d 29 (2d Cir. 2000) ...................................................................20

*Fla. Rock Indus. v. Escambia Sand & Gravel Co.*,
CIVIL ACTION 13-0499-WS-B, 2014 U.S. Dist. LEXIS 77154
(S.D. Ala. June 6, 2014) ...................................................................32

*Flores v. Sessions*,
No. CV 85-4544-DMG (AGRx), 2018 U.S. Dist. LEXIS 115488
(C.D. Cal. July 9, 2018)...................................................................32

*Greenberg v. Hudson Bay Master Fund Ltd.*,
No. 14c-v-5226 (DLC), 2015 U.S. Dist. LEXIS 62236
(S.D.N.Y. May 12, 2015) ...................................................................43

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76 (2d Cir. 2002) ...................................................................35

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ...................................................................24

*Klawonn v. YA Global Invs., L.P.*,
No. 10-2108 (SRC), 2011 U.S. Dist. LEXIS 88535 (D.N.J. Aug. 10, 2011) ......28

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991) ...................................................................25

*Levner v. Prince Alwaleed*,
61 F.3d 8 (2d Cir. 1995) ...................................................................47

*Levy v. Southbrook Int'l Invs., Ltd.*,
No. 99 Civ. 1480 (NRB), 2000 U.S. Dist. LEXIS 6301
(S.D.N.Y. May 8, 2000) ...................................................................44

*Levy v. Southbrook Int'l Invs., Ltd.*,
263 F.3d 10 (2d Cir. 2001) ........................................................ *passim*

*Morales v. Quintel Entm't, Inc.*,
249 F.3d 115 (2d Cir. 2001) .................................................. 20, 40

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*,
709 F.3d 109 (2d Cir. 2013) .................................................. 29-30

*Olagues v. Perceptive Advisors LLC*,
902 F.3d 121 (2d Cir. 2018) .................................................. 19, 50

*Packer v. Raging Cap. Mgmt., LLC,*
 981 F.3d 148 (2d Cir. 2020) ...................................................39

*Press v. Quick & Reilly, Inc.,*
 218 F.3d 121 (2d Cir. 2000) ...................................................24

*Register.com, Inc. v. Verio, Inc.,*
 356 F.3d 393 (2d Cir. 2004) ...................................................32

*Roth v. Armistice Cap., LLC,*
 No. 1:20-cv-08872 (JLR), 2024 U.S. Dist. LEXIS 56887
 (S.D.N.Y. Mar. 27, 2024) .......................................................24

*Roth v. Jennings,*
 489 F.3d 499 (2d Cir. 2007) ...................................................25

*Roth v. LAL Family Corp.,*
 138 F.4th 696 (2d Cir. 2025) ...................................................16

*Roth v. Solus Alt. Asset Mgmt. LP,*
 124 F. Supp. 3d 315 (S.D.N.Y. 2015) ............................... *passim*

*Roth v. Solus Alt. Asset Mgmt. LP,*
 258 F. Supp. 3d 364 (S.D.N.Y. 2017) ....................................24

*SEC v. Alpine Secs. Corp.,*
 308 F. Supp. 3d 775 (S.D.N.Y. 2018) ....................................50

*SEC v. Medallion Fin. Corp.,*
 No. 21-cv-11125 (LAK), 2022 U.S. Dist. LEXIS 137463
 (S.D.N.Y. Aug. 2, 2022) .........................................................29

*SM Kids, LLC v. Google LLC,*
 963 F.3d 206 (2d Cir. 2020) ...................................................17

*U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.),*
 730 F.3d 88 (2d Cir. 2013) .....................................................34

*United States v. G-I Holdings, Inc.,*
 369 B.R. 832 (D.N.J. 2007) ....................................................32

*Wellman v. Dickinson,*
 682 F.2d 355 (2d Cir. 1982) ...................................................41

**Statutes & Other Authorities:**

15 U.S.C. § 78p(a) ...............................................................................1

15 U.S.C. § 78p(b) ...........................................................................1, 3

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1331 .............................................................................3, 4

17 C.F.R. § 240.13d-1(a) ...................................................................46

17 C.F.R. § 240.13d-3 .......................................................................20

17 C.F.R. § 240.13d-3(a) .............................................................. 20, 21

17 C.F.R. § 240.13d-3(b) .......................................................... 43, 44, 50

17 C.F.R. § 240.13d-3(d)(1)(i)............................................... *passim*

17 C.F.R. § 240.13d-101 ....................................................................46

Filing and Disclosure Requirements Relating to Beneficial Ownership, Release
No. 34-14692, 43 Fed. Reg. 18484, 18489 (Apr. 28, 1978) ...............40

N.Y. Gen. Oblig. Law § 15-301.............................................................31

## PRELIMINARY STATEMENT

This case arises out of a desperate financing launched in February 2023 by Plaintiff-Appellant 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("BBBY"). In a last-ditch bid to avert bankruptcy, BBBY sold deeply discounted derivative securities to Defendants-Appellees HBC Investments LLC ("HBCI") and Hudson Bay Capital Management LP ("Hudson Bay Capital" and, collectively with HBCI, "Hudson Bay"). Hudson Bay used those derivatives to backstop an unprecedented trading program that in mere weeks netted more than $300 million in profit from hundreds of thousands of purchases and sales of BBBY's equity securities. This trading spree flooded the market with new shares, sent BBBY's stock nosediving, saddled countless retail investors with steep losses, and hastened a public company's demise.

At issue is whether Hudson Bay's trades plausibly violated Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b). Section 16 applies to the directors and officers of every issuer of a class of public equity securities, as well as every beneficial owner of more than 10% of any such class. *Id.* § 78p(a). Under Section 16(b), these "insiders" are strictly liable to turn over to the issuer any profit realized from any purchase and sale of the issuer's equity securities within a period of less than six months. *Id.* § 78p(b).

The District Court dismissed on the pleading for failure to state a claim, holding that the complaint did not plausibly allege that Hudson Bay beneficially owned more than 10% of BBBY's common stock. The court found BBBY's claim implausible in light of contractual "blockers" that Hudson Bay built into the terms of its derivative securities. These blockers purported to limit Hudson Bay's right to acquire beneficial ownership of BBBY's common stock to 9.99% of shares outstanding — a line just short of Section 16(b)'s 10% trip-wire for liability.

Under this Court's precedent, investors may use blockers to structure around Section 16 obligations — but *only* if the blockers are "[b]inding" and "[e]ffective." *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001). BBBY's complaint alleged that Hudson Bay's blockers were not binding and effective but an illusory artifice that placed no genuine constraint on Hudson Bay's acquisition or disposition of BBBY stock. BBBY backed this allegation with 70 pages of well-pleaded facts. These facts included a secret side agreement Hudson Bay made to strip the blockers of any means of enforcement and peremptorily require BBBY to fulfill conversion and exercise requests "in such amounts as specified by [Hudson Bay]." The well-pleaded facts also included the precise times and dates Hudson Bay exceeded the 9.99% cap by holding or exercising the right to acquire more than 10% of BBBY's stock.

2

The District Court critically erred in evaluating these allegations under *Levy*. At each step, its analysis elevated the blockers' formal requirements over well-pleaded facts explaining why those requirements did not genuinely constrain Hudson Bay's rights. This approach defied *Levy*'s mandate to consider the "substance of the transaction rather than its form." It misapplied longstanding SEC guidance on separating "illusory" from "binding" blockers. And it ignored Rule 13d-3(b), which voids any contractual device used to prevent the vesting of beneficial ownership as part of a plan of disclosure evasion.

Allowed to stand, the District Court's decision will raise an impossible pleading standard that gives a legal pass to essentially any competently drafted blocker regardless of its ineffectiveness in practice. That result makes a dead letter of *Levy*, the SEC's guidance, and Rule 13d-3(b). The Court should correct this error, vacate the District Court's judgment, and allow this case to proceed.

## JURISDICTIONAL STATEMENT

The case presents a federal question under Sections 16(b) and 27 of the Act, 15 U.S.C. §§ 78p(b), 78aa. The District Court had jurisdiction under 28 U.S.C. § 1331. Hudson Bay's motion to dismiss was granted by opinion and order of September 30, 2025. SPA-1.[1] The District Court entered its final judgment on

---

[1] Citations to "SPA-___" refer to the Special Appendix bound with this brief. Citations to "JA-___" refer to the parties' Joint Appendix. Documents filed with the District Court are cited as "No. 24-cv-3370, ECF ___, at ___."

October 2, 2025, *see* JA-7, and BBBY timely appealed on October 28, 2025, *see id.*; JA-333. This Court has jurisdiction to review the District Court's final decision under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Whether the District Court erred in dismissing the action despite the complaint's plausible allegation, supported by well-pleaded facts, that the blockers purporting to curb Hudson Bay's beneficial ownership were ineffective in design and practice, placing no genuine constraint on Hudson Bay's acquisition and disposition of BBBY stock.

## STATEMENT OF THE CASE

BBBY's complaint, filed May 2, 2024, asserted a single claim for relief under Section 16(b) of the Act. The District Court, per Judge Vyskocil, dismissed the complaint under Rule 12(b)(6). The court's opinion is unreported but available at *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 1:24-cv-03370-MKV, 2025 U.S. Dist. LEXIS 193869, 2025 WL 2782334 (S.D.N.Y. Sept. 30, 2025). The complaint's well-pleaded allegations supply the relevant facts.

### A. The Parties

BBBY is the company formerly known as Bed Bath & Beyond Inc. JA-9 ¶ 6. Until its bankruptcy in April 2023, BBBY retailed home merchandise through a nationwide chain of stores. JA-14 ¶ 30. Defendant HBCI is a multibillion-dollar hedge fund, and Defendant Hudson Bay Capital its affiliated investment manager.

4

JA-13–14 ¶¶ 28–29.  In early 2023 Hudson Bay approached BBBY, then desperate for cash, to propose an extraordinary financing that would hand Hudson Bay rights over the vast majority of BBBY's fully diluted equity.  JA-14–15 ¶¶ 34–35.

### B.    The Hudson Bay Financing

Under the terms of the Hudson Bay financing, BBBY issued three new classes of derivative securities: (1) Series A Preferred Stock, convertible into BBBY common stock at a floating discount to market, subject to a floor of $0.7160 per share (the "Series A Preferred"); (2) warrants to acquire additional common stock at the holder's option (the "Common Warrants"); and (3) warrants to acquire additional Series A Preferred and Common Warrants either at the holder's option or, if numerous conditions could be satisfied, through an "exercise" forced by BBBY (the "Preferred Warrants").  *See* JA-15–20 ¶¶ 36–64.  BBBY refers to the Series A Preferred, the Common Warrants, and the Preferred Warrants collectively as the "Derivative Securities".

BBBY raised $225 million at the closing of the financing on February 7. JA-20 ¶ 65.  It stood to raise up to $800 million more over the following months if it could force Hudson Bay to exercise all of the Preferred Warrants.  *Id.*

Although the financing was nominally structured as an underwritten public offering, Hudson Bay bought the vast majority of the Derivative Securities and all of the Preferred Warrants.  JA-15 ¶ 37, JA-19–20 ¶ 64.  Hudson Bay's investment

entitled it to a whopping 97.8% of all the common stock underlying the Derivative Securities, with 28 other investors dividing up the remaining 2.2% of the equity. JA-32 ¶ 136.  Hudson Bay also drafted the main deal documents, tailoring many of the key legal terms — including the 9.99% blockers at issue here — to suit its needs.  JA-15 ¶ 37.

### C.    The Blockers

At the financing's launch, the Derivative Securities gave Hudson Bay rights over a total of 711,648,336 BBBY shares, or 85% of BBBY shares outstanding on an as-converted, as-exercised basis.  JA-28 ¶ 114.  This stake was so massive that it exceeded 10% of shares outstanding for months, even as Hudson Bay rapidly converted and exercised its Derivative Securities and sold off the underlying stock. JA-11–12 ¶ 18; JA-28 ¶¶ 115–116.  Had Hudson Bay been a "beneficial owner" of all shares underlying its Derivative Securities, it would have been subject to Section 16 of the Act at all times from February 7, 2023 to April 18, 2023.  JA-28 ¶ 120.

In an attempt to suppress its beneficial ownership, Hudson Bay had its attorneys draft conversion and exercise limitations into the terms of the Derivative Securities.  JA-30 ¶ 127.  These so-called "blockers" purported to bar conversion or exercise of the Derivative Securities to the extent the holder would thereby beneficially own more than 10% of BBBY's outstanding common stock.  *Id.* ¶ 128.

The blockers governing the Series A Preferred, adopted as part of an amendment to

BBBY's Certificate of Incorporation, read in pertinent part:

> The Company shall not effect the conversion of any of the
> Preferred Shares held by a Holder, and such Holder shall not
> have the right to convert any of the Preferred Shares held by
> such Holder pursuant to the terms and conditions of this
> Certificate of Amendment and any such conversion shall be
> null and void and treated as if never made, to the extent that
> after giving effect to such conversion, such Holder together
> with the other Attribution Parties collectively would
> beneficially own in excess of 9.99% (the "**Maximum
> Percentage**") of the shares of Common Stock outstanding
> immediately after giving effect to such conversion. . . . For
> purposes of clarity, the shares of Common Stock issuable to a
> Holder pursuant to the terms of this Certificate of Amendment
> in excess of the Maximum Percentage shall not be deemed to be
> beneficially owned by such Holder for any purpose including
> for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934
> Act.

JA-30–31 ¶ 129. The blockers governing the Common Warrants, spelled out in the

warrant itself, contained similar language. *See* JA-31 ¶ 130; SPA-5.[2]

### D. Hudson Bay's Plan to Evade Disclosure

The sole purpose of the blockers was to help Hudson Bay avoid the

disclosure and disgorgement obligations of Sections 13(d) and (g) and 16 of the

Act. JA-37 ¶ 161. The blockers served no purpose for BBBY, which was eager to

sell as much stock as possible. BBBY had tried shopping itself just weeks earlier;

---

[2] The Preferred Warrants had no blockers because the Preferred Warrants
could not be exercised to acquire common stock directly, only additional Series A
Preferred or Common Warrants. *See* JA-19–20 ¶ 64; SPA-4 n.3.

7

it would have gladly sold 100% of its stock, let alone 10% of it.  *See* JA-38–39 ¶¶ 168–174.

Hudson Bay structured the financing as an underwritten offering partly to conceal its participation.  JA-32 ¶ 135.  Intermediating the sale of the Derivative Securities through an underwriter with a handful of co-investors allowed Hudson Bay to keep its name off the public disclosure documents.  *Id.* ¶ 137.  The offering documents tiptoed around Hudson Bay's identity with allusions to "the holder that purchased at least 20,000 shares of Series A Convertible Preferred Stock."  JA-33 ¶ 138.  Relying on the blockers, Hudson Bay never filed any statements under Sections 13(d) or (g) or 16 of the Act.  JA-32 ¶ 133.  Investors had to rely on media reports, which claimed to unmask Hudson Bay based on anonymous sources "with knowledge of the matter" who "asked not to be named."  JA-33 ¶ 143.

### E.    The Secret Side Letter

To guarantee silence, Hudson Bay took the unusual step of entering into a private side agreement with BBBY on February 6, 2023 (the "Side Letter").  JA-212.[3]  This secret agreement, signed on the deal's eve and revealed for the first time in this litigation, gave Hudson Bay special rights unbeknownst to its co-investors or the public.  One of these rights, inscribed under the heading

---

[3] The District Court sanitizes this agreement with the less clandestine name "February 6 Letter," SPA-7, even though "Side Letter" was the styling used in both parties' submissions as well as in the agreement itself.  *See, e.g.*, JA-232 ("*Signature Page to Side Letter*").

"Limitations on Disclosure," expressly forbad BBBY to "disclose the name of [Hudson Bay] in any filing, announcement, release or otherwise." JA-218 § 2(f)(ii). The same paragraph relieved Hudson Bay of any "duty not to trade on the basis of[] any material, non-public information regarding [BBBY]." *Id.*

The Side Letter also quietly disabled any means BBBY might have had to monitor and enforce Hudson Bay's compliance with the blockers. BBBY was in no position to monitor Hudson Bay's beneficial ownership to begin with, since it had no way to know how many shares Hudson Bay sold or retained from the stock acquired through its Derivative Securities. *See* JA-40 ¶¶ 181–182. The Side Letter went a step further by stymying any attempt to get this information. Section 2(n) declared the submission of request forms to be the "totality of the procedures required" of Hudson Bay to convert or exercise its Derivative Securities. JA-221 § 2(n). Hudson Bay would not have to provide any "other information" to receive the shares it requested. *Id.* BBBY was left with no alternative but to issue shares "in such amounts as specified by [Hudson Bay]." JA-222 § 3(b).

## F.  Hudson Bay's Trading Program

Relying on the blockers, and on its secret rights in the Side Letter, Hudson Bay embarked on a trading program that may be unprecedented in the American capital markets for its complexity, speed, and scale, and for the damage it inflicted on public investors. JA-12 ¶ 19. The financing launched on February 7, 2023, and

9

within weeks Hudson Bay had converted or exercised its Derivative Securities 90 times to acquire a total of 444 million new BBBY shares. *Id.* ¶ 21; JA-46 ¶ 215. Many of these conversion and exercise requests were frontloaded, with Hudson Bay submitting 15 on just the first two days of the deal. JA-46–47 ¶¶ 216–217. By 9:45 a.m. on the first day, when the market had only been open for 15 minutes, Hudson Bay had already exercised its Common Warrants four times. *Id.* JA-47 ¶ 218.

Hudson Bay sold the shares it received as fast as it got them, executing hundreds of thousands of open-market trades. JA-21 ¶ 72; JA-66 ¶ 336. These acquisitions and sales rapidly expanded BBBY's share count, which ballooned from around 117 million when the financing began to more than 782 million at the time of BBBY's bankruptcy. *See* JA-22 ¶¶ 79–81. Fully 444 million of these new shares — more than 370% of the original float — passed through Hudson Bay, without any prior public disclosure of its role. JA-12 ¶ 21.

Hudson Bay's relentless selling torpedoed BBBY's stock price, which sank from over $5 per share on February 6 to $0.8125 per share six weeks later. *See* JA-23–24 ¶¶ 90–94; JA-25 ¶ 102. The stock's spectacular collapse destroyed what remained of investor and vendor confidence in the company, contributing to its failure. JA-12 ¶ 23.

Hudson Bay emerged from this carnage unscathed because the Derivative

Securities let it acquire BBBY stock at a deep discount to market. JA-13 ¶ 24. In addition to a floating conversion price (which let Hudson Bay convert its Series A Preferred at an 8% discount, subject only to a low floor), the deal built in several other discounts or "sweeteners." *See* JA-16 ¶¶ 41–42; JA-18 ¶ 57; JA-20–21 ¶¶ 67–70. These terms ensured that Hudson Bay could buy stock from BBBY at discount prices while selling it to public investors at market prices, virtually guaranteeing a profit. JA-13 ¶ 24.

In many cases, Hudson Bay entered trades to sell the underlying shares before BBBY had even issued them. JA-21 ¶ 72. These pre-sales were possible because then-applicable SEC rules allowed investors two business days to deliver any stock they agreed to sell. *Id.* ¶ 74. BBBY had to meet conversion or exercise requests on the same "T+2" schedule. *See* JA-49 ¶ 232; JA-82 § 4(c)(i); JA-148–149 § 1(a). Exploiting this settlement cycle, Hudson Bay would (1) submit a conversion or exercise request; (2) enter a trade to sell the requested shares; (3) acquire the requested shares from BBBY; and (4) dispose of the acquired shares by delivering them to the buyer to close out the original sale. *See* JA-21 ¶ 75. Hudson Bay repeated this modus operandi — request, trade, acquire, dispose — over and over between February 7 and BBBY's April 23 bankruptcy. *See* JA-21–22 ¶¶ 75–78.

### G. The Termination of the Financing

BBBY's survival depended on raising more cash by forcing Hudson Bay to make ongoing exercises of the Preferred Warrants. JA-20 ¶ 65; JA-25 ¶ 97. The conditions to exercise included minimum price levels for BBBY's publicly traded common stock. JA-17 ¶ 53. Hudson Bay's stock sales quickly drove the market price below the applicable minimum, and BBBY had to negotiate an amendment to the Preferred Warrants to salvage the financing. *See* JA-25 ¶¶ 96–97. No sooner had the parties agreed to lower the minimum than the stock crashed below that level too. *Id.* ¶ 101. On March 30, 2023, when it became clear that BBBY would be unable to force further exercises of the Preferred Warrants, the parties agreed to terminate the financing. JA-26 ¶ 103.

BBBY tried to replace the Hudson Bay financing but could not raise sufficient funds to stay afloat. *See* JA-27 ¶¶ 109–110. It filed for bankruptcy on April 23, 2023, and its business was eventually liquidated. *Id.* ¶ 111. By that time, Hudson Bay had reaped a profit of more than $310 million from purchasing and selling BBBY's equity securities. JA-74 ¶ 370.

### H. The Complaint and Rule 12(b)(6) Motion

BBBY filed its complaint on May 2, 2024, alleging a single claim for relief under Section 16(b) of the Act. JA-75–76. The complaint acknowledged that binding and effective blockers have been respected under *Levy* as a means of

12

structuring around Section 16(b).  JA-35 ¶¶ 151–152.  It alleged, however, that Hudson Bay's blockers were not binding and effective but an illusory contrivance that placed no genuine constraint on Hudson Bay's beneficial ownership.  JA-35–36 ¶¶ 153–155.

In support of this allegation, the complaint invoked guidance from an amicus brief submitted by the SEC at this Court's invitation in *Levy*.  Br. of SEC as Amicus Curiae, *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001) (No. 00-7630) ("SEC Amicus Br.").  The brief identified the following factors to help distinguish binding from illusory blockers:

> Factors that may indicate that a conversion cap is *illusory* include whether the cap:
>
> - [**Factor 1**] is easily waivable by the parties (particularly the holder of the convertible securities);
>
> - [**Factor 2**] lacks an enforcement mechanism;
>
> - [**Factor 3**] has not been adhered to in practice; or
>
> - [**Factor 4**] can be avoided by transferring the securities to an affiliate of the holder.
>
> Factors that may indicate that a cap is *binding* include whether it:
>
> - [**Factor 5**] is provided in the certificate of designation or the issuer's governing instruments;
>
> - [**Factor 6**] reflects limitations established by another regulatory scheme applicable to the issuer; or

13

- [**Factor 7**] is the product of bona fide negotiations between the parties.

  [**Integrity Consideration**] Limitations on the number of conversions that may take place over a period of time may add integrity to such provisions, although they are not essential.

*Id.* at 25 (BBBY's alterations); JA-264.

The complaint alleged that Hudson Bay's blockers met almost none of these criteria, and in fact had none of the indicia of a binding cap. *See* JA-37 ¶ 159. BBBY conceded Factor 4 and that the blockers in the Series A Preferred were embedded in BBBY's charter documents and not easily waived. *Id.* ¶ 162. By contrast, the blockers in the Common Warrants were a bilateral agreement and waivable like any other. *See* JA-38 ¶¶ 163–165. Hudson Bay's rights in the Common Warrants alone gave it a position in BBBY's stock exceeding 10% of shares outstanding at all times from February 7 until March 30, 2023. *Id.* ¶ 166. As an effective cap on Hudson Bay's beneficial ownership, therefore, the blockers on the whole satisfied *none* of the SEC's criteria except Factor 4. *See* JA-37–56 ¶¶ 159–270.

Hudson Bay filed a motion to dismiss the complaint under Rule 12(b)(6). JA-5. With the District Court's leave, three law professors submitted a brief as amici curiae in support of the motion. JA-6. Two hedge funds that have co-invested with Hudson Bay on other deals financed the brief. No. 24-cv-3370, ECF 47, at 1 n.1. BBBY filed responses to the Hudson Bay and amici briefs,

14

arguing that the complaint plausibly alleged that Hudson Bay's blockers were ineffective in design and practice under *Levy*, the SEC's criteria, and Rule 13d-3(b).  JA-6; JA-7.

## I.     The District Court's Opinion

The District Court dismissed the complaint on September 30, 2025.  SPA-1. Despite granting Hudson Bay's motion, Judge Vyskocil rejected the main arguments offered in its support.

The District Court refused to disregard the agency guidance, agreeing with BBBY that the SEC's amicus brief was persuasive and that *Levy* had actually relied on it.  *See* SPA-17.  The court also rejected the amici professors' per se rule that blockers make it "'***contractually impossible*** for the investor to beneficially own more than 10 percent.'"  SPA-15–16 (quoting No. 24-cv-3370, ECF 47, at 2). The District Court reasoned that amici's argument "presume[d] a dispositive issue" and failed to address whether Hudson Bay's blockers were "'illusory or a sham.'" *Id.* (quoting *Levy*, 263 F.3d at 17 n.5).

Applying the SEC's factors, the District Court held that the complaint did not plausibly allege that the blockers were illusory.  SPA-18.  The District Court appeared to agree that the blockers did not satisfy Factors 5–7 or the Integrity Consideration, but it dismissed this shortcoming in a footnote.  *See* SPA-32 n.8 ("[T]he SEC never indicated[] that the absence of those factors suggests a

15

conversion cap was illusory.").

On Factors 1–3, the District Court relied on the text of the blockers, concluding that the language "contradicted" and trumped BBBY's detailed allegations about the blockers' ineffectiveness. *See* SPA-12; SPA-22–23 (Factor 1); SPA-23–24, 25 & n.6, 26 n.7 (Factor 2); SPA-27 (Factor 3). The court thus rejected BBBY's allegations that the Side Letter short-circuited any means of enforcement, that the blockers had been breached in practice, and that the Common Warrant blockers were easily waived or amended. SPA-21; SPA-23; SPA-26.

The District Court's final judgment was entered on October 2, 2025, *see* JA-7; SPA-37, and BBBY's notice of appeal was timely filed on October 28, 2025, *see* JA-7; JA-333.

## STANDARD OF REVIEW

A dismissal under Rule 12(b)(6) is reviewed de novo. *E.g.*, *Roth v. LAL Family Corp.*, 138 F.4th 696, 701 (2d Cir. 2025). The complaint should not be dismissed as long as it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept a complaint's factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *E.g.*, *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).

The movant bears the burden of establishing that a complaint fails to state a claim.  *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 214 (2d Cir. 2020).

## SUMMARY OF ARGUMENT

The District Court correctly rejected Hudson Bay's main arguments for dismissal.  Recognizing that *Levy* countenances enforcement only of "binding" and "effective" blockers, the District Court easily dispatched Hudson Bay's facile claim that "blockers are enforced as written."  No. 24-cv-3370, ECF 25, at 14.  The court also properly declined Hudson Bay's invitation to ignore the SEC's amicus brief, guidance on which the *Levy* Court heavily relied.

Having stated the law correctly, the District Court then erred in applying it. The court found the complaint "contradicted" by the text of the blockers, in spite of the complaint's allegation, backed by detailed pleading, that those textual limitations did not bind Hudson Bay in practice.  The complaint alleged that the secret Side Letter thwarted any real enforcement of the blockers; the District Court responded that boilerplate "affirma[tions] of compliance" sufficed for enforcement. SPA-25 & n.6.  The complaint alleged that the Common Warrant blockers were easily amended; the District Court responded that the Common Warrant's text "expressly prohibit[s] amendment."  SPA-22.  The complaint alleged that Hudson Bay repeatedly exceeded the 9.99% cap; the District Court responded that such

17

breaches were impossible because "the clear terms of the blocker" denied Hudson Bay any "right to acquire" shares in excess of 9.99%.  SPA-27.

This circular reasoning — the blockers were binding because they limited Hudson Bay's rights, and those limits were effective because they were spelled out in binding blockers — raised an insurmountable barrier to pleading.  It effectively denied the complaint's allegations at the threshold and without discovery, crediting the blockers in the face of well-pleaded allegations that the blockers could not be credited.  Because any competent draftsman can copy and paste a blocker to satisfy the District Court's spare textual standards, its decision gives a free pass to essentially any competently drafted blocker, no matter how ineffective in practice.  The District Court's decision thus collapses to the same per se rule of enforceability that it purports to reject.

That outcome guts the law of this circuit.  A per se rule disregards *Levy*'s admonition to consider "the commercial substance of the transaction rather than its form."  It abandons the case-by-case decisionmaking called for in the agency guidance relied on by *Levy*.  And it erases Rule 13d-3(b) from the regulatory framework.

This last rule, completely ignored by the District Court, provides an independent basis for vacatur.  Rule 13d-3(b) disregards any contract used to "prevent[] the vesting of . . . beneficial ownership as part of a plan or scheme to

18

evade the reporting requirements of section 13(d) or (g) of the Act." Whereas the *Levy* plaintiff alleged no attempt at concealment, BBBY pleads in detail how Hudson Bay used its blockers to execute a comprehensive plan of disclosure evasion. The proper application of Rule 13d-3(b) divided an earlier panel of this Court in *CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 654 F.3d 276 (2d Cir. 2011). The Court now has the opportunity to give needed guidance by enforcing the rule's plain terms and vacating the District Court's judgment.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT BLOCKERS ARE ENFORCEABLE UNDER *LEVY* ONLY IF THEY ARE BINDING AND EFFECTIVE

To state a claim under Section 16(b), a plaintiff must plead (1) a purchase and (2) sale of equity securities (3) within a period of less than six months (4) by a director or officer of the issuer or by a beneficial owner of more than 10% of any class of the issuer's registered equity securities. *E.g.*, *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018). Only the fourth element is at issue. In light of the 9.99% cap set by the blockers in the Derivative Securities, the District Court held that the complaint did not plausibly allege Hudson Bay's beneficial ownership of more than 10% of BBBY's common stock. SPA-18.

19

The Act does not define a "beneficial owner," but the SEC has exercised its rulemaking authority to define that term in Rule 13d-3. 17 C.F.R. § 240.13d-3. Rule 16a-1(a)(1) adopts that definition "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the Act." *Id.* § 240.16a-1(a)(1). This Court has upheld Rule 16a-1(a)(1) as a lawful exercise of the SEC's authority. *See Feder v. Frost*, 220 F.3d 29, 35–36 (2d Cir. 2000). For purposes of Section 16, therefore, a "beneficial owner of more than 10 percent" of any registered class of equity securities means a person so deemed under Rule 13d-3. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122 (2d Cir. 2001).

Three parts of Rule 13d-3 are germane:

- **Rule 13d-3(a)** defines a security's "beneficial owner" to include anyone who has or shares, directly or indirectly, (1) "[v]oting power which includes the power to vote, or to direct the voting of, such security"; or (2) "[i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a).

- **Rule 13d-3(d)(1)(i)** deems a person without immediate voting or investment power to be a beneficial owner of a security if he has "the right to acquire beneficial ownership of such security . . . within sixty

days," as through "the exercise of any . . . warrant" or "the conversion
of a security." *Id.* § 240.13d-3(d)(1)(i).

- **Rule 13d-3(b)** imputes beneficial ownership to anyone who uses a
  "contract, arrangement, or device with the purpose of effect of . . .
  preventing the vesting of such beneficial ownership as part of a plan
  or scheme to evade the reporting requirements of section 13(d) or (g)
  of the Act." *Id.* § 240.13d-3(b).

*Levy* assessed the enforceability of a blocker, or "conversion cap," under
these rules. The plaintiff in *Levy* argued that a 4.9% conversion cap failed under
Rule 13d-3(a) and (d)(1)(i) because it allowed the investor to cumulatively dispose
of more than 10% of the stock within a 60-day period through serial conversions
and sales. 263 F.3d at 15. The plaintiff also challenged the cap as void under
Rule 13d-3(b). *Id.* at 12 & n.2.

Unlike BBBY's arguments, none of the *Levy* plaintiff's arguments went
beyond the four corners of the contracts at issue. They relied only on the language
of the cap, the Act, and the SEC's rules. The *Levy* plaintiff never alleged that the
issuer lacked the will or means to enforce the cap, much less that the defendant
sabotaged enforcement through a secret side agreement. Nor was any allegation
made that the cap had been breached or disclosure evaded. The *Levy* plaintiff's

21

arguments were categorical: they would have invalidated essentially every blocker with the same language.

The *Levy* Court sought the views of the SEC, which submitted an amicus brief after oral argument. The SEC advised that a 4.9% cap was not invalid just because the investor could cumulatively dispose of more than 4.9% of the stock through serial conversions and sales over a 60-day period. SEC Amicus Br. at 12. But such a cap was not automatically valid either, as the SEC balked at a blanket rule either way:

> While the Commission believes that conversion caps may be effective in principle, such provisions should be examined on a case-by-case basis to determine whether they are binding and valid. If a cap is not effective in constraining conversion rights, it is not a basis for finding limits on beneficial ownership.

*Id.* at 13. To help distinguish "binding" from "illusory" caps, the SEC offered the list of factors reproduced above. *Id.* at 24–25. Most of these factors — such as whether the cap is easily waivable, was the product of "bona fide negotiations," and is followed "in practice" — cannot be assessed solely from the contract's text.

The *Levy* Court followed the SEC's guidance. It rejected plaintiff's "seria[l] conversions" argument, backing the SEC's view that beneficial ownership must be "determined at any one time, not cumulatively." 263 F.3d at 16. Because the plaintiff's arguments relied only on the text of the blockers and made no use of the SEC's amicus brief (which had not yet been filed when the case was argued), the

22

Court had no need to apply the SEC's factors.  The Court repeated the SEC's admonition, however, that "'[w]hen the limitations provided by conversion caps are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed.'"  *Id.* at 17 n.5 (quoting SEC Amicus Br. at 25–26).  It added that "'the commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions.'"  *Id.* (quoting *Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir. 1970)).

The District Court correctly applied this controlling law in rejecting Hudson Bay's main argument.  That pat argument — "blockers are enforced as written" — cannot be squared with *Levy* or the SEC's guidance.  No. 24-cv-3370, ECF 25, at 14.[4]  It takes no account of the "commercial substance" of the transaction, *Levy*, 263 F.3d at 17 n.5 (internal quotation marks omitted), and it abdicates a "case-by-case" investigation of whether a given blocker is actually "effective in constraining conversion rights."  SEC Amicus Br. at 13.  Hudson Bay's argument was as categorical as the plaintiff's arguments in *Levy*, and it failed accordingly.

The District Court also correctly declined Hudson Bay's proposal to ignore the SEC's guidance.  Hudson Bay contended that the agency's brief "played no

---

[4] *See also id.* ("Where [blockers] unambiguously bar an investor from acquiring beneficial ownership of more than 10% of the issuer's common stock, the investor cannot be a greater than 10% beneficial owner as a matter of law.").

role in [*Levy*]," No. 24-cv-3370, ECF 25, at 14 (internal quotation marks omitted), when in fact the *Levy* opinion relied on it heavily, citing and quoting the brief several times. *Levy*, 263 F.3d at 15, 16, 17 n.5. The *Levy* Court stopped short of applying the SEC's factors only because the parties never addressed them, but it quoted with approval the SEC's warning to "'disregard'" limitations "'discovered to be illusory or a sham.'" *Id.* at 17 n.5 (quoting SEC Amicus Br. at 25–26).

As *Levy* recognized, the SEC's interpretation of Rule 13d-3 warranted deference. *See id.* at 16 (citing *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000)); *see also Auer v. Robbins*, 519 U.S. 452 (1997).[5] Another court in this circuit has relied on the SEC's factors in a Section 16(b) case brought post-*Levy*. *See Roth v. Solus Alt. Asset, Mgmt. LP*, 258 F. Supp. 3d 364, 370 (S.D.N.Y. 2017). The District Court properly turned to the factors for guidance as well.

---

[5] The Supreme Court recently reaffirmed the *Auer* doctrine in *Kisor v. Wilkie*, 588 U.S. 558 (2019). It approved deference where, as here, "the agency was not a party to the litigation, and had expressed its views only in response to the Court's request." *Id.* at 579 n.6; *see also Roth v. Armistice Cap., LLC*, No. 1:20-cv-08872 (JLR), 2024 U.S. Dist. LEXIS 56887, at *33 n.5 (S.D.N.Y. Mar. 27, 2024) (citing *Kisor* in deferring to a 19-year-old SEC amicus brief in another Section 16(b) case).

## II. THE DISTRICT COURT ERRED IN APPLYING *LEVY* AND THE SEC'S GUIDANCE, EFFECTIVELY ANNOUNCING A PER SE RULE THAT UNDERMINES THE LAW OF THIS CIRCUIT

### A. The Complaint Plausibly Alleged That the Blockers Were Illusory Under *Levy* and the SEC's Guidance

Having correctly identified the relevant law, the District Court critically erred in applying it. The court should have evaluated the blockers' promises on the assumption that the complaint's well-pleaded allegations were true. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–111 (2d Cir. 2010). Instead, it did the opposite. It evaluated the complaint's well-pleaded allegations on the uncritical assumption that the blockers' promises were true.

This approach misused the parties' contracts under Rule 12(b)(6). The complaint did not dispute that the blockers said what they said; it alleged that they did not effectively do what they said. It was no answer to that allegation to repeat the blockers' text. In an analogous Section 16(b) case, this Court explained:

> [T]he contents of the document are controlling where a plaintiff has alleged that the document contains, or does not contain, certain statements. As we noted in *Kramer*, however, such documents may properly be considered only for "what" they contain, "not to prove the truth" of their contents.

*Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). The District Court's credulous endorsement of the blockers' promises went beyond considering "what" they said and overstepped to "prov[ing] the[ir] truth." *Compare* SPA-6 (assuming, from the

terms of the Derivative Securities, that Hudson Bay "would 'not have the power to vote or transfer'" more than 9.99% of BBBY's stock), *with* JA-58 ¶¶ 284–285 (alleging that Hudson Bay did in fact transfer 10.1% of the stock).

The District Court's indulgent reliance on the blockers also broke with the SEC's guidance and this Court's controlling opinion in *Levy*. The court ended up presuming the very issue it purported to decide, viz., whether the blockers were plausibly alleged "'to be illusory or a sham.'" SPA-15–16 (quoting *Levy*, 263 F.3d at 17 n.5). With all reasonable inferences drawn in BBBY's favor, the complaint more than adequately alleged that Hudson Bay's blockers were illusory.

### 1. The Complaint Plausibly Alleged That the Blockers Lacked an Enforcement Mechanism

Enforcement of the blockers depended entirely on self-policing by Hudson Bay. JA-10 ¶ 11. BBBY had no way to know how much stock Hudson Bay held, and the secret Side Letter made sure it couldn't find out. The Side Letter dictated that Hudson Bay's conversion and exercise requests were "the totality of the procedures" necessary to acquire shares through the Derivative Securities. JA-40–41 ¶ 183; JA-221 § 2(n). BBBY was flatly denied any "other information," JA-221 § 2(n), and prohibited from issuing shares in any amount except "as specified . . . by [Hudson Bay]." JA-222 § 3(b). These allegations raised a more than plausible inference that the blockers "lack[ed] an enforcement mechanism," SEC Amicus Br. at 25, and the District Court erred in concluding otherwise.

26

The District Court divined an enforcement mechanism from BBBY's commitments "'not [to] effect [a] conversion'" above the cap and to "'deem[]'" any excess shares "'not . . . to be beneficially owned'" by Hudson Bay. SPA-23 (quoting the blockers). This reasoning replaced a critical assessment of whether the blockers were "illusory or a sham," *Levy*, 263 F.3d at 17 n.5 (internal quotation marks omitted), with uncritical incantation of the blockers' text. In the District Court's view, the blockers' "enforcement mechanism" was the blockers themselves.

This view made no sense in light of the Side Letter. BBBY had no way to know how much stock Hudson Bay beneficially owned, and the Side Letter made it impossible for BBBY to find out. How could BBBY "enforce[]" a prohibition against excessive requests when the Side Letter denied it any way to know whether a request was excessive? This kind of engineered futility, slipped into the deal under cover of darkness and at Hudson Bay's insistence, only strengthens the inference that the blockers were window-dressing without substance, i.e., illusory.

The District Court's view that *Levy* found an "enforcement mechanism" in even weaker blockers, SPA-24, grossly misreads *Levy*, which did not apply the SEC's factors at all.[6] The SEC did not appear in *Levy* until the case was fully

---

[6] The parties were unanimous on this point. *See* No. 24-cv-3370, ECF 25, at 13 ("[T]he *Levy* court never mentioned these factors . . . ."); No. 24-cv-3370, ECF 37, at 10 ("The *Levy* Court never applied the SEC's factors because the

briefed and argued. *See* 263 F.3d at 14. The parties' arguments in that case looked no further than the text of the contracts, made no use of the SEC's factors, and gave this Court no record on which to apply them. The words "factor" and "enforcement" do not even appear in this Court's opinion.

When the *Levy* Court referred to a "means of ensuring compliance," it was addressing an argument about contract construction. *See id.* at 18. The plaintiff argued, without any reference to "enforcement" or the SEC's factors, that the blocker was a sham because its language allowed the investor to revoke an excessive conversion without actually requiring him to do so. *See id.* at 17 ("'*may . . . revoke*'"). The Court rejected that contractual argument on contractual grounds, not in reliance on the SEC's factors. *See id.* at 18 ("[T]he clause relied on by plaintiff-appellant to prove that the conversion cap is a sham is properly interpreted as an exception to the irrevocability provision . . . ."). The Court never held that self-policing automatically qualified as an enforcement mechanism. It certainly never held that self-policing would suffice in the face of the issuer's indifference and a secret side agreement that quietly sabotaged independent monitoring.

---

parties never applied them."); *see also Klawonn v. YA Global Invs., L.P.*, No. 10-2108 (SRC), 2011 U.S. Dist. LEXIS 88535, at *12 (D.N.J. Aug. 10, 2011) ("[The Second Circuit] did not make use of the SEC's lists of factors.").

The District Court opined that "Plaintiff cites no authority supporting the assertion that a lack of interest in enforcement renders a blocker illusory," SPA-24, but that's untrue. BBBY cited *Roth v. Solus Alternative Asset Management LP*, 124 F. Supp. 3d 315 (S.D.N.Y. 2015), noting that the *Roth* court "denied a motion to dismiss on similar facts." No. 24-cv-3370, ECF 37, at 13. The court in *Roth* branded a blocker "inherently suspect," especially because it "was negotiated as part of the rescue of [the issuer], and its enforcement is largely limited to [the investor's] own promises." 124 F. Supp. 3d at 325, *quoted in* No. 24-cv-3370, ECF 37, at 13. Hudson Bay's blockers were equally suspect. Because BBBY was desperate for cash and unconcerned with the blockers, enforcement was left to the investor's own promises, as in *Roth*.

The District Court acknowledged that the opacity of Hudson Bay's holdings "may have inhibited BBBY's ability to enforce the cap," SPA-25, but it believed the potential for self-policing "weigh[ed] in favor of concluding that the blockers were binding," SPA-26. "[W]eigh[ing]" the inferences on a motion to dismiss was improper. If the court could reasonably infer that enforcement was impaired, that inference had to be drawn, notwithstanding that other inferences were possible. *See SEC v. Medallion Fin. Corp.*, No. 21-cv-11125 (LAK), 2022 U.S. Dist. LEXIS 137463, at *4 (S.D.N.Y. Aug. 2, 2022) ("[T]he Court should not find facts by weighing competing inferences on a motion to dismiss."); *see also N.J. Carpenters*

29

*Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013) ("[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inference[s] rises to the level of an 'obvious alternative explanation.'").

But even if the District Court were correct that an "enforcement mechanism" could be found in the absence of any will or way to monitor compliance, no court has ever allowed an investor to actively disable monitoring. That is what the Side Letter did. Not only was BBBY's sole means of enforcement stripped away, but it was stripped away by dark of night, in a secret agreement deliberately withheld from investors at Hudson Bay's behest. These well-pleaded facts adequately alleged that the blockers lacked, and indeed were calculatingly denied, an "enforcement mechanism."

### 2. The Complaint Plausibly Alleged That the Blockers in the Common Warrants Could Be Easily Waived or Amended

The complaint alleged that the blockers in the Common Warrants served at Hudson Bay's pleasure; if Hudson Bay were "happier without them, the blockers in the Common Warrants would be gone." JA-40 ¶ 177. The Common Warrant blockers served no purpose for BBBY, were purely contractual, and could be waived or amended like any other contract. JA-37 ¶ 162; JA-38 ¶ 168. BBBY urgently needed to raise cash and actually would have preferred to have a buy-and-hold investor acquire a large block of its stock. *See* JA-39 ¶ 172. When a

30

condition to forced exercise of the Preferred Warrants failed, BBBY rushed to amend them to keep Hudson Bay buying. *Id.* ¶ 175. Had Hudson Bay wanted to scrap the Common Warrant blockers and buy more stock, BBBY would have gladly amended those too. *Id.* ¶ 176.

In dismissing these allegations, the District Court began with the text of the blockers, and ended there too. It reasoned that the Common Warrants' blockers could not be amended because "the Common Warrant . . . expressly prohibit[s] amendment." SPA-22–23 (citing Section 11 of the form of warrant). This reasoning failed even on its own, circular terms. Section 11 purported to ban amendments to the blockers but did nothing to ban amendments to Section 11 itself. *See* JA-164 § 11. The parties were always free to remove the restriction on amending the blocker and *then* amend it. *See* JA-38 ¶ 165; *Beatty v. Guggenheim Expl. Co.*, 122 N.E. 378, 381 (N.Y. 1919) (Cardozo, J.) ("The clause which forbids a change, may be changed like any other."), *abrogated on other grounds by statute*, N.Y. Gen. Oblig. Law § 15-301. Even if the inquiry could be reduced to pure contract construction, the text of the Common Warrants would only undercut the District Court's conclusion.

The District Court's reasoning also ignores basic principles of contract. The Common Warrants were governed by New York law, which requires for a contract only "offer, acceptance, consideration, mutual assent and intent to be bound." *E.g.*,

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (internal quotation marks omitted). Because valid contract formation is not conditioned on the absence of a prior, conflicting agreement, the parties can always make a new agreement to amend the old one even if the old one purports to bar amendment. A fully integrated agreement simply supersedes the prior understanding, as "[t]hose who make a contract, may unmake it." *Beatty*, 122 N.E. at 381; *see also Applied Energetics, Inc. v. Newoak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("Under New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." (cleaned up)); *Credit Suisse First Boston Corp. v. Pitofsky*, 824 N.E.2d 929, 932 (N.Y. 2005). ("[A]ny two parties to a bilateral contract could agree to modify it.").

Out of 800 years of common law, the District Court could not find a single case to support its "no amendments allowed" theory of contract. Every case BBBY found rejects it. *See, e.g.*, *United States v. G-I Holdings, Inc.*, 369 B.R. 832, 838 n.12 (D.N.J. 2007) ("[P]arties to an executory contract are always free to amend the contract.").[7] BBBY's allegation that the blockers in the Common

---

[7] *See also Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 U.S. Dist. LEXIS 115488, at *15 (C.D. Cal. July 9, 2018) ("Of course, the parties are always free to meet and confer regarding any contractual amendments on which they can mutually agree. This is basic contract law."); *Fla. Rock Indus. v. Escambia Sand & Gravel Co.*, CIVIL ACTION 13-0499-WS-B, 2014 U.S. Dist. LEXIS 77154, at *36 (S.D. Ala. June 6, 2014) ("Of course, parties are always free to modify or amend the terms of their contract." (citing cases)).

Warrants could be easily waived or amended was well-pleaded and had to be assumed true. The District Court erred in rejecting it.

### 3. The Complaint Plausibly Alleged That the Blockers Failed in Practice, with Hudson Bay Repeatedly Exceeding the 9.99% Cap

Whereas the plaintiff in *Levy* made "no claim that Southbrook ever exceeded the conversion cap," 263 F.3d at 12, BBBY alleged that Hudson Bay's blockers were repeatedly breached. Hudson Bay beneficially owned more than 9.99% of shares outstanding from approximately 9:45 a.m. on February 7, 2023 until about 2 p.m. on February 10, 2023, and then again from about 4:25 p.m. on March 20, 2023 until the early afternoon of March 22, 2023. JA-53–55 ¶¶ 258–263. It had 10.1% of the stock just sitting in its brokerage account at 9:27 a.m. on February 10. JA-58 ¶¶ 284–286. The District Court gave several reasons for rejecting these allegations, none persuasive.

Its first rationale clung again to the blockers' text. In the District Court's view, the clear terms of the blockers barred beneficial ownership above 9.99%, so ipso facto, any shares requested or received in excess of the cap could not have been beneficially owned. *See* SPA-27 ("[I]f the requests Plaintiff [sic] made on February 7, February 8, February 9, and March 21, 2023 would have caused Defendants to exceed the conversion cap, as Plaintiff alleges, by operation of the clear terms of the blocker provisions, they did not have had [sic] a 'right to

acquire' the common stock shares [sic] requested."). This explanation repeats the same conclusion-assuming, form-over-fact logic that pervades the rest of the court's opinion. Rather than assess the effectiveness of the blockers in light of what allegedly happened, the District Court denied what allegedly happened on the assumption that the blockers were effective.

The District Court's reasoning also waved away the Side Letter. This secret, eleventh-hour agreement gave Hudson Bay special acquisition rights not available to other investors in the deal. BBBY was obligated to deliver shares, within two business days, "in such amounts as specified . . . by the Investor." JA-222 § 3(b). The Side Letter barred BBBY from giving its transfer agent any instructions other than those received from Hudson Bay. *Id.* If Hudson Bay's request "specified" shares in a particular "amount[]," it had the "right to acquire" those shares under the plain terms of the Side Letter.

The District Court brushed aside these allegations because a different section of the Side Letter generically obligated BBBY (though, interestingly, not Hudson Bay) to honor the "terms, conditions and time periods" of the Transaction Documents. SPA-28 (citing JA-221–222 § 2(n)). In privileging this general obligation over the specific requirements of Section 3(b), the District Court inverted the canon that the specific governs the general. *E.g.*, *U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 99 (2d Cir. 2013)

34

("Under New York law, a specific provision governs the circumstance to which it is directed, even in the face of a more general provision." (cleaned up)).  The court also begged the same question begged throughout its opinion: how was BBBY supposed to "honor" the 9.99% cap when it had no idea how much stock Hudson Bay beneficially owned and, thanks to the Side Letter, had no way to find out?

The District Court's construction also makes surplusage of much of the rest of the Side Letter.  *See, e.g.*, *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous.").  If the Side Letter did no more than handmaiden the other Transaction Documents, *see* SPA-28 ("work in conjunction with them"), then what was the point of it?  Why make it a secret?  And why apply it *only* to Hudson Bay — the one investor out of 29 whose stake was large enough to implicate the blockers?  Without answering these fairly obvious questions, the District Court's reasoning hardly explains the Side Letter, much less offers an "obvious alternative explanation" justifying dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007).

The District Court's reasoning also shortchanged the complaint's well-pleaded allegations about how violative requests were handled.  BBBY alleged not only that Hudson Bay had the de facto right to acquire more than 9.99% of its stock but that those rights were actually exercised and satisfied.  "[A]ll of these

35

violative requests were fulfilled, and none was ever withdrawn, nullified, or voided." JA-55 ¶ 268. At 9:27 a.m. on February 10, 2023, Hudson Bay had 10.1% of BBBY's outstanding common stock just sitting in its brokerage account. JA-58 ¶¶ 284–286.[8] This excursion above the 9.99% cap is perhaps the starkest proof of the blockers' failure. If Hudson Bay had no right to acquire more than 9.99% of BBBY's stock, then how did it wind up with 10.1% of it? And if Hudson Bay had no power to dispose of these excess shares, then how did it manage to dispose of them?

The District Court reasoned that any shares Hudson Bay requested in excess of the cap should not be counted if Hudson Bay had already agreed to sell them. *See* SPA-29. Recall that Hudson Bay's modus operandi cycled through four steps: request, trade, acquire, dispose. In the District Court's view, any shares Hudson Bay agreed to sell at step 2 could be deducted from its beneficial ownership, even though Hudson Bay still had the right to acquire them, and the power to dispose of them, at steps 3 and 4. *See* SPA-29–31. This reasoning erred in two respects.

---

[8] According to the District Court, "Plaintiff makes no allegation that on February 7, February 8, February 9, and March 21, Defendants in fact held shares that amounted to more than 10% of outstanding common stock." SPA-29. The District Court omits that BBBY made just such an allegation about February 10: "At 9:27 a.m. on February 10, therefore, the Hudson Bay Defendants had more than 10% of BBBY's outstanding common stock sitting in their brokerage account." JA-58 ¶ 286. This allegation, briefly mentioned in the District Court's statement of facts, SPA-9, is otherwise swept under the rug.

*First*, it countermanded *Levy*'s clear instruction that beneficial ownership under Rule 13d-3(d)(1)(i) must be calculated based on the investor's rights at a point in time, not cumulatively by integrating transactions over a period:

> The SEC's use of "within sixty days" in Rule 13d-3(d)(1)(i) directs us to look not to the percentage of common shares cumulatively, beneficially owned during a 60 day period as plaintiff-appellant argues, but rather, to ***whether the "right to acquire" inures at some point within sixty days of the acquisition.*** In short, "within sixty days" is a timing limit, not a direction to aggregate. Thus, ***beneficial ownership is determined at any one time, not cumulatively.*** This interpretation is consistent with the Supreme Court's instruction that Section 16(b) operate only within "narrowly drawn limits." Moreover, this interpretation limits Section 16(b) short swing trading liability to those persons in a position to influence the value of stocks ***because they hold or have the "right to acquire", at any one time, more than 10% of the issuer's common stock.***

263 F.3d at 16 (emphasis added). The District Court made the same mistake the plaintiff made in *Levy*. Rather than determine beneficial ownership from the amount of stock Hudson Bay "ha[d] the 'right to acquire', at any one time," the District Court erroneously calculated it "cumulatively," by adding up "seriatum conversions and sales." *Id.* at 15.

The complaint correctly calculates beneficial ownership under *Levy*. It gives snapshot calculations of Hudson Bay's beneficial ownership at 4 p.m. on each of February 7, February 8, February 9, and March 21, 2023. In conformity with Rule 13d-3(d)(1)(i), each calculation divides (x) the total number of shares Hudson Bay

37

had the right to acquire within two business days through pending conversion and exercise requests, by (y) the sum of that total number plus shares outstanding. The following table shows the results:

| As of 4 p.m. on . . . | HB Had the Right to Acquire the Following Number of Shares Within Two Business Days . . . | And BBBY Had Approximately the Following Number of Shares Outstanding . . . | So HB Beneficially Owned Approximately the Following % of Shares Outstanding . . . |
|---|---|---|---|
| February 7, 2023 | 31,965,740 | 116,837,942 | 21.48% |
| February 8, 2023 | 48,215,740 | 122,532,421 | 28.24% |
| February 9, 2023 | 32,500,000 | 154,262,331 | 17.40% |
| March 21, 2023 | 46,156,987 | 360,698,965 | 11.34% |

*See* JA-53–54 ¶¶ 258–261. Under the plain terms of Rule 13d-3(d)(1)(i) as conclusively interpreted by *Levy*, these well-pleaded facts adequately alleged that Hudson Bay repeatedly tore through the 9.99% cap.

*Second*, the District Court's methodology ignores the animating purpose of Rule 13d-3(d)(1)(i). As this Court explained in *Levy*, "Section 13(d) and the rules promulgated thereunder are reporting requirements intended to provide investors with early warnings of potential changes in control." 263 F.3d at 15. An investor's influence depends on how much of a "'right to acquire' inures at some point within sixty days of the acquisition," not on the cumulative amount the investor can serially acquire and sell over a period of time. *Id.* at 16; *see also id.* ("'[A]s the point in time in which the right to acquire may come to fruition is

extended into the future the relation of the right's ability to influence control is correspondingly attenuated.'" (quoting SEC Amicus Br. at 15)).

The District Court's decision frustrates this purpose. It would recognize no reporting obligation even if Hudson Bay had the right to acquire, at one time, *every single share* underlying the Derivative Securities. Under the District Court's reasoning, Hudson Bay could submit a conversion or exercise request, immediately enter a trade to sell the stock, immediately submit another request, immediately enter another sell order, and so on. Hudson Bay could convert and exercise all of its Derivative Securities through this process within a single day. It would then have the right to acquire all 711,648,336 underlying shares, or 80% of BBBY's fully diluted equity, two business days later. JA-12 ¶ 20; JA-27 ¶ 112; JA-52 ¶ 255. Yet by the District Court's logic, Hudson Bay would still beneficially own just 9.99% of the stock and have no reporting obligation.

Hudson Bay could even make all of these sales to a single private buyer. The buyer would then have the right to acquire 711,648,336 shares in two business days from Hudson Bay, just as Hudson Bay had the right to acquire the same shares in two business days from BBBY. No one would contest that the buyer in that scenario beneficially owned the shares. *See, e.g.*, *Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148, 152 (2d Cir. 2020). It follows that Hudson Bay must beneficially own them too. It would defy logic for the buyer to have a reporting

39

obligation but not Hudson Bay, when the buyer and Hudson Bay both have the same right to acquire the same shares within the same two-day period.

The SEC adopted Rule 13d-3 with this scenario in mind. Over objections, it included dispositive power as a touchstone of beneficial ownership, recognizing that an investor who couldn't vote stock might still transfer it to someone who could:

> The Commission nevertheless continues to believe that the power to dispose, without more, gives its holder the ability to change or influence control and is therefore essential to eliciting the type of information within the purview of section 13(d). This is attributable to the fact that the power to vote inheres in the security and may be relocated in the hands of any person to whom the holder of the power to dispose wishes to sell. Thus, the holder of the power to dispose potentially has the ability to bring about the rapid shift in control at which section 13(d) is aimed even though he does not have the power to vote or to direct the voting of the security.

Filing and Disclosure Requirements Relating to Beneficial Ownership, Release No. 34-14692, 43 Fed. Reg. 18484, 18489 (Apr. 28, 1978); *see also Egghead.com, Inc. v. Brookhaven Cap. Mgmt. Co.*, 340 F.3d 79, 84 (2d Cir. 2003) ("§ 13's purpose . . . is to 'alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.'" (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122–23 (2d Cir. 2001))).

Even if the blockers stopped Hudson Bay from voting more than 9.99% of BBBY's stock, they left it free to transfer all of the voting power in the underlying shares, at a stroke, to a third party. *See Wellman v. Dickinson*, 682 F.2d 355, 365 (2d Cir. 1982) ("The power to dispose of a block of securities represents a means for effecting changes in corporate control in addition to the possession of voting control."). By greenlighting a "rapid shift in control" free of any disclosure, the District Court enabled exactly what Section 13(d) was meant to stop.

### B. The District Court Undermined *Levy* and the SEC's Guidance with a De Facto Rule That Blockers Are Enforceable Per Se

In exalting form over substance, the District Court hollowed out *Levy* and the SEC's guidance. *Levy* considers a transaction's "commercial substance . . . rather than its form." 263 F.3d at 17 n.5 (internal quotation marks omitted). The SEC's guidance calls for a "case-by-case" investigation of whether blockers are binding or illusory. SEC Amicus Br. at 24–25. In spite of these straightforward directions, the District Court ignored the "substance" and case-specific facts of Hudson Bay's transactions, preoccupying itself almost entirely with the blockers' form. Because any competently drafted blocker can satisfy the District Court's formal standards, its decision effectively supplants *Levy* and the SEC's guidance with a rule that blockers are enforceable per se.

The reductive formalism of the District Court's approach is evident in its application of the SEC's factors. The District Court's application of Factors 1–3

41

required little more than contract construction.  The court held that the Common

Warrant blockers resisted amendment and waiver because the warrant's terms

barred it (Factor 1).  SPA-22–23.  It found an adequate enforcement mechanism in

boilerplate compliance affirmations (Factor 2).  SPA-26 n.7.  It concluded that

excessive stock acquisitions were impossible because the blockers said investors

had no right to acquire more than 9.99% of the stock (Factor 3).  SPA-27.  The

same conclusions could be drawn of any identically worded blocker, regardless of

its ineffectiveness in practice.

BBBY conceded that the blockers' text satisfied Factor 4, and the District

Court dismissed the absence of Factors 5–7 as inconsequential in light of

Factors 1–3.  *See* SPA-32 n.8.  But if Factors 5–7 matter only when Factors 1–4 are

in doubt, and if all doubt on Factors 1–4 can be quieted by the text of the blocker,

then the entire analysis reduces to formal adequacy.  A blocker will pass inspection

as long as it formulaically recites that the holder (1) cannot waive or amend it;

(2) must affirm compliance; (3) has no right to exceed the cap; and (4) beneficially

owns any shares held by its affiliates.  Such a standard amounts to a per se rule that

any competently drafted blocker is enforceable.

The District Court's exertions at distinguishing adverse precedent, including

Hudson Bay's earlier run-in with Section 16, further expose the untenable

formalism of its approach.  *See* SPA-20 (distinguishing *Roth*, 124 F. Supp. 3d 315;

and *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14c-v-5226 (DLC), 2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015)). The District Court explained away *Greenberg* as a draftsman's error. *See id.* It dismissed *Roth* as not involving a blocker at all but rather a "'one-time divestment mechanism'" by an existing 10% owner. *Id.* (quoting *Roth*, 124 F. Supp. 3d at 325).[9]

In each case, the problem was purely formal: "[T]he 'so-called blockers' in those cases did not clearly prohibit defendants from becoming beneficial owners in excess of ten percent." *Id.* If only those blockers had "clearly prohibit[ed]" 10% beneficial ownership, they would have passed the District Court's test too — regardless of whether that "clear[] prohibit[ion]" actually worked in practice. This triumph of form over substance cannot be reconciled with *Levy*'s focus on a transaction's "commercial substance . . . rather than its form" or with the SEC's vigilance against "illusory or . . . sham" blockers. It upends the law of this circuit and should be corrected.

---

[9] Neither distinction was persuasive. Rule 13d-3 treats contracts that "divest[] . . . beneficial ownership" and "prevent[] the vesting of . . . beneficial ownership" identically, so that distinction fails to explain *Roth*. 17 C.F.R. § 240.13d-3(b); *see also Roth*, 124 F. Supp. 3d at 324 n.8 (reasoning that a divestment mechanism and conversion cap are "subject to similar limitations to the extent that both involve mechanisms to divest, or prevent the vesting of, beneficial ownership"). The lacuna in the *Greenberg* blocker, which let the investor cross the 10% line with group shares, was not unique to that case. The form of Hudson Bay's compliance representations, so heavily touted by the District Court as an "enforcement mechanism," *see* SPA-25 & n.6; SPA-26 n.7, had the same lacuna and made Hudson Bay's blockers equally unreliable. *See* JA-41–42 ¶¶ 186-189.

### III.    THE PLAIN TERMS OF RULE 13d-3(b) INVALIDATED HUDSON BAY'S BLOCKERS AS A MATTER OF LAW

The District Court's decision also frustrated Section 13(d) by condoning evasion of the statute's reporting requirements.  The complaint plausibly alleged that Hudson Bay used the blockers to "prevent[] the vesting of . . . beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act."  17 C.F.R. § 240.13d-3(b).  Under the plain and unambiguous terms of Rule 13d-3(b), that evasive plan made Hudson Bay the beneficial owner of all common stock subject to that "contract, arrangement, or device."  *Id.*

The district court in *Levy* rejected an argument from Rule 13d-3(b) only because the plaintiff had not alleged a "plan or scheme" of disclosure evasion:

> Plaintiff's argument under Rule 13d-3(b), which prohibits "contract[s], arrangement[s] or device[s]" that are "part of a plan or scheme to evade the [applicable] reporting requirements," similarly fails as there is no factual basis to support the existence of such a plan or scheme to evade, here. There is no allegation in plaintiff's complaint that Southbrook failed to disclose any aspects of the ImmunoGen transaction in applicable regulatory filings, or that defendant ever attempted to conceal any matter for the purpose of avoiding its reporting obligations.

*Levy v. Southbrook Int'l Invs., Ltd.*, No. 99 Civ. 1480 (NRB), 2000 U.S. Dist. LEXIS 6301, at \*16 (S.D.N.Y. May 8, 2000) (footnote omitted, alterations in

original).[10]  This Court affirmed "for substantially the same reasons as stated by the district court."  *Levy*, 263 F.3d at 18; *see also id.* at 13–14.

This case could not be more different.  BBBY's complaint alleges that Hudson Bay took elaborate steps to conceal its investment, with the blockers serving as the linchpin of a thoroughgoing plan of disclosure evasion.  JA-35 ¶ 150.  Concealment largely motivated the entire structure of the deal.  Running the offering via an underwriter, with 28 smaller investors as co-purchasers, kept Hudson Bay's name off the disclosure documents.  JA-32–33 ¶ 137.  Public investors were left to speculate on Hudson Bay's role based on a media report sourced to anonymous informants.  JA-33–34 ¶ 143.

Not only did Hudson Bay work to evade disclosure, but it worked to evade disclosure of its work to evade disclosure.  It wangled its confidentiality rights through the Side Letter, a unique secret agreement disclosed for the first time in this litigation.  The Side Letter unambiguously forbad BBBY to "disclose the name of the Investor in any filing, announcement, release or otherwise."  JA-218 § 2(f)(ii).  None of Hudson Bay's 28 co-investors was a party to this secret agreement or, presumably, even knew about it.

---

[10] The SEC remarked on this omission as well.  *See* SEC Amicus Br. at 24 n.11 (slighting plaintiff's Rule 13d-3(b) argument because "[t]here is no allegation . . . that Southbrook ever held more than 4.9% of ImmunoGen's outstanding common stock at one time or attempted to conceal that ownership.").

All of this maneuvering would have been pointless had Hudson Bay been forced to out itself in a filing under Section 13(d) or (g). An investor must file a statement on Schedule 13D when it acquires beneficial ownership of more than 5% of the issuer's stock. 17 C.F.R. § 240.13d-1(a). Even a passive investor must file when it acquires beneficial ownership of more than 20%. *Id.* § 240.13d-1(c). Despite having the right on some days to acquire (and actually acquiring) more than 20% of BBBY's outstanding shares, Hudson Bay relied on the blockers to avoid filing any statement under Sections 13(d) or (g). JA-32 ¶ 133; JA-53 ¶¶ 258, 259.

Hudson Bay's stealth severely harmed public investors, many of whom suffered steep losses in the financing. JA-12 ¶ 19; JA-24 ¶¶ 92–93. A properly filed Schedule 13D must "[s]tate the purpose or purposes of the acquisition of securities of the issuer." 17 C.F.R. § 240.13d-101 item 4. It must also "[d]escribe any plans or proposals" relating to any "acquisition . . . of additional securities of the issuer, or the disposition of securities of the issuer." *Id.* Amendments must be promptly filed with any change in beneficial ownership of more than 1% of the class. *Id.* § 240.13d-2(a). Had investors received this disclosure, they would have known that Hudson Bay was not a "white knight prepared to buy and hold a controlling stake" but a "flip[per]" planning to "dump[] [its] shares on the market as fast as [it] got them." JA-20 ¶ 66; JA-39 ¶ 172. Hudson Bay deliberately

concealed this information because it "knew [its] flood of open-market sales would sink BBBY's stock." JA-34 ¶ 149.

These allegations, ignored by the District Court, find no parallel in *Levy* or in any other case. The innocent use of blockers is routine. As Hudson Bay conceded below, issuers often use blockers to contain large investors. *See* No. 24-cv-3370, ECF 25, at 2 ("Companies also use blockers to prevent holders from building control positions."). Blockers may even aid in regulatory compliance, as when they conform an investor's position to antitrust, banking, or other investment controls. *See Levner v. Prince Alwaleed*, 61 F.3d 8, 9 (2d Cir. 1995) (blocker required by Federal Reserve Board); *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 962 (9th Cir. 1994) (blocker required by Federal Home Loan Bank Board). Regulatory evasion is not a blocker's only purpose; it was just the only purpose of Hudson Bay's blockers.

This Court was previously asked to apply Rule 13d-3(b) to derivative securities in *CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 654 F.3d 276 (2d Cir. 2011). Rather than purchase the issuer's shares directly, the defendants in *CSX* entered into equity swaps, allegedly as part of a plan to evade Section 13(d)'s reporting requirements. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 548–49 (S.D.N.Y. 2008), *vacated in part*

47

*on other grounds*, 654 F.3d 276. The district court observed that "by its plain terms [Rule 13d-3(b)] is triggered when three elements are satisfied":

- the use of a contract, arrangement, or device;

- with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership;

- as part of a plan or scheme to evade the reporting requirements of Section 13(d) or (g).

*Id.* at 548. The lower court found the evidence "overwhelming" that the swaps were used, "at least in major part, for the purpose of preventing the vesting of beneficial ownership of CSX shares in [the investor] and as part of a plan or scheme to evade the reporting requirements of Section 13(d)." *Id.* at 548–49.

This Court vacated on appeal but fractured on the proper application of Rule 13d-3(b) to the swaps. *CSX*, 654 F.3d at 282. While the panel could reach no binding opinion on that question, the late securities expert Judge Winter took it up in a thorough concurrence. *See id.* at 288–310 (Winter, J., concurring). A district court in this circuit would later follow Judge Winter's opinion by denying a motion to dismiss in another Section 16(b) case involving a blocker. *See Roth*, 124 F. Supp. 3d at 324–25.

In Judge Winter's view, whether a contractual limitation on beneficial ownership survives Rule 13d-3(b) turns on whether the contract genuinely sheds "substantially the characteristics or expected benefits that are intended to be

48

regulated." *CSX*, 654 F.3d at 306 (Winter, J., concurring). Rule 13d-3(b) will disregard any contract with a "'component that provides a substantial equivalence of the rights of ownership relevant to control, or includes steps that stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner.'" *Roth*, 124 F. Supp. 3d at 325 (quoting *CSX*, 654 F.3d at 305 (Winter, J., concurring) (cleaned up)).

The complaint plausibly alleged that Hudson Bay's blockers crossed far beyond that line. While the public terms of the blockers purported to deny Hudson Bay the right to acquire more than 9.99% of the stock, the secret terms of the Side Letter said something very different. The Side Letter gave Hudson Bay the right to acquire stock "in such amounts as [Hudson Bay] specified." JA-222 § 3(b). BBBY could not gainsay compliance or seek further assurances, for the Side Letter denied it any "other information" about Hudson Bay's requests. JA-221 § 2(n). BBBY could not call a time-out or pause a suspicious conversion or exercise, for the Side Letter barred it from imposing any "procedures" beyond the bare request forms. *Id.* From the moment Hudson Bay submitted a conversion or exercise request, the Side Letter bound BBBY to issue shares in the amount requested within two business days, no questions asked. Hudson Bay enjoyed the right to acquire stock by fiat, with beneficial ownership vesting at "'the signal of the

49

would-be owner.'" *Roth*, 124 F. Supp. 3d at 325 (quoting *CSX*, 654 F.3d at 305 (Winter, J., concurring)).

Because Judge Winter's opinion was nonbinding, this Court now has the opportunity to issue needed guidance on Rule 13d-3(b). Its interpretation should begin and end with the rule's unambiguous terms. *See Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 129 (2d Cir. 2018) ("[W]e still begin with the text of the regulation and go no further unless an ambiguity in the language so requires." (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 251–52 (2d Cir. 2006))); *SEC v. Alpine Secs. Corp.*, 308 F. Supp. 3d 775, 789 (S.D.N.Y. 2018) ("If a regulation is unambiguous, the clear meaning of the regulation controls . . . .").

When Rule 13d-3(b)'s terms are given their plain meaning, the conclusion is inescapable: the complaint plausibly alleged that Hudson Bay's blockers were a "contract, arrangement, or device with the purpose of effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act." 17 C.F.R. § 240.13d-3(b). Those plain terms direct that Hudson Bay "shall be deemed for purposes of such sections to be the beneficial owner of such security." *Id.* So deemed, Hudson Bay beneficially owned all of the BBBY common stock underlying its Derivative Securities, and thereby beneficially owned more than 10% of BBBY's common

stock from February 7 to April 18, 2023.  JA-11–12 ¶ 18.  The complaint

adequately pled a Section 16(b) claim under Rule 13d-3(b), and the District Court

erred in dismissing it.

## CONCLUSION

The judgment of the District Court should be vacated and the case remanded

for further proceedings.

Dated:  December 19, 2025

Respectfully submitted,

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania  19087
Phone:  +1 (484) 214-4697
Fax:     +1 (646) 462-3356
Email:  hunter@hunterkmiec.com

*Counsel for Plaintiff-Appellant 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,419 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  December 19, 2025

/s/ James A. Hunter
James A. Hunter

**SPECIAL APPENDIX**

i

# TABLE OF CONTENTS

**PAGE**

Opinion and Order filed September 30, 2025.................................... SPA-1

Judgment entered October 2, 2025 ..................................... SPA-37

15 USCS § 78m ........................................................ SPA-38

15 USCS § 78p.......................................................... SPA-58

17 CFR 240.13d-3..................................................... SPA-61

17 CFR 240.16a-1 ...................................................... SPA-63

SPA-1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/30/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC. f/k/a BED BATH & BEYOND INC.,<br><br>                                        Plaintiff,<br><br>                    -against-<br><br>HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP,<br><br>                                        Defendants. | 1:24-cv-03370-MKV<br><br>**OPINION & ORDER GRANTING<br>MOTION TO DISMISS** |

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff, 20230930-DK-BUTTERFLY-1, INC., f/k/a Bed Bath & Beyond Inc., ("BBBY"), brings this action against HBC Investments LLC ("HBCI") and Hudson Bay Capital Management LP ("Hudson Bay Capital," and together with HBCI, "Defendants"). BBBY brings one cause of action, seeking disgorgement for an alleged violation of the Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"). Defendants move to dismiss the operative complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons below, the motion to dismiss is GRANTED and the motion to seal is GRANTED in part.

**FACTUAL BACKGROUND[1]**

BBBY is the issuer formerly known as Bed Bath & Beyond Inc. Compl. ¶ 6. It sold home goods through a national chain of stores until its bankruptcy in April 2023. Compl. ¶ 30. Until September 29, 2023, BBBY's common stock was registered under Section 12(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), 15 U.S.C. § 78l(b). Compl. ¶ 31.

---

[1] The facts as stated herein are drawn from Plaintiff's Complaint [ECF No. 1 ("Compl.")], the allegations of which are accepted as true for purposes of this motion, see *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as well as documents attached to the Complaint as exhibits. *See Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014).

SPA-2

Defendant HBCI is a limited liability private investment fund that shared voting and investment control over its portfolio securities with its investment adviser and managing member, Defendant Hudson Bay Capital.  Compl. ¶ 28.  Hudson Bay Capital owned equity interests in HBCI and received fees based on the performance of HBCI's portfolio.  Compl. ¶ 29.

BBBY's business began to deteriorate in 2019 and by early 2023 the company was looking for ways to raise additional cash.  Compl. ¶¶ 32–34.  On February 7, 2023, BBBY and Defendants entered into a financing arrangement that provided BBBY with necessary funds.  Compl. ¶ 35–36 (the "Financing Arrangement").  BBBY raised around $225 million at the close of the deal and stood to raise up to $800 million more over the following months.  Compl. ¶ 65.  Defendants drafted the main deal documents.  Compl. ¶ 37.

## I.     The Derivative Securities

In accordance with the Financing Arrangement executed on February 7, 2023, BBBY issued three new classes of derivative securities: (a) Series A Convertible Preferred Stock ("Series A"), (b) Common Stock Warrants ("Common Warrants") and (c) Series A Convertible Preferred Warrants ("Preferred Warrants," and together with "Series A" and "Common Warrants", the "Derivative Securities").  *See* Compl.  ¶¶ 36–64.

The Series A was convertible into BBBY common stock at any time at the holder's request at a discount to market price, subject to a floor of $0.7160 per share.  Compl. ¶¶ 41–45.  Defendants acquired ninety percent of the Series A shares issued and sold by BBBY on February 7, 2023.  Compl. ¶ 39.[2]

---

[2] Plaintiff refers to Defendants collectively throughout the Complaint.  Exhibits attached to the Complaint suggest that HBCI, the private investment fund, was in fact the derivative security holder and party to several relevant contracts with BBBY, though Hudson Bay Capital often signed these contacts on behalf of HBCI as an "authorized signatory." *See* Compl. Exs. E, G, I ("Conversion Request").

SPA-3

The Common Warrants were issued at no additional cost to buyers of Series A based on the size of their Series A subscriptions. Compl. ¶ 58. Common Warrants allowed the owners to purchase shares of BBBY common stock. Compl. ¶ 55. Each Common Warrant was exercisable for five years at any time at the holder's request to purchase one share of BBBY's common stock at an exercise price of $6.15. Compl. ¶ 59. Holders could also submit a request to use an "alternate cashless exercise," which required the holder to relinquish 35% of the underlying shares to which the holder was entitled in exchange for the remaining 65% of the underlying common stock at no out-of-pocket cost. Compl. ¶ 60. Defendants acquired 93.72% of the Common Warrants issued on February 7. Compl. ¶¶ 58, 64.

The Preferred Warrants were issued pro rata at no additional cost to any investor who purchased at least $75 million of the Series A. Compl. ¶ 48. The Preferred Warrants allowed the holder to acquire additional Series A and Common Warrants either at the holder's option or, if several conditions were satisfied, through an exercise "forced" by BBBY. *See* Compl. ¶¶ 46–54, 64. Owners of Preferred Warrants were also entitled to receive additional Common Warrants upon any exercise of Preferred Warrants. Compl. ¶ 62. Defendants acquired all Preferred Warrants issued on February 7. Compl. ¶ 50.

On the date that a Series A holder requested to convert the derivative shares for common stock, or the "Conversion Date," that holder would "be treated for all purposes as the record holder or holders of such Conversion Shares." Compl. ¶ 242. The Common Warrants similarly provided that, "[u]pon delivery of an Exercise Notice . . . , the Holder shall be deemed for all corporate purposes to have become the holder of record" of the requested shares. Compl. ¶ 243. As the "holder of record" of shares noticed for conversion or exercise, the Hudson Bay Defendants would

SPA-4

have the power to vote those shares on any matter submitted to BBBY's stockholders of record. Compl. ¶ 244.

The Derivative Securities issued to Defendants gave them the right to buy heavily discounted, tradable BBBY common stock that they could sell to public investors at market price for a profit. Compl. ¶ 66. In the first two weeks after the Financing Arrangement was executed, Defendants sold more than numerous shares into the public market, nearly doubling the number of publicly traded BBBY shares. Compl. ¶ 78–80. Within several months, the number of outstanding shares had expanded to 782 million. Compl. ¶ 81. In the same time period, the value of BBBY common stock plummeted. Compl. ¶¶ 92–100. By March 20, 2023, less than two months after the Financing Agreement was reached, BBBY and the Defendants agreed to terminate the financing. Compl. ¶¶ 103–04. A month later, BBBY filed a Chapter 11 bankruptcy petition, and the business was liquidated. Compl. ¶ 111.

According to Plaintiff, shares *underlying* the Derivative Securities held by Defendants, together with any common stock the Defendants held outright, exceeded 10% of BBBY's shares outstanding from February 7 to April 17, 2023. Compl. ¶ 114–18.

## II.    The Blockers

Exercise and conversion caps, commonly known as "blockers," were included in the terms of Series A and Common Warrants. Compl. ¶¶ 127, 150. The blockers explicitly barred owners of the Derivative Securities from beneficially owning more than 9.99% of BBBY's outstanding common stock. *See* Compl. ¶ 128; *see also* Compl. ¶¶ 129–130.[3] The blockers were included in the Financing Agreement transactional documents to avoid disclosure and disgorgement

---

[3] These blockers effectively applied to all Derivative Securities issued to Defendants as part of the Financing Agreement because Preferred Warrants could not be converted directly to common stock and instead could only be traded for Series A or Common Warrants. *See id.* ¶ 64.

4

obligations under Sections 13 and 16 of the Securities Exchange Act that are triggered when an

investor beneficially owns more than 10% a company's stock.  Compl. ¶¶ 3, 126, 150.  The

blocker for Series A, which by amendment appears in the BBBY Certificate of Incorporation,

reads:

> The Company shall not effect the conversion of any of the Preferred Shares held by a Holder, and such Holder shall not have the right to convert any of the Preferred Shares held by such Holder pursuant to the terms and conditions of this Certificate of Amendment and any *such conversion shall be null and void and treated as if never made, to the extent that after giving effect to such conversion, such Holder* together with the other Attribution Parties collectively *would beneficially own in excess of 9.99%* (the "Maximum Percentage") of the shares of Common Stock outstanding immediately after giving effect to such conversion . . . .  For purposes of clarity, *the shares of Common Stock issuable to a Holder pursuant to the terms of this Certificate of Amendment in excess of the Maximum Percentage shall not be deemed to be beneficially owned by such Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act.*

Compl. ¶ 129, Ex. A ("Certificate of Amendment") § 4(d) (emphasis altered).  The blocker for

Common Warrants, which appears in the warrant to purchase common stock itself, reads almost

exactly the same:

> The Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and *any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder* together with the other Attribution Parties collectively *would beneficially own in excess of 9.99%* (the "Maximum Percentage") of the shares of Common Stock outstanding immediately after giving effect to such exercise . . . . For purposes of clarity*, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act.*

Compl. ¶ 130, Ex. C ("Common Warrant") § 1(f) (emphasis altered).

Both blockers stated that any shares improperly issued, such that the derivative holder would have beneficial ownership of more than 9.99% of outstanding common stock, shall be "null," "void," and "cancelled ab initio." Certificate of Amendment § 4(d); Common Warrant § 1(f). Further, if such common stock shares were improperly issued, Defendants would "not have the power to vote or transfer" them. Certificate of Amendment § 4(d); Common Warrant § 1(f).

The Certificate of Amendment governing Series A derivative securities provides that:

> If after the Company's receipt of a Conversion Notice from a Holder, the Company or such Holder determines, in good faith, that the issuance of shares of Common Stock to such Holder in accordance therewith would result in the Holder (together with the other Attribution Parties) exceeding the Maximum Percentage (such excess number of shares of Common Stock, the "Blocked Shares"), such party shall notify the other party and any Blocked Shares shall be held in abeyance until such time as the delivery of such Blocked Shares would not result in such Holder and the other Attribution Parties exceeding the Maximum Percentage . . . .

Certificate of Amendment § 4(d). Common Warrants do not include the same requirement to hold shares exceeding the conversion cap in abeyance.

Both blockers state: "Upon delivery of a written notice to the Company, any Holder may from time to time increase . . . or decrease the Maximum [allowed] Percentage of such Holder to any other percentage not in excess of 9.99% as specified in such notice; provided" certain requirements are met." Certificate of Amendment § 4(d); Common Warrant § 1(f); *see also* Compl. ¶ 131.

The Common Warrant and the Certificate of Amendment governing Series A allow for amendments but specifically exclude the blocker provisions from permitted amendments. *See* Certificate of Amendment § 30(b) ("Amendment. *Except for Section 4(d) [the blocker]*, which may not be amended or waived hereunder, this Certificate of Amendment or any provision hereof may be amended by . . . .") (emphasis added); Certificate of Amendment § 4(d) ("[t]he limitation

6

contained in this paragraph may not be waived and shall apply to a successor holder" of the security); Common Warrant § 11 ("AMENDMENT AND WAIVER. Except as otherwise provided herein, the provisions of this Warrant *(other than Section 1(f) [the blocker])* may be amended . . . .") (emphasis added).

Defendants had no duty to quantify their beneficial ownership when they delivered a conversion or exercise request to BBBY and BBBY never received any "end of the trading day" tally. Compl. ¶¶ 182, 183. Instead, each conversion or exercise request included a representation that the acquisition effected thereby would not make Defendants beneficial owners of more than 9.99% of BBBY's common stock. Compl. ¶ 186. For example: "[T]his Conversion Notice shall constitute a representation by the Holder of the Preferred Shares submitting this Conversion Notice that after giving effect to the conversion provided for in this Conversion Notice, such Holder (together with its affiliates) will not have beneficial ownership (together with the beneficial ownership of such Person's affiliates) of a number of shares of Common Stock which exceeds the Maximum Percentage." Compl. ¶ 186; *see* Ex. I ("Series A Conversion Notice"); Ex. J ("Common Warrant Exercise Notice").

Plaintiff alleges that blockers were "illusory" and Defendants did beneficially own greater than 10% of BBBY's common stock and so, pursuant to the disgorgement provision of Section 16(b), Defendants owe BBBY the $310,061,851.69 profit earned from short swing transactions. Compl. ¶¶ 11, 151–52, 335, 372–79.

### III.    The February 6 Letter

One day before the Financing Agreement was executed, BBBY and HBCI signed a related agreement (the "February 6 Letter"). Compl. ¶ 139. The February 6 Letter stated that the forms of conversion and exercise notices "set forth the totality of the procedures required of the Investor

in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares." Compl. ¶ 183. The language went on to forbid BBBY from requesting any "other information" from Defendants. Compl. ¶ 183. The February 6 Letter also obligated BBBY to instruct its transfer agent to issue BBBY common shares to Defendants "in such amounts as specified from time to time by the Investor." Compl. ¶ 184. The February 6 Letter also required BBBY and Defendants to "honor" requests for the Derivative Securities "in accordance with" the "conditions" and "terms" of the documents containing the blockers. Compl. Ex. G ("February 6 Letter") § 2(n).

## IV.  <u>Alleged Breaches of the Blockers</u>

Defendants submitted ninety conversion and exercise requests between February 7, 2023 and April 23, 2023, including fifteen on February 7 and 8. Compl. ¶ 215. Plaintiff speculates that the numerous conversion and exercise requests, as well as the revisions of those requests "all but guaranteed that mistakes would be made and that the 9.99% cap would be breached." Compl. ¶ 228. No share issued to Defendants "was ever withdrawn, nullified, or voided" by reason of the blockers. Compl. ¶ 268. Plaintiff alleges that, based on its own *post hoc* calculations, Defendants beneficially owned more than 9.99% of outstanding BBBY stock on February 7, February 8, February 9, and March 21. Compl. ¶¶ 258–61.[4]  However, Defendants' contemporaneous

---

[4] In the Complaint and Plaintiff's opposition to the motion to dismiss ("Pl. Opp." or "Opposition"), Plaintiff makes inconsistent allegations regarding Defendants' purported beneficial ownership and how the percentage Defendants allegedly beneficially owned should be calculated. *Compare* Compl. ¶¶ 198–210, *with* ¶¶ 258–61 *and* Pl. Opp. at 19. Defendants argue that Plaintiff's approach to calculating beneficial ownership is incorrect. *See* Def. Mem. 21–24. As further explained below, Plaintiff concedes that if Defendants are correct regarding the proper approach to calculation, Defendants did not exceed the 9.99% threshold. Compl. ¶¶ 186, 193, 201, 202, 209, 210, 236, Ex. K ("Defendants' Advances Sales Table"); Def. Mem. at 22–24; Def. Reply at 6–8. The Court concludes below that Defendants' approach to calculating beneficial ownership is correct under the law and that the blockers were binding, precluding Defendants from ever acquiring more than 9.99% beneficial ownership. Since the Complaint's detailed allegations regarding Plaintiff's approach to calculating the beneficial ownership of outstanding common stock shares and the shares underlying Defendants' derivative securities are not necessary to the Court's analysis, are at times inconsistent, and are partly under seal, the Court need not and does not restate each of them here.

calculation resulted in a lower beneficial ownership percentage because, they deducted from the numerator any issuable shares they had sold in the open market during the day on February 7. Compl. ¶ 236.

Plaintiff also asserts that Defendants maintained dispositive power over the common stock underlying their Derivative Securities which made them more than 10% beneficial owners of that underlying, unissued common stock. Compl. ¶¶ 271–315.  First, Plaintiff alleges that Defendants' numerous advanced sales of these unissued shares underlying their Derivative Securities often exceeded 10% of BBBY common stock outstanding.  Compl. ¶ 276–77.  Second, Plaintiff asserts that Defendants' dispositive power over the underlying shares was evident at the time common stock was delivered to Defendants.  Compl. ¶ 281.  Plaintiff alleges that, at the time of delivery to Defendants' brokerage account on 9:27 a.m. on February 10, 2023, 19.5 million shares that had been requested on February 8, 2023, represented more than 10.1% of BBBY's shares outstanding, including all shares subject to Defendants' pending conversion and exercise requests.  Compl. ¶¶ 285–87.  Finally, Plaintiff asserts that the terms governing the Derivative Securities gave Defendants dispositive power over the underlying securities in another respect: through the "Required Reserve Amount" required by the Certificate of Amendment and the Common Warrants.  *See* Compl. ¶¶ 303, 306–07; Certificate of Amendment §11(a); Common Warrant §1(g)(i).  The Required Reserve Amount was a portion of BBBY's authorized but unissued common stock (or treasury stock) that BBBY was required to reserve for issuance to holders of the Derivative Securities to satisfy conversion or exercise requests.  Compl. ¶ 304.  As holders of Derivative Securities, Defendants had the power to stop BBBY from transferring a certain amount of unissued shares to anyone else.  Compl. ¶ 312–15.

**V.      Alleged Short Swing Transactions**

From February 7, 2023 to April 18, 2023, Defendants sold hundreds of millions of shares of BBBY's common stock over the open market in hundreds of thousands of trades.  Compl. ¶ 336.  Plaintiff alleges that if Defendants' transactions in Preferred Warrants, Common Warrants, and call options are construed as purchases and sales of underlying common stock, Defendants made a profit in that time period of $310,061,851.69.  Compl. ¶¶ 369–70.

## PROCEDURAL HISTORY

Plaintiff initiated this case as a miscellaneous action by filing a motion for leave to file a complaint under seal with a redacted version on the public docket, which Judge Koeltl granted. *See 20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 24-mc-206-JGK (S.D.N.Y. Apr. 30, 2024); *see also* [ECF No. 1 ("Complaint" or "Compl.")].  The Complaint asserts one cause of action, a violation of Section 16(b).  Thereafter, the case was reassigned to this Court.

Defendants filed a pre-motion letter seeking leave to move to dismiss the case.  [ECF Nos. 17].  Plaintiff was granted leave by the Court to file an amended complaint in response to the issues raised in the pre-motion letter.  [ECF No. 21].  Plaintiff declined to amend the complaint.  [ECF No. 22].  Thereafter, Defendants moved to dismiss the Complaint, filing a memorandum of law, [ECF Nos. 24, 25 ("Def. Mem.")], and a declaration in support, which attached several exhibits of publicly filed documents.  [ECF No. 26].  In opposition, Plaintiff filed a memorandum of law under seal.  [ECF Nos. 37, 38 ("Pl. Opp.")].  Defendants filed a reply, [ECF No. 44 ("Def. Reply")], and a declaration in further support of its motion, which attached one additional publicly filed exhibit.  [ECF No. 45].  Plaintiff also filed a letter motion to seal its opposition, as well as a declaration in support of the motion.  [ECF Nos. 35 ("Sealing Mot."), 36 ("Hunter Decl")].  Defendants did not oppose the motion to seal.

With leave of the Court, three securities law professors filed a brief of *amicus curiae* in support of the motion to dismiss, [ECF Nos. 46 ("Order Granting Leave to File *Amicus* Brief"), 47 ("*Amicus* Brief")], and a declaration in support, which attached one exhibit. [ECF No. 48]. Plaintiff filed a response to the *amicus* submission. [ECF No. 52 ("Reply to *Amici*")].

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678.

The "plausibility standard" articulated in *Ashcroft* "is not akin to a 'probability requirement,'" but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678. Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At bottom, Plaintiff must "nudg[e] [his] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 569. Otherwise, the complaint must be dismissed. *Id.*

On a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference, "matters of which judicial notice may be

taken," and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). "A document is incorporated by reference if the complaint 'makes a clear, definite and substantial reference to [it].' " *Hagan v. City of New York*, 39 F. Supp. 3d 481, 494 (S.D.N.Y. 2014) (quoting *Helprin v. Harcourt, Inc.,* 277 F.Supp.2d 327, 330–31 (S.D.N.Y. 2003)). A court is not required to credit an assertion in a complaint that is directly "contradicted by more specific allegations" in the complaint "or documentary evidence" attached to the complaint. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

## II.    Securities Exchange Act § 16(b)

Section 16(b) requires statutory insiders to disgorge all profits realized from any purchase and sale (or sale and purchase) of the same security made within a six-month period. *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012), *as amended* (July 13, 2012). Section 16(b) seeks to prevent "insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock." *Morales v. Quintel Entm't*, 249 F.3d 115, 122 (2d Cir. 2001). Accordingly, Section 16(b) imposes strict liability regardless of whether the insider traded using inside information or intended to profit on the basis of such information. *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014). Given the section's strict liability regime, Section 16(b) liability is confined within "narrowly drawn limits" and applied mechanically. *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976); *see also Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (courts are "reluctant to exceed a literal, 'mechanical' application of the statutory text in determining . . . liability"). Moreover, the Second Circuit has held that Section 16(b) should be construed as an "exclusion from liability,

not a rule of inclusion." *Rosen v. Brookhaven Cap. Mgmt. Co.*, Ltd., 113 F. Supp. 2d 615, 617–18 (S.D.N.Y. 2000) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 310 (2d Cir. 1998).

## DISCUSSION

### I. Failure to State a Claim

BBBY asserts that Defendants violated Section 16(b) when they made profits from short-swing trading of common stock underlying the Derivative Securities while they were statutory insiders of BBBY. *See* Compl. ¶¶ 372–80. Defendants moved to dismiss arguing that the blocker provisions governing the Derivative Securities prevented them from becoming a statutory insider and thus insulate them from any liability under Section 16(b). *See* Def. Mem. at 1. Plaintiff has failed to plausibly allege that Defendants were statutory insiders of BBBY.

#### A. Absent a Valid Blocker, Defendants Clearly Would Be Statutory Insiders

To establish liability under Section 16(b) Plaintiff must show that there was (1) both a purchase and a sale of a particular security (2) by a statutory insider (3) within a six-month period. *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001); 15 U.S.C.A. § 78p(b). Disgorgement for these so-called "short-swing profits" only applies when one is a statutory insider at both the time of the purchase and the time of the sale in question. *See* 15 U.S.C. § 78p(b); *Goldman Sachs Grp., Inc.*, 740 F.3d at 875.

A statutory insider includes directors, officers, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer. 15 U.S.C. § 78p(a). Defendants were not officers or directors of BBBY, so Section 16(b) liability can attach here only if Defendants were beneficial owners of more than 10% of outstanding BBBY common stock. Therefore, the dispositive issue on the pending motion is

whether Defendants were a more than a 10% beneficial owner of BBBY's common stock at the time of alleged short-swing trades.

Section 16(b) adopts the definition of "beneficial owner" found in Section 13(d) of the Exchange Act and the rules promulgated thereunder. *Levy*, 263 F.3d at 14 (citing 17 C.F.R. 240.16a–1(a)(1). Rule 13d–3 defines a "beneficial owner" as:

> (a) any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3. Moreover, Rule 13d–3 explains that an investor is also "deemed" to be the beneficial owner of a security:

> [I]f that person has the *right to acquire* beneficial ownership of such security, as defined in Rule 13d–3(a) (§ 240.13d–3(a)) *within sixty days*, including but not limited to any right to acquire: (A) through the exercise of any option, warrant or right; (B) through the conversion of a security; (C) pursuant to the power to revoke a trust, discretionary account, or similar arrangement; or (D) pursuant to the automatic termination of a trust, discretionary account or similar arrangement . . . .

17 C.F.R. 240.13d–3(d)(1)(i) (emphasis added).

Accordingly, "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16" because holding such a derivative security gives the holder the right to acquire the underlying shares. *Levy*, 263 F.3d at 16; *see, e.g.*, *Goldman Sachs Grp., Inc.*, 740 F.3d at 870 (quoting Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34–28869, 56 Fed. Reg. 7242, 7248 (Feb. 21, 1991)).

Plaintiff alleges that the shares underlying the Derivative Securities held by Defendants, together with any common stock the Defendants held outright exceeded 10% of BBBY's shares outstanding from February 7 to April 17, 2023.  Compl. ¶ 114–15, 117–18. As such, accepting that allegation as true, without a valid blocker in place, Plaintiff would state a plausible claim that Defendants were "beneficial owners" of more than 10% outstanding BBBY common stock and thus were statutory insiders subject to the restrictions on short swing transactions in Section 16(b).

### B. Plaintiff Has Not Plausibly Alleged that the Relevant Blocker Provisions are Illusory

A conversion cap, or "blocker," is a permissible way of avoiding Section 16(b) liability. *Levy v. Southbrook Intern. Inv. Ltd.*, 263 F.3d 10, 12 (2d Cir. 2001); *Roth v. Solus Alternative Asset Mgmt. LP*, 124 F. Supp. 3d 315, 321 (S.D.N.Y. 2015) ("*Roth I*").  Indeed, the *Amici* professors correctly point out, "binding Second Circuit precedent has enforced blockers like any other contract." *Amicus* Brief at 2; *see e.g.*, *Roth v. Armistice Cap., LLC*, No. 24-950, 2025 WL 2471028, at *4 (2d Cir. Aug. 28, 2025); *Levy*, 263 F.3d at 12.  In *Levy*, the Second Circuit held that, for the purposes of determining whether a defendant is a Section 16(b) statutory insider, "where a binding conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities."  *See Levy*, 263 F.3d at 12.

The *Amici* professors are not correct, however, that "[t]he question here is whether [Section 16(b)] applies when contractual . . . 'conversion caps' or 'blockers' make it **contractually impossible** for the investor to beneficially own more than 10 percent of a company's securities." *Amicus* Brief at 2 (emphasis in the original).  This statement presumes a dispositive issue—disputed here—and fails to address a second inquiry expressly contemplated by  Second Circuit

15

precedent. Specifically, the Second Circuit makes clear in *Levy* that "[w]hen the limitations

provided by [the blockers] are discovered to be illusory or a sham, they should be disregarded and

the courts should analyze the case as though no such limitations existed." *Levy*, 263 F.3d at 17 n.5

(quoting Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25 (2d Cir.

Mar. 23, 2001)).

Accordingly, the question here is whether Plaintiff plausibly alleges that the relevant

blockers were illusory. Under *Levy*, as long as the blockers are valid and binding, Defendants

cannot be deemed the beneficial owner of more than 9.99% of BBBY stock because they did not

have "the right to acquire" more than 9.99% of BBBY common stock "within sixty days" of any

conversion request. *Levy*, 263 F.3d at 16; *see also* 17 C.F.R. 240.13d–3(d)(1)(i) (an investor is a

beneficial owner of shares "if that person has the *right to acquire* beneficial ownership of such

security, . . . *within sixty days*") (emphasis added).

Plaintiff insists that the blockers here are not binding and should thus be disregarded

entirely. *See, e.g.*, Compl. ¶¶ 154–56. In making its argument, Plaintiff relies on a list of non-

exclusive factors set out in an *amicus* brief filed by the Securities and Exchange Commission (the

"SEC") in *Levy* that are purportedly indicative of whether a conversion cap is binding. *See* Compl.

¶ 157 (citing Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25 (2d

Cir. Mar. 23, 2001) (the "SEC *Amicus*")). The SEC *Amicus* states that factors that "may indicate

that a conversion cap is *illusory* include whether the cap":

- is easily waivable by the parties (particularly the holder of the convertible securities);
- lacks an enforcement mechanism;
- has not been adhered to in practice; or
- can be avoided by transferring the securities to an affiliate of the holder.

It goes on to list factors that "may indicate that a cap is *binding*"—whether it:

16

- is provided in the certificate of designation or the issuer's governing instruments;
- reflects limitations established by another regulatory scheme applicable to the issuer; or
- is the product of bona fide negotiations between the parties."

*Id.* Defendants argue that the Court should not rely on such factors because the *Levy* court never expressly applied them. *See* Def. Mem. at 13 (citing an out-of-circuit case, *Klawonn v. YA Global Invs., L.P.*, 2011 WL 3502022, at *4 (D.N.J. Aug. 10, 2011)). Defendants argue that instead this Court should interpret the blocker "as a whole," analyzing the language of the contract, as the Levy court did. *Id.*

However, *Levy* repeatedly relies on the SEC interpretation of Section 16(b) in its *amicus* brief and determines that it is "bound by the SEC's interpretations of its regulations in its *amicus* briefs, unless they are plainly erroneous or inconsistent with the regulation[s]." *Levy*, 263 F.3d at 14, 15–16 (quoting *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000)). This Court may not necessarily be *bound* by an *amicus* submission filed in a different case. Indeed, the Second Circuit opinions that noted that the Second Circuit is bound by interpretations of regulations in SEC *amicus* briefs, were referring to *amicus* briefs filed in those cases. *See Levy*, 263 F.3d at 14; *Quick & Reilly*, 218 F.3d at 128 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (finding Secretary of Labor's *amicus* brief filed in that case was controlling unless "plainly erroneous")). The SEC has not filed an *amicus* brief in this case.[5] However, considering the dearth of case law in this Circuit on the issue of sham or illusory blockers, in addition of course to textual analysis of the contract, the Court will employ the SEC factors to the extent they are persuasive and applicable, as other courts in this district have done. *See Roth on behalf of YRC Worldwide, Inc. v. Solus*

---

[5] Moreover, the general requirement that courts defer to agency interpretations, which was in place when *Levy* was decided, has since been overruled. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

*Alternative Asset, Mgmt. LP*, 258 F. Supp. 3d 364, 370 (S.D.N.Y. 2017) ("*Roth II*"); *Roth I*, 124 F. Supp. 3d at 325; *see also Loper Bright*, 603 U.S. at 386 (holding that the government's longstanding interpretation can be an "interpretive aid").

*Levy* itself remains controlling, and the Court is not convinced that the SEC's "non-exclusive" list of potential factors conflicts with the *Levy* opinion. Rather, *Levy* appears to have applied some of the above factors, assessing: (1) whether the blocker provision was easily waivable by the investor; (2) whether the cap had been adhered to in practice, noting that Plaintiff did not claim that the defendants "ever exceeded the conversion cap"; and (3) whether the parties had a means of enforcing the clause or "ensuring compliance with the cap" by granting the Defendant the ability to revoke a requested conversion to the extent that it would exceed the cap. *Levy*, 263 F.3d at 12, 18.

In any event, employing the SEC factors, as Plaintiff urges the Court to do, Plaintiff fails to plausibly allege that the subject blockers are a sham. Without plausibly alleging that the blockers were illusory, Plaintiff's arguments that Defendants maintained beneficial ownership over the common stock underlying their Derivative Securities fail. *See* Compl. ¶¶ 271–315. Plaintiff's arguments fail because, as explained above, the Second Circuit has clearly held that, "where a *binding* conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities." *Levy*, 263 F.3d at 12 (emphasis added).

> **i.      The Text of the Subject Blockers Deny Investors the Right to Acquire More than 10% of the Underlying Equity Securities**

The blockers here expressly limit beneficial ownership of the underlying common stock in excess of 9.99% by (1) prohibiting BBBY from "effect[ing] the conversion" or "effect[ing] the

exercise" of Series A or Common Warrants that would result in the derivative security holder "beneficially owning in excess of 9.99% . . . of the shares of Common Stock outstanding immediately after giving effect to such" conversion or exercise and (2) stating that the holder of the derivative security "shall not have the right" to any such conversion or exercise.  Compl. ¶¶ 129, 130.  The blockers specified that, in the event shares were issued to an investor which made the investor an owner of more than 9.99% outstanding common stock, those shares issued in excess would be deemed "null and void and treated as if never made." Certificate of Amendment § 4(d); Common Warrant § 1(f).  Further, the blockers provided that Hudson Bay "shall not have the power to vote or transfer" shares issued above 9.99%.  *See* Certificate of Amendment § 4(d); Common Warrant § 1(f).  Finally, the blockers state, "[f]or purposes of clarity," that any shares of common stock "issuable" under the Common Warrant or Series A "in excess of [9.99%] shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act."  *See* Certificate of Amendment § 4(d); Common Warrant § 1(f).

Similar to the cases cited by Defendants—in which courts found that blockers were binding and thus defendants were not beneficial owners of over 10% of a company's stock—the blockers in this case are "clear prohibition[s]" on derivative security holders' right to acquire more than 9.99% of BBBY's common stock.  *See Levy*, 263 F.3d at 18; *see Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448  (S.D.N.Y. 2001) (blocker was "clearly written and enforceable as a matter of law"); *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC,* 115 F. Supp. 2d 440, 443 (S.D.N.Y. 2000) (allegations that defendant was a 10% beneficial owner were "insufficient as a matter of law" due to a binding blocker); *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99-civ-342 (DLC), 1999 WL 544708, at *16 (S.D.N.Y. July 27, 1999) (holding that a holder of derivative securities was not a beneficial owner of the underlying common

stock when a blocker prevented its purchase of common stock such that it would own more than 4.999% of the outstanding shares of common stock).

As such, if the cap is binding, "the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those [underlying] equity securities." *Levy*, 263 F.3d at 12. The blockers at issue here confirm that the parties have agreed the investors do not beneficially own the common stock underlying the Derivative Securities. Specifically, as Plaintiff's own pleading makes clear, the parties specifically agreed that, "[f]or purposes of clarity, the shares of Common Stock issuable to a Holder pursuant to the terms of this Certificate of Amendment [or Warrant] in excess of the Maximum Percentage shall not be deemed to be beneficially owned by such Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act." Compl. ¶¶ 129, 130.

Cases in this district involving blockers which denied motions to dismiss the Section 16(b) claims are factually distinct from this case in that the "so-called blockers" in those cases did not clearly prohibit defendants from becoming beneficial owners in excess of ten percent. *See Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14-cv-5226 (DLC), 2015 WL 2212215, at *6–*7 (S.D.N.Y. May 12, 2015) (Plaintiff plausibly alleged Defendants were a "shareholder group" sharing a common objective and the court held that the subject blocker did not prohibit beneficial ownership by a shareholder group); *see Roth I*, 124 F. Supp. 3d at 325 (explaining that the purported blocker was "not really a 'blocker' at all," and, instead, was "one-time divestment mechanism," since it was agreed between the parties after the investor had already accrued more than 10% beneficial ownership and since, "rather than preventing [the investor] from attaining insider status . . . purport[ed] to eliminate it.").

20

Indeed, Plaintiff does not argue that the blockers were do not prohibit ownership greater than 9.99%. Rather, Plaintiff here argues that several other *Levy* SEC factors weigh in favor of a finding that the blockers were illusory, including importantly that blockers were not adhered to in practice. *See* Compl. ¶¶ 157-159; Pl. Opp. at 12–22 (citing Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25); *see also Roth II*, 258 F. Supp. at 370 (analyzing the *Levy* SEC factors); *Roth I*, 124 F. Supp. 3d at 325 (same). Plaintiff's arguments are unavailing.

### ii.    *The Blockers Were Not Easily Waivable by the Parties*

Plaintiff emphasizes that the *Levy* SEC *Amicus* states that a blocker may be "illusory" when a conversion cap "is easily waivable by the parties (particularly the holder of the convertible securities)." *See* Pl. Opp. at 14–16; SEC *Amicus*, 2001 WL 34120374, at *25. However, Plaintiff has not plausibly established that the parties could have easily waived the blocker provision.

First, Plaintiff asserts that Defendants could elect to lift the 9.99% cap in both blockers "whenever it wanted." Compl. ¶ 131. This allegation is directly in conflict with a part of the text of the blockers which is omitted from the Complaint but appears in the attached exhibits. *Compare* Compl. ¶ 131 *with* Certificate of Amendment § 4(d); Common Warrant § 1(f). Each blocker states: "Upon delivery of a written notice to the Company, any Holder may from time to time increase . . . or decrease the Maximum Percentage of such Holder to any other percentage *not in excess of 9.99%* as specified in such notice;" provided certain requirements are met. Certificate of Amendment § 4(d); *accord* Common Warrant § 1(f) (emphasis added). In light of the clear text of the blockers, which is set forth in attachments to the complaint, the Court is not required to credit Plaintiff's conclusory allegation that the blockers gave Defendants the "unilateral right" to lift the cap, *see* Compl. ¶ 131 ; *see L-7 Designs, Inc.*, 647 F.3d at 422.

Second, Plaintiff argues that the blocker in the Common Warrants could be freely waived because the parties could agree to amend the terms of the Common Warrants which were "purely contractual." Compl. ¶ 162. Plaintiff suggests that the blocker governing the Common Warrant derivatives, which is included in the warrant itself—a contract between parties—is more easily waivable than the Series A blocker, which is "enshrined in BBBY's certificate of incorporation." Compl. ¶ 162. Apparently conceding that the blockers governing the Series A derivative securities were not easily waivable, this argument also fails to establish the Common Warrant blockers were easily waivable.

It is nonsensical to assert that simply because parties could amend a contract, that the contract's provision are "easily waivable" such that they are illusory. *See generally Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684, 49 N.Y.S.3d 65, 71 N.E.3d 556 (N.Y. 2017) (an "illusory contract" is "an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation."). Further, the Second Circuit and courts in this district have found that blockers were binding when included in contracts between the security issuer and the security holder, rather than in the issuer's certificate of incorporation. *See Levy*, 263 F.3d at 11, 18 (binding blocker in a Convertible Preferred Stock Purchase Agreement between the parties); *Roth II*, 258 F. Supp. 3d at 367 (binding conversion waiver in a Stock Purchase Agreement between the parties).

Regardless, Plaintiff's argument that a blocker is easily waivable when it is amendable is irrelevant because both the Common Warrant and the Certificate of Amendment governing Series A expressly prohibit amendment of the blocker provisions. *See* Certificate of Amendment § 30(b) ("Amendment. Except for Section 4(d) [the blocker], which may not be amended or waived hereunder, this Certificate of Amendment or any provision hereof may be amended . . . .");

Certificate of Amendment § 4(d) ("[t]he limitation contained in this paragraph may not be waived and shall apply to a successor holder" of the security); Common Warrant § 11 ("AMENDMENT AND WAIVER. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f) [the blocker]) may be amended . . . ."). Accordingly, Plaintiff has not plausibly alleged that the Blockers here are easily waivable by the parties.

### iii.    *The Blockers Included Enforcement Mechanisms*

As indicated above, one of the SEC factors that the *Levy* court considered in determining that a blocker was binding was that it "provid[ed] a means of ensuring compliance." *Levy*, 263 F.3d at 18. The blockers here likewise provided enforcement mechanisms. In particular, both blockers expressly require that "[t]he Company shall not effect the conversion [or exercise]" of any shares that would exceed the conversion cap. Certificate of Amendment § 4(d); Common Warrant § 1(f)). Further, both blockers provide that any shares improperly issued over the conversion cap will be deemed "null," "void," and "cancelled ab initio." Certificate of Amendment § 4(d); Common Warrant § 1(f)). The blockers further make clear that if shares were issued over the conversion cap, Defendants would "not have the power to vote or transfer" those shares, which would "not be deemed to be beneficially owned" by Defendants. *See* Certificate of Amendment § 4(d); Common Warrant § 1(f). The elimination of any power to vote or transfer shares above the 9.99% threshold, or in effect act with the outsized power of an insider, is fully consistent with the goal of Section 16(b) "to deter insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock." *Greenberg*, 2015 WL 2212215, at *4 (quoting *Morales,* 249 F.3d at 121).

Additionally, the Certificate of Amendment governing Series A derivative securities provides:

> If after the Company's receipt of a Conversion Notice from a
> Holder, the Company or such Holder determines, in good faith, that
> the issuance of shares of Common Stock to such Holder in
> accordance therewith would result in the Holder (together with the
> other Attribution Parties) exceeding the Maximum Percentage (such
> excess number of shares of Common Stock, the 'Blocked Shares'),
> such party shall notify the other party and any Blocked Shares shall
> be held in abeyance until such time as the delivery of such Blocked
> Shares would not result in such Holder and the other Attribution
> Parties exceeding the Maximum Percentage . . . .

Certificate of Amendment § 4(d).  *Levy* held that a blocker with a similar enforcement mechanism

was not easily waived by a derivative security holder when it allowed, but did not require, the

derivative holder to revoke its conversion request if such a request would result in the holder

exceeding the conversion cap.  *Levy*, 263 F.3d at 17–18.  Rather than find the blocker illusory,

*Levy* held that the holder's option to revoke a conversion request in those circumstances was a

"means of ensuring compliance with the cap."  *Id.* at 18.  Here, for the Series A securities, there

exists an even stronger enforcement mechanism that requires the investor to notify the issuer of

common stock of any stock issued above the 9.99% threshold.  Accordingly, the blockers did by

their express terms include enforcement mechanisms.

 In support of its argument that there were no valid enforcement mechanisms for the

blockers, Plaintiff first argues that the above-described enforcement mechanisms were ineffectual

because BBBY lacked the will to enforce the blockers.  Compl. ¶¶ 171, 173–78; Pl. Opp. at 16.

Plaintiff speculates that "[i]f someone wanted to acquire more than 9.99% of BBBY's common

stock, management would have been thrilled."  Compl. ¶ 171.  Plaintiff further asserts that "the

blockers were only there to keep the Hudson Bay Defendants happy," BBBY "did not care whether

[the blockers] were enforced, modified, or terminated," and thus, BBBY lacked any will to enforce

the blockers.  Compl. ¶¶ 168, 177–78.  Plaintiff cites no authority supporting the assertion that a

lack of interest in enforcement renders a blocker illusory.  Further, the proper analysis clearly

focuses on whether enforcement mechanisms were included in the text of the blockers, not whether the issuer was interested in using them. *See See Levy*, 263 F.3d at 17–18; SEC *Amicus* at *25.

Plaintiff next argues that BBBY had no way to determine whether derivative holders' conversion requests would make them over 9.99% beneficial owners, and so, according to Plaintiff, that it lacked the ability to enforce the conversion cap. Compl. ¶¶ 171, 173–90; Pl. Opp. at 16–17. Specifically, Plaintiff asserts that, as derivative holders, Defendants had no duty to quantify their beneficial ownership when they delivered a conversion or exercise request to BBBY and BBBY never received any "end of the trading day" tally. Compl. ¶¶ 182, 183. Defendants, however, were required to affirm in each conversion or exercise request that the acquisition effected thereby would not make the Defendants beneficial owners of more than 9.99% of BBBY's common stock. Compl. ¶ 186.[6]

Next, Plaintiff points to the February 6 Letter which stated that the forms of conversion and exercise notices "set forth the totality of the procedures required of the Investor in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares" and that no "other information . . . shall be required of [Defendants] to exercise their Preferred Warrants or Common Warrants or convert their Preferred Shares." Compl. ¶ 186; February 6 Letter § 2(n). As such, Plaintiff argues BBBY had no means to determine how much common stock Defendants continued to beneficially own and thus whether the pending conversion or exercise request would put them over the conversion cap.

BBBY's inability to assess on its own whether derivative holders' requests could breach the conversion cap may have inhibited BBBY's ability to enforce the cap. However, the Second

---

[6] *See also* Certificate of Amendment § 4(c)(i) (requiring investor to use form Series A Conversion Notice to convert common stock shares); Common Warrant § 1(a) (requiring investor to use form Common Warrant Exercise Notice to request common stock shares); Series A Conversion Notice (including affirmance of compliance with blocker); Common Warrant Exercise Notice (same).

Circuit's opinion in *Levy* makes clear that an issuer need not have an independent ability to enforce a conversion cap for a blocker to be binding. The *Levy* Court affirmed an opinion granting a motion to dismiss, finding a blocker was binding where the duty of enforcement rested entirely with the derivative holder. *See Levy*, 263 F.3d at 17–18 (holding that the holder's option to revoke a conversion request when such a request would result in the holder exceeding the conversion cap was a "means of ensuring compliance with the cap.").[7] Considering this precedent, Plaintiff's own Complaint, and the documents attached to it make clear that the blockers here included enforcement mechanisms that weigh in favor of concluding that the blockers were binding rather than illusory.

### iv. *Plaintiff Has Not Plausibly Alleged That the Blockers Were Not Adhered to in Practice*

As noted above, in *Levy*, the Second Circuit reasoned that a blocker was binding in part because there was "no claim" that the defendant had "exceeded the conversion cap." *Levy*, 263 F.3d at 12. Here, by contrast, Plaintiff argues that Defendants did not adhere to the blockers in practice. In particular, Plaintiff asserts that Defendants they beneficially owned more than 9.99% of outstanding BBBY stock on February 7, February 8, February 9, and March 21, 2023, *see* Compl. ¶¶ 258–61, Plaintiff's own allegations contradict that assertion. However, Plaintiff's own specific allegations contradict Plaintiff's argument. *See L-7 Designs, Inc.*, 647 F.3d at 422.

Plaintiff argues that Defendants' pending conversion and exercise requests gave them the right to acquire beneficial ownership of more than 9.99% of BBBY's common stock from

---

[7] Here, by Plaintiff's own allegations, the Certificate of Amendment and the Common Warrant clearly place on Defendants, a duty to affirm compliance with the blockers when requesting common stock. Compl. ¶ 186; Certificate of Amendment § 4(c)(i) (requiring investor to use form Series A Conversion Notice to convert common stock shares); Common Warrant § 1(a) (requiring investor to use form Common Warrant Exercise Notice to request common stock shares); Series A Conversion Notice (including affirmance of compliance with blocker); Common Warrant Exercise Notice (same). Moreover, at least for Series A securities, the investor was required to notify the issuer if any common shares were issued in excess of 9.99% and hold such shares in abeyance. *See* Certificate of Amendment § 4(d).

approximately 9:45 a.m. on February 7, 2023 until about 2 p.m., on February 10, 2023, and then again from about 4:25 p.m. on March 20, 2023 until the early afternoon of March 22, 2023. Compl. ¶ 263. Central to these allegations is the premise that upon submitting conversion and exercise requests on those days, Defendants had the "right to acquire" any shares requested and thus immediately became the beneficial owner of the common stock shares they requested. Compl. ¶¶ 254–57. Indeed, pursuant to Rule 13d–3 any investor is "deemed" to be the beneficial owner of a security "if that person has the *right to acquire* beneficial ownership of such security, . . . within sixty days." *See* 17 C.F.R. 240.13d–3(d)(1)(i) (emphasis added).

However, the blocker provision terms clearly denied Defendants the right to the issuance of any shares that would make them beneficial owners of more than 9.99%. Compl. ¶¶ 129–30. The blockers specifically instruct that "[t]he Company shall not effect" the conversion or exercise of any derivative security and the "Holder *shall not have the right* to convert [or exercise] any of" the Derivative Securities that would grant Defendants over 9.99% of the common stock outstanding. Compl. ¶ 129–30 (emphasis added). Accordingly, if the requests Plaintiff made on February 7, February 8, February 9, and March 21, 2023 would have caused Defendants to exceed the conversion cap, as Plaintiff alleges, by operation of the clear terms of the blocker provisions, they did not have had a "right to acquire" the common stock shares requested.

Plaintiff asserts that the February 6 Letter extinguished the 9.99% outstanding common stock limitation because it required BBBY to issue shares "in such amounts as specified by" Defendants and accordingly required BBBY to issue shares that would exceed the blocker cap if Defendants so requested. *See* Pl. Opp. at 1, 21 n.9 (citing February 6 Letter § 3(b)); Compl. ¶ 184. However, the February 6 Letter does not state that it works to eliminate the conversion caps on the Defendants' Derivative Securities. In fact, the February 6 Letter explicitly required BBBY and

Defendants to "honor" exercises of the Derivative Securities "in accordance with" the "conditions" and "terms" of the documents containing the blockers. *See* February 6 Letter § 2(n) ("The Company shall honor exercises of the Preferred Warrants and Common Warrants and conversions of the Preferred Shares . . . in accordance with the terms, conditions and time periods set forth in the Certificate of Amendment, Preferred Warrants and Common Warrants, respectively."). The February 6 Letter includes an "Entire Agreement" provision which outlines the agreements that the February 6 Letter is intended to supersede. *Id.* § 4(e). Rather than stating that the February 6 Letter supersedes any part of the Certificate of Amendment or the Common Warrants that include the blockers, the provision states that:

> This Agreement [the February 6 Letter], the other Transaction Documents [defined as the Certificate of Amendment, the Preferred Warrants and the Common Warrants] and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein supersede all other prior oral or written agreements between the Investor [and] the Company, . . . [and] contain the entire understanding of the parties solely with respect to the matters covered herein and therein.

*Id.* (emphasis added). Accordingly, the February 6 Letter was not written to supersede and extinguish the blockers in the Certificate of Amendment and the Common Warrants, but rather to work in conjunction with them.

Consequently, because it is directly contradicted by other allegations, the Court need not accept as true Plaintiff's assertions that on February 7, February 8, February 9, and March 21 Defendants had the "right to acquire" and thus were beneficial owners of the shares they requested on those days, if the requested shares were in fact in excess of 9.99% of the outstanding common stock. Compl. ¶¶ 237, 258–61. *See Levy*, 263 F.3d at 15 (explaining that the SEC *Amicus* counsels that "Rule 13d–3(d)(1)(i) speaks to the 'right,' not the 'ability' to acquire" and thus "the investor's 'right to acquire' stock is at all times subject to the conversion cap."); *L-7 Designs, Inc.*, 647 F.3d

at 422.  Plaintiff makes no allegation that on February 7, February 8, February 9, and March 21, Defendants in fact held shares that amounted to more than 10% of outstanding common stock.

Significantly, Defendants assert, and the Complaint concedes, that if the shares Defendants had already sold to third parties are deducted from Plaintiff's calculation of Defendants' beneficial ownership, Defendants would remain under 10% beneficial ownership of outstanding BBBY common stock. Compl. ¶¶ 186, 193, 201, 202, 209, 210 ("This incorrect accounting [of deducting sold shares] . . . served as the basis for the beneficial ownership representation included in each one of the scores of conversion and exercise requests submitted to BBBY by the Hudson Bay Defendants during that period [which represented that Defendants remained below the 10% threshold]"), 236, Ex. K ("Defendants' Advanced Sales Table"); Def. Mem. at 22–24; Def. Reply at 6–8.  According to relevant case law, the moment Defendants sold shares, they lost any dispositive power over those shares. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 423 (1972) (contemplating that "a statutory insider might sell enough shares to bring his holdings below 10%" thus divesting themselves of beneficial ownership of shares through sale); *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 131 (2d Cir. 2018) (same); *Goldman Sachs Grp., Inc.*, 740 F.3d at 874 (same).

In fact, Defendants' approach of selling common stock before requesting additional shares in order to remain below the conversion cap is specifically condoned by the Second Circuit in *Levy.*  The *Levy* Court states that: "Only when the investor divests itself of sufficient shares of common stock to reduce holdings below the cap does any additional 'right to acquire' come into being . . . . At that point the investor does not have voting power, investment power, or the 'right to acquire' those powers, with respect to the divested shares." *Levy*, 263 F.3d at 15 (citation omitted).

Plaintiff argues that Defendants retained dispositive power over shares even after they were sold because Defendants retained the "dispositive" power to request those shares in conversion and exercise requests, direct Plaintiff to send those shares to Defendants' brokerage account, and then send those shares to third parties that had previously purchased the shares. *See* Pl. Opp. at 21 ("Once Hudson Bay received those shares [that it had requested], it exercised the power to dispose of them by delivering them to its buyers to close out its sales."). However, once Defendants sold BBBY common stock to a third-party buyer, that buyer became the owner of the shares, and Defendants were restrained in their actions regardless of the physical location of the shares and Defendants were required to deliver the shares to the buyer. *See Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 651–52 (S.D.N.Y. 2022) ("sale" is completed when "the investors' rights [become] fixed and irrevocable," and "technicalities" like "[s]ettlement of the contracts or delivery of the shares" are "of no import" to determine when a sale occurs "for Section 16(b) purposes") (citation omitted); *see also Connell v. Johnson*, 2020 WL 2748439, at *2 (S.D.N.Y. May 27, 2020) ("the critical moment in the initial 'purchase' or 'sale,' for the purpose of determining when that transaction occurred within the meaning of § 16(b), is that point at which the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor."). Accordingly, Defendants could not instead decide to vote the shares already sold or dispose of them differently by selling them for a second time to another buyer. In sum, those shares already sold should not be counted toward Defendants' beneficial ownership.

Plaintiff has pointed to only one case supporting its assertion that beneficial ownership of securities for purposes of Section 13(d), and thus Section 16(b), does not terminate when the securities are sold. *See* Pl. Opp. at 20 (citing *Chechele v. Standard Gen. L.P.*, No. 20-civ-3177

(KPF), 2021 WL 2853438, at *6–*7 (S.D.N.Y. July 8, 2021)). While this case held that an investor remained a beneficial owner after the sale of shares, it is factually distinguishable because there, the investor retained residual power to vote and did in fact vote its shares at a stockholder meeting. *Id.* at 7. The case did not find that the seller maintained any dispositive power over the sold shares, *see id,* and Plaintiff does not argue that Defendants retained residual voting power here. *See* Pl. Opp. Indeed, under the terms of the blockers, if Defendants beneficially owned more than 9.99% of outstanding common stock, they had no "power to vote or transfer" the stock issued in excess of the cap. *See* Certificate of Amendment § 4(d); Common Warrant § 1(f). Accordingly, it is unclear how Defendants could have asserted more than 9.99% voting power despite the blockers in place. *See* Certificate of Amendment § 4(d); Common Warrant § 1(f) (both blockers provide that derivative holders would "not have the power to vote or transfer" any shares issued that exceeded the 9.99% conversion cap as they would "not be deemed to be beneficially owned" by the holders). Plaintiff also cites a Second Circuit case for the uncontroversial proposition that an investor has beneficial ownership when it has the "power to dispose of a block of securities." Pl. Opp. at 21 (quoting *Wellman v. Dickinson*, 682 F.2d 355, 365 (2d Cir. 1982)). That case merely holds that voting power is not the only measure of beneficial ownership, and it does not support Plaintiff's claim that Defendants retained dispositive power over sold shares. *See Wellman*, 682 F.2d at 365–66.

Beneficial ownership "does not turn on who owns legal title to the stock, or who is the registered owner" but "instead . . . focuses on any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised," *Chechele*, 2021 WL 2853438, at *6 (quoting *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993)). Here, Defendants had no ability to affect voting or investment power

over shares they had already sold. Accordingly, those shares should not be counted toward Defendants' beneficial ownership percentage and Plaintiff has not plausibly alleged that Defendants did not adhere to the relevant 9.99% conversion caps.[8]

In sum, BBBY's allegations do not amount to a plausible claim for relief on the theory that the blocker provisions were illusory or a sham. Thus, Plaintiff does not plausibly allege that Defendants beneficially owned the common stock underlying the Derivative Securities they held such that Defendants were over 10% beneficial owners of outstanding BBBY common stock while executing conversions and sales of the stock within a six-month period. Accordingly, Defendants' motion to dismiss is granted.

## II.  <u>Motion to Seal</u>

Plaintiff moves unopposed to file its Opposition to the pending motion to dismiss under seal and file a public version with few redactions. [ECF Nos. 35 ("Mot. to Seal Opp.")]; *see also* [ECF No. 38 ("Pl. Opp." or "Opposition")]. As described above, Plaintiff initiated this case as a miscellaneous action by filing a motion for leave to file a complaint under seal with a redacted version on the public docket. *See* Motion to Seal, *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 24-mc-206-JGK [ECF No. 1] (S.D.N.Y. Apr. 30, 2024). Plaintiff received the redacted information from Defendants pursuant to a Confidentiality Agreement in a separate lawsuit and, commendably, in this lawsuit Plaintiff has sought to protect this information from disclosure. *See* Mot. to Seal Compl. at 3, *20230930-DK-Butterfly-1*, No. 24-mc-206-JGK [ECF No. 1–2 ("Mot. to Seal Compl.")] (S.D.N.Y. Apr. 29, 2024). Plaintiff states that the purpose of

---

[8] Plaintiff makes no argument regarding the final factor that may suggest a conversion cap is illusory, that it "can be avoided by transferring the securities to an affiliate of the holder." *See* SEC *Amicus*, 2001 WL 34120374, at *25. Plaintiff's arguments regarding the remaining SEC *Amicus* factors are not persuasive because the SEC stated only that they "may indicate that a cap is binding." Pl. Opp. at 12–16. It does not follow, and the SEC never indicated, that the absence of those factors suggests a conversion cap was illusory.

sealing and redacting the Complaint was to protect from public disclosure, information regarding Defendants' terms and timing of their sales of BBBY's securities which Plaintiff alleges would reveal proprietary information about their trading strategies and harm the Defendants if disclosed. *See* Mot. to Seal Compl. at 5; Mot. to Seal Opp.[9]  The judge temporarily presiding over the case in Part One granted the motion to file the Complaint under seal.  *See* Order, *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 24-mc-206-JGK [ECF No. 4] (S.D.N.Y. Apr. 30, 2024).  Plaintiff argues that since the briefing of the pending motion to dismiss does not seek to redact any information that was not already redacted from the publicly filed version of the Complaint, the same analysis applies, and the Court should grant the motion to seal.  *See* Mot. to Seal Opp.

In assessing whether sealing is appropriate, the Court considers (1) whether the documents at issue are "judicial documents"; (2) if so, the weight of the presumption of public access attaching to any such document; and (3) whether any countervailing factors outweigh the right of public access.  *See e.g.*, *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 85 (2d Cir. 2023), *cert. denied sub nom. Abelar v. Int'l Bus. Machines Corp.*, 144 S. Ct. 827, 218 L. Ed. 2d 33 (2024); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006).

Plaintiff's Opposition and the Complaint are both judicial documents because they are "relevant to the performance of the judicial function and useful in the judicial process."  *See In re IBM Arb. Agreement Litig.*, 76 F.4th at 85 (quoting *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022)). The presumption of public access is strong to the extent that this Court relied on the Complaint and the Opposition to rule on the motion to dismiss. *See Olson*, 29 F.4th at 89–

---

[9] Defendants have filed no motion seeking protection of their own information and included only a statement in Plaintiff's initial motion to seal that they "do not oppose BBBY's requested relief, as it concerns nonpublic and sensitive information." *See* Mot. to Seal Compl. at 1 n.1.

90 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amodeo II*")) (holding that the "strongest presumption attaches where the documents 'determin[e] litigants' substantive rights.' "); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (finding that the presumption is "at its zenith" where documents "directly affect an adjudication, or are used to determine litigants' substantive legal rights" (internal quotation marks and citation omitted)).  However, to the extent those redacted allegations—and the corresponding redacted statements in the Opposition—were irrelevant to the Court's analysis, they are afforded a much weaker presumption of public access.  *See, e.g.*, *Maragh v. Roosevelt Island Operating Corp.*, No. 21-2129, 2022 WL 14199384, at *2 (2d Cir. Oct. 25, 2022) (quoting *Amodeo II*, 71 F.3d at 1050) (holding that the sealed material at issue played only a "negligible role" in the district court's decision and thus the presumption of public access was weak); *see also In re IBM Arb. Agreement Litig.*, 76 F.4th at 85 ("[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.").

This opinion relies on and cites primarily unredacted allegations from the Complaint, exhibits not under seal, and portions of the parties' briefing on the motion to dismiss that are not redacted.  Accordingly, the Court holds in accordance with the prior ruling allowing redactions in the Complaint that, to the extent redacted material is not disclosed in this Opinion, BBBY's privacy interests in its proprietary information outweigh the presumption of public access to the Opposition. *See, e.g.*, *Riseandshine Corp. v. PepsiCo Inc.*, No. 21-civ-6324 (LGS), 2024 WL 3290416, at *2 (S.D.N.Y. July 2, 2024) (granting motion to seal non-public financial information relating to companies' internal strategies); *W.J. Deutsch & Sons Ltd. v. Diego Zamora, S.A.*, No. 1:21-civ-11003-LTS, 2022 WL 890184, at *3 (S.D.N.Y. Mar. 25, 2022) (granting motion to seal

"confidential business information that is not publicly known" where the movant demonstrated that disclosure would "subject them to a competitive disadvantage"); *see also METAx LLC v. Meta Platforms, Inc.*, No. 1:22-civ-06125-LLS, 2025 WL 2753233, at *4 (S.D.N.Y. Sept. 26, 2025) ("[C]ourts have consistently found that confidential commercial information of a business— including confidential research, internal business documents and information about a business's operations[—]are the proper subject of sealing."). Accordingly, Plaintiff's motion is granted in part, and the Opposition may remain under seal with a redacted version filed on the public docket.

However, to the extent this Opinion does reveal redacted allegations in the Complaint or redacted statements from the Opposition, those allegations and statements are necessary to the Court's analysis and thus there is "no justification for sealing those materials that would outweigh the public's right of access to judicial documents necessary to understand the basis for [the Court's] rulings." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018); *see also Olson*, 29 F.4th at 89–90 (holding that "strongest presumption attaches where the documents 'determin[e] litigants' substantive rights' " and the presumption of public access is "bolstered by the fact that, . . . the public will be able to better understand and assess" the ruling of the Court if unsealed). Accordingly, as the Second Circuit held in *Spinelli* and as is a common practice of courts in this district, redacted portions of the Complaint and Opposition are unsealed only to the extent that they are revealed in this Opinion. *Spinelli*, 903 F.3d at 193 n.2; *see, e.g.*, *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 316 (S.D.N.Y.), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 262 (S.D.N.Y. 2018).

SPA-36

**CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that the Defendants' motion to dismiss is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion to seal is GRANTED in part, with the caveat that redacted portions of the Complaint, and the Opposition are unsealed only to the extent that they are revealed in this Opinion.

The Court dismisses this case with prejudice.[10]   The Clerk of Court is respectfully requested to terminate docket entries 24 and 35 and close this case.

**SO ORDERED.**

Date:  **September 30, 2025**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

---

[10] The Court does not *sua sponte* grant Plaintiff leave to amend the Complaint.  First, Plaintiff was granted an opportunity to amend the Complaint in response to issues raised in Defendants' initial pre-motion letter requesting leave to file a motion to dismiss.  [ECF Nos. 17, 21].  Plaintiff declined to amend the complaint.  [ECF No. 22]. Second, Plaintiff did not request leave to amend in its opposition to the pending motion to dismiss and thus did not demonstrate to the Court that the opportunity to amend would not be futile.  *See, e.g.*, *Treiber v. Aspen Dental Mgmt.*, Inc., 635 F. App'x 1, 4 (2d Cir. 2016).

36

SPA-37

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
20230930-DK-BUTTERFLY-1, INC. f/k/a BED
BATH & BEYOND INC.,

                         Plaintiff,

          -against-                          24 **CIVIL** 3370 (MKV)

                                               <u>**JUDGMENT**</u>

HBC INVESTMENTS LLC and HUDSON BAY
CAPITAL MANAGEMENT LP,

                         Defendants.
----------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion & Order dated September 30, 2025, Defendants' motion to dismiss

is GRANTED. Plaintiff's motion to seal is GRANTED in part, with the caveat that redacted

portions of the Complaint, and the Opposition are unsealed only to the extent that they are

revealed in the Opinion. The Court dismisses this case with prejudice; accordingly, the case is

closed.

**Dated:** New York, New York

        September 30, 2025

                                   **TAMMI M. HELLWIG**
                                   _____
                                    **Clerk of Court**

                    **BY:**          K. Mango

                                   _____
                                    **Deputy Clerk**

SPA-38

# 15 USCS § 78m

Current through Public Law 119-47, approved December 5, 2025.

*United States Code*
*TITLE*

*Service*        >
*15. COMMERCE AND TRADE (Chs. 1 — 123)*        >
*CHAPTER 2B. SECURITIES EXCHANGES (§§ 78a — 78rr)*

## § 78m. Periodical and other reports

**(a) Reports by issuer of security; contents.** Every issuer of a security registered pursuant to section 12 of this title [15 USCS § 78l] shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

**(1)** such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 12 [15 USCS § 78l], except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

**(2)** such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Every issuer of a security registered on a national securities exchange shall also file a duplicate original of such information, documents, and reports with the exchange. In any registration statement, periodic report, or other reports to be filed with the Commission, an emerging growth company need not present selected financial data in accordance with section 229.301 of title 17, Code of Federal Regulations, for any period prior to the earliest audited period presented in connection with its first registration statement that became effective under this Act or the Securities Act of 1933 [15 USCS §§ 78a et seq. or 77a et seq.] and, with respect to any such statement or reports, an emerging growth company may not be required to comply with any new or revised financial accounting standard until such date that a company that is not an issuer (as defined under section 2(a) of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201(a))) is required to comply with such new or revised accounting standard, if such standard applies to companies that are not issuers.

**(b) Form of report; books, records, and internal accounting; directives.**

**(1)** The Commission may prescribe, in regard to reports made pursuant to this title, the form or forms in which the required information shall be set forth, the items or details to be shown in the balance sheet and the earnings statement, and the methods to be followed in the preparation of reports, in the appraisal or valuation of assets and liabilities, in the determination of depreciation and depletion, in the differentiation of recurring and nonrecurring income, in the differentiation of investment and operating income, and in the preparation, where the Commission deems it necessary or desirable, of separate and/or consolidated balance sheets or income accounts of any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer; but in the case of the reports of any person whose methods of accounting are prescribed under the provisions of any law of the United States, or any rule or regulation thereunder, the rules and regulations of the Commission with respect to reports shall not be inconsistent with the requirements imposed by such law or rule or regulation in respect of the same subject matter (except that such rules and regulations of the Commission may be inconsistent with such requirements to the extent that the Commission determines that the public interest or the protection of investors so requires).

15 USCS § 78m

**(2)** Every issuer which has a class of securities registered pursuant to section 12 of this title [15 USCS § 78l] and every issuer which is required to file reports pursuant to section 15(d) of this title [15 USCS § 78o(d)] shall—

**(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

**(B)** devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

**(i)** transactions are executed in accordance with management's general or specific authorization;

**(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

**(iii)** access to assets is permitted only in accordance with management's general or specific authorization; and

**(iv)** the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and

**(C)** notwithstanding any other provision of law, pay the allocable share of such issuer of a reasonable annual accounting support fee or fees, determined in accordance with section 109 of the Sarbanes-Oxley Act of 2002.

**(3)**

**(A)** With respect to matters concerning the national security of the United States, no duty or liability under paragraph (2) of this subsection shall be imposed upon any person acting in cooperation with the head of any Federal department or agency responsible for such matters if such act in cooperation with such head of a department or agency was done upon the specific, written directive of the head of such department or agency pursuant to Presidential authority to issue such directives. Each directive issued under this paragraph shall set forth the specific facts and circumstances with respect to which the provisions of this paragraph are to be invoked. Each such directive shall, unless renewed in writing, expire one year after the date of issuance.

**(B)** Each head of a Federal department or agency of the United States who issues a directive pursuant to this paragraph shall maintain a complete file of all such directives and shall, on October 1 of each year, transmit a summary of matters covered by such directives in force at any time during the previous year to the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate.

**(4)** No criminal liability shall be imposed for failing to comply with the requirements of paragraph (2) of this subsection except as provided in paragraph (5) of this subsection.

**(5)** No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

**(6)** Where an issuer which has a class of securities registered pursuant to section 12 of this title [15 USCS § 78l] or an issuer which is required to file reports pursuant to section 15(d) of this title [15 USCS § 78o(d)] holds 50 per centum or less of the voting power with respect to a domestic or foreign firm, the provisions of paragraph (2) require only that the issuer proceed in good faith to use its influence, to the extent reasonable under the issuer's circumstances, to cause such domestic or foreign firm to devise and maintain a system of internal accounting controls consistent with paragraph (2). Such circumstances include the relative degree of the issuer's ownership of the domestic or foreign firm and the laws and practices governing the business operations of the country in which such firm is located. An issuer which demonstrates good faith efforts to use such influence shall be conclusively presumed to have complied with the requirements of paragraph (2).

15 USCS § 78m

**(7)** For the purpose of paragraph (2) of this subsection, the terms "reasonable assurances" and "reasonable detail" mean such level of detail and degree of assurance as would satisfy prudent officials in the conduct of their own affairs.

**(c) Alternative reports.** If in the judgment of the Commission any report required under subsection (a) is inapplicable to any specified class or classes of issuers, the Commission shall require in lieu thereof the submission of such reports of comparable character as it may deem applicable to such class or classes of issuers.

**(d) Reports by persons acquiring more than five per centum of certain classes of securities.**

**(1)** Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title [15 USCS § 78l], or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g)(2)(G) of this title [15 USCS § 78l(g)(2)(G)], or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940 [15 USCS §§ 80a-1 et seq.] or any equity security issued by a Native Corporation pursuant to section 37(d)(6) of the Alaska Native Claims Settlement Act [43 USCS § 1629c(d)(6)], or otherwise becomes or is deemed to become a beneficial owner of any of the foregoing upon the purchase or sale of a security-based swap that the Commission may define by rule, and is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition or within such shorter time as the Commission may establish by rule, file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

**(A)** the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

**(B)** the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 3(a)(6) of this title [15 USCS § 78c(a)(6)], if the person filing such statement so requests, the name of the bank shall not be made available to the public;

**(C)** if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

**(D)** the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

**(E)** information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

**(2)** If any material change occurs in the facts set forth, and in the statement filed with the Commission, an amendment shall be filed with the Commission, in accordance with such rules and regulations as

SPA-41

15 USCS § 78m

the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(3)** When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

**(4)** In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

**(5)** The Commission, by rule or regulation or by order, may permit any person to file in lieu of the statement required by paragraph (1) of this subsection or the rules and regulations thereunder, a notice stating the name of such person, the number of shares of any equity securities subject to paragraph (1) which are owned by him, the date of their acquisition and such other information as the Commission may specify, if it appears to the Commission that such securities were acquired by such person in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer nor in connection with or as a participant in any transaction having such purpose or effect.

**(6)** The provisions of this subsection shall not apply to—

    **(A)** any acquisition or offer to acquire securities made or proposed to be made by means of a registration statement under the Securities Act of 1933 [15 USCS §§ 77a et seq.];

    **(B)** any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class;

    **(C)** any acquisition of an equity security by the issuer of such security;

    **(D)** any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection.

**(e) Purchase of securities by issuer.**

    **(1)** It shall be unlawful for an issuer which has a class of equity securities registered pursuant to section 12 of this title [15 USCS § 78l], or which is a closed-end investment company registered under the Investment Company Act of 1940 [15 USCS §§ 80a-1 et seq.], to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the Commission, in the public interest or for the protection of investors, may adopt (A) to define acts and practices which are fraudulent, deceptive, or manipulative, and (B) to prescribe means reasonably designed to prevent such acts and practices. Such rules and regulations may require such issuer to provide holders of equity securities of such class with such information relating to the reasons for such purchase, the source of funds, the number of shares to be purchased, the price to be paid for such securities, the method of purchase, and such additional information, as the Commission deems necessary or appropriate in the public interest or for the protection of investors, or which the Commission deems to be material to a determination whether such security should be sold.

    **(2)** For the purpose of this subsection, a purchase by or for the issuer or any person controlling, controlled by, or under common control with the issuer, or a purchase subject to control of the issuer or any such person, shall be deemed to be a purchase by the issuer. The Commission shall have power to make rules and regulations implementing this paragraph in the public interest and for the protection of investors, including exemptive rules and regulations covering situations in which the Commission deems it unnecessary or inappropriate that a purchase of the type described in this paragraph shall be deemed to be a purchase by the issuer for purposes of some or all of the provisions of paragraph (1) of this subsection.

15 USCS § 78m

**(3)** At the time of filing such statement as the Commission may require by rule pursuant to paragraph (1) of this subsection, the person making the filing shall pay to the Commission a fee at a rate that, subject to paragraph (4), is equal to $92 per $1,000,000 of the value of securities proposed to be purchased. The fee shall be reduced with respect to securities in an amount equal to any fee paid with respect to any securities issued in connection with the proposed transaction under section 6(b) of the Securities Act of 1933 [15 USCS § 77f(b)], or the fee paid under that section [15 USCS § 77f(b)] shall be reduced in an amount equal to the fee paid to the Commission in connection with such transaction under this paragraph.

**(4)** Annual adjustment. For each fiscal year, the Commission shall by order adjust the rate required by paragraph (3) for such fiscal year to a rate that is equal to the rate (expressed in dollars per million) that is applicable under section 6(b) of the Securities Act of 1933 [15 USCS § 77f(b)] for such fiscal year.

**(5)** Fee collections. Fees collected pursuant to this subsection for fiscal year 2012 and each fiscal year thereafter shall be deposited and credited as general revenue of the Treasury and shall not be available for obligation.

**(6)** Effective date; publication. In exercising its authority under this subsection, the Commission shall not be required to comply with the provisions of section 553 of title 5, United States Code. An adjusted rate prescribed under paragraph (4) shall be published and take effect in accordance with section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)).

**(7)** Pro rata application. The rates per $1,000,000 required by this subsection shall be applied pro rata to amounts and balances of less than $1,000,000.

**(8)–(10)** [Deleted]

**(f) Reports by institutional investment managers.**

**(1)** Every institutional investment manager which uses the mails, or any means or instrumentality of interstate commerce in the course of its business as an institutional investment manager and which exercises investment discretion with respect to accounts holding equity securities of a class described in section 13(d)(1) of this title or otherwise becomes or is deemed to become a beneficial owner of any security of a class described in subsection (d)(1) upon the purchase or sale of a security-based swap that the Commission may define by rule, having an aggregate fair market value on the last trading day in any of the preceding twelve months of at least $100,000,000 or such lesser amount (but in no case less than $10,000,000) as the Commission, by rule, may determine, shall file reports with the Commission in such form, for such periods, and at such times after the end of such periods as the Commission, by rule, may prescribe, but in no event shall such reports be filed for periods longer than one year or shorter than one quarter. Such reports shall include for each such equity security held on the last day of the reporting period by accounts (in aggregate or by type as the Commission, by rule, may prescribe) with respect to which the institutional investment manager exercises investment discretion (other than securities held in amounts which the Commission, by rule, determines to be insignificant for purposes of this subsection), the name of the issuer and the title, class, CUSIP number, number of shares or principal amount, and aggregate fair market value of each such security. Such reports may also include for accounts (in aggregate or by type) with respect to which the institutional investment manager exercises investment discretion such of the following information as the Commission, by rule, prescribes—

**(A)** the name of the issuer and the title, class, CUSIP number, number of shares or principal amount, and aggregate fair market value or cost or amortized cost of each other security (other than an exempted security) held on the last day of the reporting period by such accounts;

**(B)** the aggregate fair market value or cost or amortized cost of exempted securities (in aggregate or by class) held on the last day of the reporting period by such accounts;

**(C)** the number of shares of each equity security of a class described in section 13(d)(1) of this title [subsec. (d)(1) of this section] held on the last day of the reporting period by such accounts with

15 USCS § 78m

respect to which the institutional investment manager possesses sole or shared authority to exercise the voting rights evidenced by such securities;

**(D)** the aggregate purchases and aggregate sales during the reporting period of each security (other than an exempted security) effected by or for such accounts; and

**(E)** with respect to any transaction or series of transactions having a market value of at least $500,000 or such other amount as the Commission, by rule, may determine, effected during the reporting period by or for such accounts in any equity security of a class described in section 13(d)(1) of this title [subsec. (d)(1) of this section]—

    **(i)** the name of the issuer and the title, class, and CUSIP number of the security;

    **(ii)** the number of shares or principal amount of the security involved in the transaction;

    **(iii)** whether the transaction was a purchase or sale;

    **(iv)** the per share price or prices at which the transaction was effected;

    **(v)** the date or dates of the transaction;

    **(vi)** the date or dates of the settlement of the transaction;

    **(vii)** the broker or dealer through whom the transaction was effected;

    **(viii)** the market or markets in which the transaction was effected; and

    **(ix)** such other related information as the Commission, by rule, may prescribe.

**(2)** The Commission shall prescribe rules providing for the public disclosure of the name of the issuer and the title, class, CUSIP number, aggregate amount of the number of short sales of each security, and any additional information determined by the Commission following the end of the reporting period. At a minimum, such public disclosure shall occur every month.

**(3)** The Commission, by rule or order, may exempt, conditionally or unconditionally, any institutional investment manager or security or any class of institutional investment managers or securities from any or all of the provisions of this subsection or the rules thereunder.

**(4)** The Commission shall make available to the public for a reasonable fee a list of all equity securities of a class described in section 13(d)(1) of this title [subsec. (d)(1) of this section], updated no less frequently than reports are required to be filed pursuant to paragraph (1) of this subsection. The Commission shall tabulate the information contained in any report filed pursuant to this subsection in a manner which will, in the view of the Commission, maximize the usefulness of the information to other Federal and State authorities and the public. Promptly after the filing of any such report, the Commission shall make the information contained therein conveniently available to the public for a reasonable fee in such form as the Commission, by rule, may prescribe, except that the Commission, as it determines to be necessary or appropriate in the public interest or for the protection of investors, may delay or prevent public disclosure of any such information in accordance with section 552 of title 5, United States Code. Notwithstanding the preceding sentence, any such information identifying the securities held by the account of a natural person or an estate or trust (other than a business trust or investment company) shall not be disclosed to the public.

**(5)** In exercising its authority under this subsection, the Commission shall determine (and so state) that its action is necessary or appropriate in the public interest and for the protection of investors or to maintain fair and orderly markets or, in granting an exemption, that its action is consistent with the protection of investors and the purposes of this subsection. In exercising such authority the Commission shall take such steps as are within its power, including consulting with the Comptroller General of the United States, the Director of the Office of Management and Budget, the appropriate regulatory agencies, Federal and State authorities which, directly or indirectly, require reports from institutional investment managers of information substantially similar to that called for by this subsection, national securities exchanges, and registered securities associations, (A) to achieve

15 USCS § 78m

uniform, centralized reporting of information concerning the securities holdings of and transactions by or for accounts with respect to which institutional investment managers exercise investment discretion, and (B) consistently with the objective set forth in the preceding subparagraph, to avoid unnecessarily duplicative reporting by, and minimize the compliance burden on, institutional investment managers. Federal authorities which, directly or indirectly, require reports from institutional investment managers of information substantially similar to that called for by this subsection shall cooperate with the Commission in the performance of its responsibilities under the preceding sentence. An institutional investment manager which is a bank, the deposits of which are insured in accordance with the Federal Deposit Insurance Act, shall file with the appropriate regulatory agency a copy of every report filed with the Commission pursuant to this subsection.

**(6)**

    **(A)** For purposes of this subsection the term "institutional investment manager" includes any person, other than a natural person, investing in or buying and selling securities for its own account, and any person exercising investment discretion with respect to the account of any other person.

    **(B)** The Commission shall adopt such rules as it deems necessary or appropriate to prevent duplicative reporting pursuant to this subsection by two or more institutional investment managers exercising investment discretion with respect to the same amount [account].

**(g) Statement of equity security ownership.**

    **(1)** Any person who is directly or indirectly the beneficial owner of more than 5 per centum of any security of a class described in subsection (d)(1) of this section or otherwise becomes or is deemed to become a beneficial owner of any security of a class described in subsection (d)(1) upon the purchase or sale of a security-based swap that the Commission may define by rule shall file with the Commission a statement setting forth, in such form and at such time as the Commission may, by rule, prescribe—

        **(A)** such person's identity, residence, and citizenship; and

        **(B)** the number and description of the shares in which such person has an interest and the nature of such interest.

    **(2)** If any material change occurs in the facts set forth in the statement filed with the Commission, an amendment shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

    **(3)** When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

    **(4)** In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

    **(5)** In exercising its authority under this subsection, the Commission shall take such steps as it deems necessary or appropriate in the public interest or for the protection of investors (A) to achieve centralized reporting of information regarding ownership, (B) to avoid unnecessarily duplicative reporting by and minimize the compliance burden on persons required to report, and (C) to tabulate and promptly make available the information contained in any report filed pursuant to this subsection in a manner which will, in the view of the Commission, maximize the usefulness of the information to other Federal and State agencies and the public.

    **(6)** The Commission may, by rule or order, exempt, in whole or in part, any person or class of persons from any or all of the reporting requirements of this subsection as it deems necessary or appropriate in the public interest or for the protection of investors.

15 USCS § 78m

**(h) Large trader reporting.**

    **(1)** Identification requirements for large traders. For the purpose of monitoring the impact on the securities markets of securities transactions involving a substantial volume or a large fair market value or exercise value and for the purpose of otherwise assisting the Commission in the enforcement of this title, each large trader shall—

        **(A)** provide such information to the Commission as the Commission may by rule or regulation prescribe as necessary or appropriate, identifying such large trader and all accounts in or through which such large trader effects such transactions; and

        **(B)** identify, in accordance with such rules or regulations as the Commission may prescribe as necessary or appropriate, to any registered broker or dealer by or through whom such large trader directly or indirectly effects securities transactions, such large trader and all accounts directly or indirectly maintained with such broker or dealer by such large trader in or through which such transactions are effected.

    **(2)** Recordkeeping and reporting requirements for brokers and dealers. Every registered broker or dealer shall make and keep for prescribed periods such records as the Commission by rule or regulation prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this title, with respect to securities transactions that equal or exceed the reporting activity level effected directly or indirectly by or through such registered broker or dealer of or for any person that such broker or dealer knows is a large trader, or any person that such broker or dealer has reason to know is a large trader on the basis of transactions in securities effected by or through such broker or dealer. Such records shall be available for reporting to the Commission, or any self-regulatory organization that the Commission shall designate to receive such reports, on the morning of the day following the day the transactions were effected, and shall be reported to the Commission or a self-regulatory organization designated by the Commission immediately upon request by the Commission or such a self-regulatory organization. Such records and reports shall be in a format and transmitted in a manner prescribed by the Commission (including, but not limited to, machine readable form).

    **(3)** Aggregation rules. The Commission may prescribe rules or regulations governing the manner in which transactions and accounts shall be aggregated for the purpose of this subsection, including aggregation on the basis of common ownership or control.

    **(4)** Examination of broker and dealer records. All records required to be made and kept by registered brokers and dealers pursuant to this subsection with respect to transactions effected by large traders are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deems necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this title.

    **(5)** Factors to be considered in Commission actions. In exercising its authority under this subsection, the Commission shall take into account—

        **(A)** existing reporting systems;

        **(B)** the costs associated with maintaining information with respect to transactions effected by large traders and reporting such information to the Commission or self-regulatory organizations; and

        **(C)** the relationship between the United States and international securities markets.

    **(6)** Exemptions. The Commission, by rule, regulation, or order, consistent with the purposes of this title, may exempt any person or class of persons or any transaction or class of transactions, either conditionally or upon specified terms and conditions or for stated periods, from the operation of this subsection, and the rules and regulations thereunder.

15 USCS § 78m

**(7)** Authority of Commission to limit disclosure of information. Notwithstanding any other provision of law, the Commission shall not be compelled to disclose any information required to be kept or reported under this subsection. Nothing in this subsection shall authorize the Commission to withhold information from Congress, or prevent the Commission from complying with a request for information from any other Federal department or agency requesting information for purposes within the scope of its jurisdiction, or complying with an order of a court of the United States in an action brought by the United States or the Commission. For purposes of section 552 of title 5, United States Code, this subsection shall be considered a statute described in subsection (b)(3)(B) of such section 552.

**(8)** Definitions. For purposes of this subsection—

**(A)** the term "large trader" means every person who, for his own account or an account for which he exercises investment discretion, effects transactions for the purchase or sale of any publicly traded security or securities by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of a national securities exchange, directly or indirectly by or through a registered broker or dealer in an aggregate amount equal to or in excess of the identifying activity level;

**(B)** the term "publicly traded security" means any equity security (including an option on individual equity securities, and an option on a group or index of such securities) listed, or admitted to unlisted trading privileges, on a national securities exchange, or quoted in an automated interdealer quotation system;

**(C)** the term "identifying activity level" means transactions in publicly traded securities at or above a level of volume, fair market value, or exercise value as shall be fixed from time to time by the Commission by rule or regulation, specifying the time interval during which such transactions shall be aggregated;

**(D)** the term "reporting activity level" means transactions in publicly traded securities at or above a level of volume, fair market value, or exercise value as shall be fixed from time to time by the Commission by rule, regulation, or order, specifying the time interval during which such transactions shall be aggregated; and

**(E)** the term "person" has the meaning given in section 3(a)(9) of this title [15 USCS § 78c(a)(9)] and also includes two or more persons acting as a partnership, limited partnership, syndicate, or other group, but does not include a foreign central bank.

**(i) Accuracy of financial reports.** Each financial report that contains financial statements, and that is required to be prepared in accordance with (or reconciled to) generally accepted accounting principles under this title and filed with the Commission shall reflect all material correcting adjustments that have been identified by a registered public accounting firm in accordance with generally accepted accounting principles and the rules and regulations of the Commission.

**(j) Off-balance sheet transactions.** Not later than 180 days after the date of enactment of the Sarbanes-Oxley Act of 2002 [enacted July 30, 2002], the Commission shall issue final rules providing that each annual and quarterly financial report required to be filed with the Commission shall disclose all material off-balance sheet transactions, arrangements, obligations (including contingent obligations), and other relationships of the issuer with unconsolidated entities or other persons, that may have a material current or future effect on financial condition, changes in financial condition, results of operations, liquidity, capital expenditures, capital resources, or significant components of revenues or expenses.

**(k) Prohibition on personal loans to executives.**

**(1)** In general. It shall be unlawful for any issuer (as defined in section 2 of the Sarbanes-Oxley Act of 2002 [15 USCS § 7201]), directly or indirectly, including through any subsidiary, to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer. An extension of credit maintained by the issuer on the date of enactment of this subsection [enacted July 30, 2002]

15 USCS § 78m

shall not be subject to the provisions of this subsection, provided that there is no material modification to any term of any such extension of credit or any renewal of any such extension of credit on or after that date of enactment.

**(2)** Limitation. Paragraph (1) does not preclude any home improvement and manufactured home loans (as that term is defined in section 5 of the Home Owners' Loan Act (12 U.S.C. 1464)), consumer credit (as defined in section 103 of the Truth in Lending Act (15 U.S.C. 1602)), or any extension of credit under an open end credit plan (as defined in section 103 of the Truth in Lending Act (15 U.S.C. 1602)), or a charge card (as defined in section 127(c)(4)(e) of the Truth in Lending Act (15 U.S.C. 1637(c)(4)(e)), or any extension of credit by a broker or dealer registered under section 15 of this title [15 USCS § 78o] to an employee of that broker or dealer to buy, trade, or carry securities, that is permitted under rules or regulations of the Board of Governors of the Federal Reserve System pursuant to section 7 of this title [15 USCS § 78g] (other than an extension of credit that would be used to purchase the stock of that issuer), that is—

**(A)** made or provided in the ordinary course of the consumer credit business of such issuer;

**(B)** of a type that is generally made available by such issuer to the public; and

**(C)** made by such issuer on market terms, or terms that are no more favorable than those offered by the issuer to the general public for such extensions of credit.

**(3)** Rule of construction for certain loans. Paragraph (1) does not apply to any loan made or maintained by an insured depository institution (as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), if the loan is subject to the insider lending restrictions of section 22(h) of the Federal Reserve Act (12 U.S.C. 375b).

**(l) Real time issuer disclosures.** Each issuer reporting under section 13(a) or 15(d) [15 USCS § 78m(a) or 78o(d)] shall disclose to the public on a rapid and current basis such additional information concerning material changes in the financial condition or operations of the issuer, in plain English, which may include trend and qualitative information and graphic presentations, as the Commission determines, by rule, is necessary or useful for the protection of investors and in the public interest.

**(m) Public availability of security-based swap transaction data.**

**(1)** In general.

**(A)** Definition of real-time public reporting. In this paragraph, the term "real-time public reporting" means to report data relating to a security-based swap transaction, including price and volume, as soon as technologically practicable after the time at which the security-based swap transaction has been executed.

**(B)** Purpose. The purpose of this subsection is to authorize the Commission to make security-based swap transaction and pricing data available to the public in such form and at such times as the Commission determines appropriate to enhance price discovery.

**(C)** General rule. The Commission is authorized to provide by rule for the public availability of security-based swap transaction, volume, and pricing data as follows:

**(i)** With respect to those security-based swaps that are subject to the mandatory clearing requirement described in section 3C(a)(1) [15 USCS § 78c-3(a)(1)] (including those security-based swaps that are excepted from the requirement pursuant to section 3C(g) [15 USCS § 78c-3(g)]), the Commission shall require real-time public reporting for such transactions.

**(ii)** With respect to those security-based swaps that are not subject to the mandatory clearing requirement described in section 3C(a)(1) [15 USCS § 78c-3(a)(1)], but are cleared at a registered clearing agency, the Commission shall require real-time public reporting for such transactions.

**(iii)** With respect to security-based swaps that are not cleared at a registered clearing agency and which are reported to a security-based swap data repository or the Commission under

section 3C(a)(6), the Commission shall require real-time public reporting for such transactions, in a manner that does not disclose the business transactions and market positions of any person.

**(iv)** With respect to security-based swaps that are determined to be required to be cleared under section 3C(b) [15 USCS § 78c-3(b)] but are not cleared, the Commission shall require real-time public reporting for such transactions.

**(D)** Registered entities and public reporting. The Commission may require registered entities to publicly disseminate the security-based swap transaction and pricing data required to be reported under this paragraph.

**(E)** Rulemaking required. With respect to the rule providing for the public availability of transaction and pricing data for security-based swaps described in clauses (i) and (ii) of subparagraph (C), the rule promulgated by the Commission shall contain provisions—

**(i)** to ensure such information does not identify the participants;

**(ii)** to specify the criteria for determining what constitutes a large notional security-based swap transaction (block trade) for particular markets and contracts;

**(iii)** to specify the appropriate time delay for reporting large notional security-based swap transactions (block trades) to the public; and

**(iv)** that take into account whether the public disclosure will materially reduce market liquidity.

**(F)** Timeliness of reporting. Parties to a security-based swap (including agents of the parties to a security-based swap) shall be responsible for reporting security-based swap transaction information to the appropriate registered entity in a timely manner as may be prescribed by the Commission.

**(G)** Reporting of swaps to registered security-based swap data repositories. Each security-based swap (whether cleared or uncleared) shall be reported to a registered security-based swap data repository.

**(H)** Registration of clearing agencies. A clearing agency may register as a security-based swap data repository.

**(2)** Semiannual and annual public reporting of aggregate security-based swap data.

**(A)** In general. In accordance with subparagraph (B), the Commission shall issue a written report on a semiannual and annual basis to make available to the public information relating to—

**(i)** the trading and clearing in the major security-based swap categories; and

**(ii)** the market participants and developments in new products.

**(B)** Use; consultation. In preparing a report under subparagraph (A), the Commission shall—

**(i)** use information from security-based swap data repositories and clearing agencies; and

**(ii)** consult with the Office of the Comptroller of the Currency, the Bank for International Settlements, and such other regulatory bodies as may be necessary.

**(C)** Authority of Commission. The Commission may, by rule, regulation, or order, delegate the public reporting responsibilities of the Commission under this paragraph in accordance with such terms and conditions as the Commission determines to be appropriate and in the public interest.

**(n) Security-based swap data repositories.**

**(1)** Registration requirement. It shall be unlawful for any person, unless registered with the Commission, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a security-based swap data repository.

**(2)** Inspection and examination. Each registered security-based swap data repository shall be subject to inspection and examination by any representative of the Commission.

**(3)** Compliance with core principles.

**(A)** In general. To be registered, and maintain registration, as a security-based swap data repository, the security-based swap data repository shall comply with—

**(i)** the requirements and core principles described in this subsection; and

**(ii)** any requirement that the Commission may impose by rule or regulation.

**(B)** Reasonable discretion of security-based swap data repository. Unless otherwise determined by the Commission, by rule or regulation, a security-based swap data repository described in subparagraph (A) shall have reasonable discretion in establishing the manner in which the security-based swap data repository complies with the core principles described in this subsection.

**(4)** Standard setting.

**(A)** Data identification.

**(i)** In general. In accordance with clause (ii), the Commission shall prescribe standards that specify the data elements for each security-based swap that shall be collected and maintained by each registered security-based swap data repository.

**(ii)** Requirement. In carrying out clause (i), the Commission shall prescribe consistent data element standards applicable to registered entities and reporting counterparties.

**(B)** Data collection and maintenance. The Commission shall prescribe data collection and data maintenance standards for security-based swap data repositories.

**(C)** Comparability. The standards prescribed by the Commission under this subsection shall be comparable to the data standards imposed by the Commission on clearing agencies in connection with their clearing of security-based swaps.

**(5)** Duties. A security-based swap data repository shall—

**(A)** accept data prescribed by the Commission for each security-based swap under subsection (b);

**(B)** confirm with both counterparties to the security-based swap the accuracy of the data that was submitted;

**(C)** maintain the data described in subparagraph (A) in such form, in such manner, and for such period as may be required by the Commission;

**(D)**

**(i)** provide direct electronic access to the Commission (or any designee of the Commission, including another registered entity); and

**(ii)** provide the information described in subparagraph (A) in such form and at such frequency as the Commission may require to comply with the public reporting requirements set forth in subsection (m);

**(E)** at the direction of the Commission, establish automated systems for monitoring, screening, and analyzing security-based swap data;

**(F)** maintain the privacy of any and all security-based swap transaction information that the security-based swap data repository receives from a security-based swap dealer, counterparty, or any other registered entity; and

**(G)** on a confidential basis pursuant to section 24 [15 USCS § 78x], upon request, and after notifying the Commission of the request, make available security-based swap data obtained by the security-based swap data repository, including individual counterparty trade and position data, to—

SPA-50

15 USCS § 78m

      **(i)** each appropriate prudential regulator;

      **(ii)** the Financial Stability Oversight Council;

      **(iii)** the Commodity Futures Trading Commission;

      **(iv)** the Department of Justice; and

      **(v)** any other person that the Commission determines to be appropriate, including—

          **(I)** foreign financial supervisors (including foreign futures authorities);

          **(II)** foreign central banks;

          **(III)** foreign ministries; and

          **(IV)** other foreign authorities.

  **(H)** Confidentiality agreement. Before the security-based swap data repository may share information with any entity described in subparagraph (G), the security-based swap data repository shall receive a written agreement from each entity stating that the entity shall abide by the confidentiality requirements described in section 24 [15 USCS § 78x] relating to the information on security-based swap transactions that is provided.

**(6)** Designation of chief compliance officer.

  **(A)** In general. Each security-based swap data repository shall designate an individual to serve as a chief compliance officer.

  **(B)** Duties. The chief compliance officer shall—

    **(i)** report directly to the board or to the senior officer of the security-based swap data repository;

    **(ii)** review the compliance of the security-based swap data repository with respect to the requirements and core principles described in this subsection;

    **(iii)** in consultation with the board of the security-based swap data repository, a body performing a function similar to the board of the security-based swap data repository, or the senior officer of the security-based swap data repository, resolve any conflicts of interest that may arise;

    **(iv)** be responsible for administering each policy and procedure that is required to be established pursuant to this section;

    **(v)** ensure compliance with this title [15 USCS §§ 78a et seq.] (including regulations) relating to agreements, contracts, or transactions, including each rule prescribed by the Commission under this section;

    **(vi)** establish procedures for the remediation of noncompliance issues identified by the chief compliance officer through any—

        **(I)** compliance office review;

        **(II)** look-back;

        **(III)** internal or external audit finding;

        **(IV)** self-reported error; or

        **(V)** validated complaint; and

    **(vii)** establish and follow appropriate procedures for the handling, management response, remediation, retesting, and closing of noncompliance issues.

  **(C)** Annual reports.

15 USCS § 78m

**(i)** In general. In accordance with rules prescribed by the Commission, the chief compliance officer shall annually prepare and sign a report that contains a description of—

**(I)** the compliance of the security-based swap data repository of the chief compliance officer with respect to this title [15 USCS §§ 78a et seq.] (including regulations); and

**(II)** each policy and procedure of the security-based swap data repository of the chief compliance officer (including the code of ethics and conflict of interest policies of the security-based swap data repository).

**(ii)** Requirements. A compliance report under clause (i) shall—

**(I)** accompany each appropriate financial report of the security-based swap data repository that is required to be furnished to the Commission pursuant to this section; and

**(II)** include a certification that, under penalty of law, the compliance report is accurate and complete.

**(7)** Core principles applicable to security-based swap data repositories.

**(A)** Antitrust considerations. Unless necessary or appropriate to achieve the purposes of this title [15 USCS §§ 78a et seq.], the swap data repository shall not—

**(i)** adopt any rule or take any action that results in any unreasonable restraint of trade; or

**(ii)** impose any material anticompetitive burden on the trading, clearing, or reporting of transactions.

**(B)** Governance arrangements. Each security-based swap data repository shall establish governance arrangements that are transparent—

**(i)** to fulfill public interest requirements; and

**(ii)** to support the objectives of the Federal Government, owners, and participants.

**(C)** Conflicts of interest. Each security-based swap data repository shall—

**(i)** establish and enforce rules to minimize conflicts of interest in the decision-making process of the security-based swap data repository; and

**(ii)** establish a process for resolving any conflicts of interest described in clause (i).

**(D)** Additional duties developed by Commission.

**(i)** In general. The Commission may develop 1 or more additional duties applicable to security-based swap data repositories.

**(ii)** Consideration of evolving standards. In developing additional duties under subparagraph (A) [clause (i)], the Commission may take into consideration any evolving standard of the United States or the international community.

**(iii)** Additional duties for Commission designees. The Commission shall establish additional duties for any registrant described in section 13(m)(2)(C) [subsec. (m)(2)(C) of this section] in order to minimize conflicts of interest, protect data, ensure compliance, and guarantee the safety and security of the security-based swap data repository.

**(8)** Required registration for security-based swap data repositories. Any person that is required to be registered as a security-based swap data repository under this subsection shall register with the Commission, regardless of whether that person is also licensed under the Commodity Exchange Act [7 USCS §§ 1 et seq.] as a swap data repository.

**(9)** Rules. The Commission shall adopt rules governing persons that are registered under this subsection.

15 USCS § 78m

**(o) Beneficial ownership.** For purposes of this section and section 16 [15 USCS § 78p], a person shall be deemed to acquire beneficial ownership of an equity security based on the purchase or sale of a security-based swap, only to the extent that the Commission, by rule, determines after consultation with the prudential regulators and the Secretary of the Treasury, that the purchase or sale of the security-based swap, or class of security-based swap, provides incidents of ownership comparable to direct ownership of the equity security, and that it is necessary to achieve the purposes of this section that the purchase or sale of the security-based swaps, or class of security-based swap, be deemed the acquisition of beneficial ownership of the equity security.

**(p) Disclosures relating to conflict minerals originating in the Democratic Republic of the Congo.**

    **(1)** Regulations.

        **(A)** In general. Not later than 270 days after the date of the enactment of this subsection [enacted July 21, 2010], the Commission shall promulgate regulations requiring any person described in paragraph (2) to disclose annually, beginning with the person's first full fiscal year that begins after the date of promulgation of such regulations, whether conflict minerals that are necessary as described in paragraph (2)(B), in the year for which such reporting is required, did originate in the Democratic Republic of the Congo or an adjoining country and, in cases in which such conflict minerals did originate in any such country, submit to the Commission a report that includes, with respect to the period covered by the report—

            **(i)** a description of the measures taken by the person to exercise due diligence on the source and chain of custody of such minerals, which measures shall include an independent private sector audit of such report submitted through the Commission that is conducted in accordance with standards established by the Comptroller General of the United States, in accordance with rules promulgated by the Commission, in consultation with the Secretary of State; and

            **(ii)** a description of the products manufactured or contracted to be manufactured that are not DRC conflict free ("DRC conflict free" is defined to mean the products that do not contain minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country), the entity that conducted the independent private sector audit in accordance with clause (i), the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.

        **(B)** Certification. The person submitting a report under subparagraph (A) shall certify the audit described in clause (i) of such subparagraph that is included in such report. Such a certified audit shall constitute a critical component of due diligence in establishing the source and chain of custody of such minerals.

        **(C)** Unreliable determination. If a report required to be submitted by a person under subparagraph (A) relies on a determination of an independent private sector audit, as described under subparagraph (A)(i), or other due diligence processes previously determined by the Commission to be unreliable, the report shall not satisfy the requirements of the regulations promulgated under subparagraph (A)(i).

        **(D)** DRC conflict free. For purposes of this paragraph, a product may be labeled as 'DRC conflict free' if the product does not contain conflict minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country.

        **(E)** Information available to the public. Each person described under paragraph (2) shall make available to the public on the Internet website of such person the information disclosed by such person under subparagraph (A).

    **(2)** Person described. A person is described in this paragraph if—

        **(A)** the person is required to file reports with the Commission pursuant to paragraph (1)(A); and

15 USCS § 78m

**(B)** conflict minerals are necessary to the functionality or production of a product manufactured by such person.

**(3)** Revisions and waivers. The Commission shall revise or temporarily waive the requirements described in paragraph (1) if the President transmits to the Commission a determination that—

**(A)** such revision or waiver is in the national security interest of the United States and the President includes the reasons therefor; and

**(B)** establishes a date, not later than 2 years after the initial publication of such exemption, on which such exemption shall expire.

**(4)** Termination of disclosure requirements. The requirements of paragraph (1) shall terminate on the date on which the President determines and certifies to the appropriate congressional committees, but in no case earlier than the date that is one day after the end of the 5-year period beginning on the date of the enactment of this subsection, that no armed groups continue to be directly involved and benefitting from commercial activity involving conflict minerals.

**(5)** Definitions. For purposes of this subsection, the terms "adjoining country", "appropriate congressional committees", "armed group", and "conflict mineral" have the meaning given those terms under section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act [note to this section].

**(q) Disclosure of payments by resource extraction issuers.**

**(1)** Definitions. In this subsection—

**(A)** the term "commercial development of oil, natural gas, or minerals" includes exploration, extraction, processing, export, and other significant actions relating to oil, natural gas, or minerals, or the acquisition of a license for any such activity, as determined by the Commission;

**(B)** the term "foreign government" means a foreign government, a department, agency, or instrumentality of a foreign government, or a company owned by a foreign government, as determined by the Commission;

**(C)** the term "payment"—

**(i)** means a payment that is—

**(I)** made to further the commercial development of oil, natural gas, or minerals; and

**(II)** not de minimis; and

**(ii)** includes taxes, royalties, fees (including license fees), production entitlements, bonuses, and other material benefits, that the Commission, consistent with the guidelines of the Extractive Industries Transparency Initiative (to the extent practicable), determines are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals;

**(D)** the term "resource extraction issuer" means an issuer that—

**(i)** is required to file an annual report with the Commission; and

**(ii)** engages in the commercial development of oil, natural gas, or minerals;

**(E)** the term "interactive data format" means an electronic data format in which pieces of information are identified using an interactive data standard; and

**(F)** the term "interactive data standard" means [a] standardized list of electronic tags that mark information included in the annual report of a resource extraction issuer.

**(2)** Disclosure.

15 USCS § 78m

**(A)** Information required. Not later than 270 days after the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act [enacted July 21, 2010], the Commission shall issue final rules that require each resource extraction issuer to include in an annual report of the resource extraction issuer information relating to any payment made by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer to a foreign government or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals, including—

    **(i)** the type and total amount of such payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals; and

    **(ii)** the type and total amount of such payments made to each government.

**(B)** Consultation in rulemaking. In issuing rules under subparagraph (A), the Commission may consult with any agency or entity that the Commission determines is relevant.

**(C)** Interactive data format. The rules issued under subparagraph (A) shall require that the information included in the annual report of a resource extraction issuer be submitted in an interactive data format.

**(D)** Interactive data standard.

    **(i)** In general. The rules issued under subparagraph (A) shall establish an interactive data standard for the information included in the annual report of a resource extraction issuer.

    **(ii)** Electronic tags. The interactive data standard shall include electronic tags that identify, for any payments made by a resource extraction issuer to a foreign government or the Federal Government—

        **(I)** the total amounts of the payments, by category;

        **(II)** the currency used to make the payments;

        **(III)** the financial period in which the payments were made;

        **(IV)** the business segment of the resource extraction issuer that made the payments;

        **(V)** the government that received the payments, and the country in which the government is located;

        **(VI)** the project of the resource extraction issuer to which the payments relate; and

        **(VII)** such other information as the Commission may determine is necessary or appropriate in the public interest or for the protection of investors.

**(E)** International transparency efforts. To the extent practicable, the rules issued under subparagraph (A) shall support the commitment of the Federal Government to international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals.

**(F)** Effective date. With respect to each resource extraction issuer, the final rules issued under subparagraph (A) shall take effect on the date on which the resource extraction issuer is required to submit an annual report relating to the fiscal year of the resource extraction issuer that ends not earlier than 1 year after the date on which the Commission issues final rules under subparagraph (A).

**(3)** Public availability of information.

    **(A)** In general. To the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A).

15 USCS § 78m

**(B)** Other information. Nothing in this paragraph shall require the Commission to make available online information other than the information required to be submitted under the rules issued under paragraph (2)(A).

**(4)** Authorization of appropriations. There are authorized to be appropriated to the Commission such sums as may be necessary to carry out this subsection.

**(r) Disclosure of certain activities relating to Iran.**

**(1)** In general. Each issuer required to file an annual or quarterly report under subsection (a) shall disclose in that report the information required by paragraph (2) if, during the period covered by the report, the issuer or any affiliate of the issuer—

**(A)** knowingly engaged in an activity described in subsection (a) or (b) of section 5 of the Iran Sanctions Act of 1996 (Public Law 104-172; 50 U.S.C. 1701 note);

**(B)** knowingly engaged in an activity described in subsection (c)(2) of section 104 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513) or a transaction described in subsection (d)(1) of that section;

**(C)** knowingly engaged in an activity described in section 105A(b)(2) of that Act [22 USCS § 8514a(b)(2)]; or

**(D)** knowingly conducted any transaction or dealing with—

**(i)** any person the property and interests in property of which are blocked pursuant to Executive Order No. 13224 (66 Fed. Reg. 49079; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism [50 USCS § 1701 note]);

**(ii)** any person the property and interests in property of which are blocked pursuant to Executive Order No. 13382 (70 Fed. Reg. 38567; relating to blocking of property of weapons of mass destruction proliferators and their supporters [50 USCS § 1701 note]); or

**(iii)** any person or entity identified under section 560.304 of title 31, Code of Federal Regulations (relating to the definition of the Government of Iran) without the specific authorization of a Federal department or agency.

**(2)** Information required. If an issuer or an affiliate of the issuer has engaged in any activity described in paragraph (1), the issuer shall disclose a detailed description of each such activity, including—

**(A)** the nature and extent of the activity;

**(B)** the gross revenues and net profits, if any, attributable to the activity; and

**(C)** whether the issuer or the affiliate of the issuer (as the case may be) intends to continue the activity.

**(3)** Notice of disclosures. If an issuer reports under paragraph (1) that the issuer or an affiliate of the issuer has knowingly engaged in any activity described in that paragraph, the issuer shall separately file with the Commission, concurrently with the annual or quarterly report under subsection (a), a notice that the disclosure of that activity has been included in that annual or quarterly report that identifies the issuer and contains the information required by paragraph (2).

**(4)** Public disclosure of information. Upon receiving a notice under paragraph (3) that an annual or quarterly report includes a disclosure of an activity described in paragraph (1), the Commission shall promptly—

**(A)** transmit the report to—

**(i)** the President;

15 USCS § 78m

(ii) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives; and

(iii) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) make the information provided in the disclosure and the notice available to the public by posting the information on the Internet website of the Commission.

(5) Investigations. Upon receiving a report under paragraph (4) that includes a disclosure of an activity described in paragraph (1) (other than an activity described in subparagraph (D)(iii) of that paragraph), the President shall—

(A) initiate an investigation into the possible imposition of sanctions under the Iran Sanctions Act of 1996 (Public Law 104-172; 50 U.S.C. 1701 note), section 104 or 105A of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 [22 USCS § 8513 or 8514a], an Executive order specified in clause (i) or (ii) of paragraph (1)(D), or any other provision of law relating to the imposition of sanctions with respect to Iran, as applicable; and

(B) not later than 180 days after initiating such an investigation, make a determination with respect to whether sanctions should be imposed with respect to the issuer or the affiliate of the issuer (as the case may be).

(6) Sunset. The provisions of this subsection shall terminate on the date that is 30 days after the date on which the President makes the certification described in section 401(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)).

(s) Data standards.

(1) Requirement. The Commission shall, by rule, adopt data standards for all collections of information with respect to periodic and current reports required to be filed or furnished under this section or under section 15(d) [15 USCS § 78o(d)], except that the Commission may exempt exhibits, signatures, and certifications from those data standards.

(2) Consistency. The data standards required under paragraph (1) shall incorporate, and ensure compatibility with (to the extent feasible), all applicable data standards established in the rules promulgated under section 124 of the Financial Stability Act of 2010 [12 USCS § 5334], including, to the extent practicable, by having the characteristics described in clauses (i) through (vi) of subsection (c)(1)(B) of such section 124 [12 USCS § 5334].

## History

HISTORY:

June 6, 1934, ch 404, Title I, § 13, 48 Stat. 894; Aug. 20, 1964, P. L. 88-467, § 4, 78 Stat. 569; July 29, 1968, P. L. 90-439, § 2, 82 Stat. 454; Dec. 22, 1970, P. L. 91-567, §§ 1, 2, 84 Stat. 1497; June 4, 1975, P. L. 94-29, § 10, 89 Stat. 119; Feb 5, 1976, P. L. 94-210, Title III, § 308(b), 90 Stat 57; Dec. 19, 1977, P. L. 95-213, Title I, § 102, Title II, §§ 202, 203, 91 Stat. 1494, 1498, 1499; June 6, 1983, P. L. 98-38, § 2(a), 97 Stat. 205; Dec. 4, 1987, P. L. 100-181, Title III, §§ 315, 316, 101 Stat. 1256; Feb. 3, 1988, P. L. 100-241, § 12(d), 101 Stat. 1810; Aug. 23, 1988, P. L. 100-418, Title V, Subtitle A, Part I, § 5002, 102 Stat. 1415; Oct. 16, 1990, P. L. 101-432, § 3, 104 Stat. 964; Jan. 16, 2002, P. L. 107-123, § 5, 115 Stat. 2395; July 30, 2002, P. L. 107-204, Title I, § 109(i) [109(h)], Title IV, §§ 401(a), 402(a), 409, 116 Stat. 771, 785, 787, 791; July 21, 2010, P. L. 111-203, Title VII, Subtitle B, §§ 763(i), 766(b), (c), (e), Title IX, Subtitle B, §§ 929R(a), 929X(a), Subtitle I, §§ 982(h)(3), 985(b)(4), Subtitle J, § 991(b)(2), Title XV, §§ 1502(b), 1504, 124 Stat. 1779, 1799, 1866, 1870, 1930, 1933, 1952, 2213, 2220; April 5, 2012, P. L. 112-106, Title I, § 102(b)(2), 126 Stat. 309; Aug. 10, 2012, P. L. 112-158, Title II, Subtitle B, § 219(a), 126 Stat. 1235; Dec. 4, 2015, P. L. 114-94, Div G, Title LXXXVI, § 86001(c), 129 Stat. 1798; Dec. 23, 2022, P.L. 117-263, Div E, Title LVIII, Subtitle B, § 5821(f), 136 Stat. 3426.

SPA-57

15 USCS § 78m

United States Code Service
Copyright © 2025 All rights reserved.

End of Document

## 15 USCS § 78p

Current through Public Law 119-47, approved December 5, 2025.

*United States Code*
*TITLE*

Service > 
15. COMMERCE AND TRADE (Chs. 1 — 123) >
CHAPTER 2B. SECURITIES EXCHANGES (§§ 78a — 78rr)

## § 78p. Directors, officers, and principal stockholders

**(a) Disclosures required.**

**(1)** Directors, officers, and principal stockholders required to file. Every person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 12 [15 USCS § 78l], or who is a director or an officer of the issuer of such security, shall file the statements required by this subsection with the Commission.

**(2)** Time of filing. The statements required by this subsection shall be filed—

**(A)** at the time of the registration of such security on a national securities exchange or by the effective date of a registration statement filed pursuant to section 12(g) [15 USCS § 78l(g)];

**(B)** within 10 days after he or she becomes such beneficial owner, director, or officer, or within such shorter time as the Commission may establish by rule;

**(C)** if there has been a change in such ownership, or if such person shall have purchased or sold a security-based swap agreement involving such equity security, before the end of the second business day following the day on which the subject transaction has been executed, or at such other time as the Commission shall establish, by rule, in any case in which the Commission determines that such 2-day period is not feasible.

**(3)** Contents of statements. A statement filed—

**(A)** under subparagraph (A) or (B) of paragraph (2) shall contain a statement of the amount of all equity securities of such issuer of which the filing person is the beneficial owner; and

**(B)** under subparagraph (C) of such paragraph shall indicate ownership by the filing person at the date of filing, any such changes in such ownership, and such purchases and sales of the security-based swap agreements or security-based swaps as have occurred since the most recent such filing under such subparagraph.

**(4)** Electronic filing and availability. Beginning not later than 1 year after the date of enactment of the Sarbanes-Oxley Act of 2002 [enacted July 30, 2002]—

**(A)** a statement filed under subparagraph (C) of paragraph (2) shall be filed electronically;

**(B)** the Commission shall provide each such statement on a publicly accessible Internet site not later than the end of the business day following that filing; and

**(C)** the issuer (if the issuer maintains a corporate website) shall provide that statement on that corporate website, not later than the end of the business day following that filing.

**(b) Profits from purchase and sale of security within six months.** For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale

15 USCS § 78p

and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement or a security-based swap involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

**(c) Conditions for sale of security by beneficial owner, director, or officer.** It shall be unlawful for any such beneficial owner, director, or officer, directly or indirectly, to sell any equity security of such issuer (other than an exempted security), if the person selling the security or his principal (1) does not own the security sold, or (2) if owning the security, does not deliver it against such sale within twenty days thereafter, or does not within five days after such sale deposit it in the mails or other usual channels of transportation; but no person shall be deemed to have violated this subsection if he proves that notwithstanding the exercise of good faith he was unable to make such delivery or deposit within such time, or that to do so would cause undue inconvenience or expense.

**(d) Securities held in investment account, transactions in ordinary course of business, and establishment of primary or secondary market.** The provisions of subsection (b) of this section shall not apply to any purchase and sale, or sale and purchase and the provisions of subsection (c) of this section shall not apply to any sale, of an equity security not then or theretofore held by him in an investment account, by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market (otherwise than on a national securities exchange or an exchange exempted from registration under section 5 of this title [15 USCS § 78e]) for such security. The Commission may, by such rules and regulations as it deems necessary or appropriate in the public interest, define and prescribe terms and conditions with respect to securities held in an investment account and transactions made in the ordinary course of business and incident to the establishment or maintenance of a primary or secondary market.

**(e) Application of section to foreign or domestic arbitrage transactions.** The provisions of this section shall not apply to foreign or domestic arbitrage transactions unless made in contravention of such rules and regulations as the Commission may adopt in order to carry out the purposes of this section.

**(f) Treatment of transactions in security futures products.** The provisions of this section shall apply to ownership of and transactions in security futures products.

**(g) Limitations on Commission authority.** The authority of the Commission under this section with respect to security-based swap agreements shall be subject to the restrictions and limitations of section 3A(b) of this title [15 USCS § 78c-1(b)].

## History

**HISTORY:**

June 6, 1934, ch 404, Title I, § 16, 48 Stat. 896; Aug. 20, 1964, P. L. 88-467, § 8, 78 Stat. 579; Dec. 21, 2000, P. L. 106-554, § 1(a)(5), 114 Stat. 2763; July 30, 2002, P. L. 107-204, Title IV, § 403(a), 116 Stat. 788; July 21, 2010, P. L. 111-203, Title VII, Subtitle B, § 762(d)(5), Title IX, Subtitle B, § 929R(b), 124 Stat. 1761, 1867.

SPA-60

Page 3 of 3

15 USCS § 78p

United States Code Service
Copyright © 2025 All rights reserved.

End of Document

SPA-61

# 17 CFR 240.13d-3

This document is current through the December 5, 2025 issue of the Federal Register, with the exception of the amendments appearing at 90 FR 55997.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 17 Commodity and Securities Exchanges  >  Chapter II — Securities and Exchange Commission  >  Part 240 — General Rules and Regulations, Securities Exchange Act of 1934  >  Subpart A — Rules and Regulations Under the Securities Exchange Act of 1934  >  REGULATION 13D-G*

## § 240.13d-3 Determination of beneficial owner.

**(a)** For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

    **(1)** Voting power which includes the power to vote, or to direct the voting of, such security; and/or,

    **(2)** Investment power which includes the power to dispose, or to direct the disposition of, such security.

**(b)** Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.

**(c)** All securities of the same class beneficially owned by a person, regardless of the form which such beneficial ownership takes, shall be aggregated in calculating the number of shares beneficially owned by such person.

**(d)** Notwithstanding the provisions of paragraphs (a) and (c) of this rule:

    **(1)**

        **(i)** A person shall be deemed to be the beneficial owner of a security, subject to the provisions of paragraph (b) of this rule, if that person has the right to acquire beneficial ownership of such security, as defined in Rule 13d-3(a) (§ 240.13d-3(a)) within sixty days, including but not limited to any right to acquire: (A) Through the exercise of any option, warrant or right; (B) through the conversion of a security; (C) pursuant to the power to revoke a trust, discretionary account, or similar arrangement; or (D) pursuant to the automatic termination of a trust, discretionary account or similar arrangement; provided, however, any person who acquires a security or power specified in paragraphs (d)(1)(i)(A), (B) or (C), of this section, with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power. Any securities not outstanding which are subject to such options, warrants, rights or conversion privileges shall be deemed to be outstanding for the purpose of computing the percentage of outstanding securities of the class owned by such person but shall not be deemed to be outstanding for the purpose of computing the percentage of the class by any other person.

        **(ii)** Paragraph (d)(1)(i) of this section remains applicable for the purpose of determining the obligation to file with respect to the underlying security even though the option, warrant, right or convertible security is of a class of equity security, as defined in § 240.13d-1(i), and may therefore give rise to a separate obligation to file.

SPA-62

17 CFR 240.13d-3

**(2)** A member of a national securities exchange shall not be deemed to be a beneficial owner of securities held directly or indirectly by it on behalf of another person solely because such member is the record holder of such securities and, pursuant to the rules of such exchange, may direct the vote of such securities, without instruction, on other than contested matters or matters that may affect substantially the rights or privileges of the holders of the securities to be voted, but is otherwise precluded by the rules of such exchange from voting without instruction.

**(3)** A person who in the ordinary course of such person's business is a pledgee of securities under a written pledge agreement shall not be deemed to be the beneficial owner of such pledged securities until the pledgee has taken all formal steps necessary which are required to declare a default and determines that the power to vote or to direct the vote or to dispose or to direct the disposition of such pledged securities will be exercised, provided, that:

    **(i)** The pledge agreement is bona fide and was not entered into with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with any transaction having such purpose or effect, including any transaction subject to Rule 13d-3(b);

    **(ii)** The pledgee is a person specified in Rule 13d-1(b)(ii), including persons meeting the conditions set forth in paragraph (G) thereof; and

    **(iii)** The pledgee agreement, prior to default, does not grant to the pledgee;

        **(A)** The power to vote or to direct the vote of the pledged securities; or

        **(B)** The power to dispose or direct the disposition of the pledged securities, other than the grant of such power(s) pursuant to a pledge agreement under which credit is extended subject to regulation T (12 CFR 220.1 to 220.8) and in which the pledgee is a broker or dealer registered under section 15 of the act.

**(4)** A person engaged in business as an underwriter of securities who acquires securities through such person's participation in good faith in a firm commitment underwriting registered under the Securities Act of 1933 shall not be deemed to be the beneficial owner of such securities until the expiration of 40 days after the date of such acquisition.

## Statutory Authority

Authority Note Applicable to 17 CFR Ch. II, Pt. 240

## History

[43 FR 18495, Apr. 28, 1978, as amended at 43 FR 29768, July 11, 1978; 63 FR 2854, 2867, Jan. 16, 1998; 88 FR 76896, 76983, Nov. 7, 2023]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2025 All rights reserved.

# 17 CFR 240.16a-1

This document is current through the December 5, 2025 issue of the Federal Register, with the exception of the amendments appearing at 90 FR 55997.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS* > *Title 17 Commodity and Securities Exchanges* > *Chapter II — Securities and Exchange Commission* > *Part 240 — General Rules and Regulations, Securities Exchange Act of 1934* > *Subpart A — Rules and Regulations Under the Securities Exchange Act of 1934* > *Reports of Directors, Officers, and Principal Shareholders*

## § 240.16a-1 Definition of Terms.

Terms defined in this rule shall apply solely to section 16 of the Act and the rules thereunder. These terms shall not be limited to section 16(a) of the Act but also shall apply to all other subsections under section 16 of the Act.

**(a)** The term beneficial owner shall have the following applications:

**(1)** Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the Act, the term "beneficial owner" shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder; provided, however, that the following institutions or persons shall not be deemed the beneficial owner of securities of such class held for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business (or in the case of an employee benefit plan specified in paragraph (a)(1)(vi) of this section, of securities of such class allocated to plan participants where participants have voting power) as long as such shares are acquired by such institutions or persons without the purpose or effect of changing or influencing control of the issuer or engaging in any arrangement subject to Rule 13d-3(b) (§ 240.13d-3(b)):

**(i)** A broker or dealer registered under section 15 of the Act (15 U.S.C. 78o);

**(ii)** A bank as defined in section 3(a)(6) of the Act (15 U.S.C. 78c);

**(iii)** An insurance company as defined in section 3(a)(19) of the Act (15 U.S.C. 78c);

**(iv)** An investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8);

**(v)** Any person registered as an investment adviser under Section 203 of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3) or under the laws of any state;

**(vi)** An employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1001 et seq. ("ERISA") that is subject to the provisions of ERISA, or any such plan that is not subject to ERISA that is maintained primarily for the benefit of the employees of a state or local government or instrumentality, or an endowment fund;

**(vii)** A parent holding company or control person, provided the aggregate amount held directly by the parent or control person, and directly and indirectly by their subsidiaries or affiliates that are not persons specified in § 240.16a-1 (a)(1)(i) through (x), does not exceed one percent of the securities of the subject class;

**(viii)** A savings association as defined in Section 3(b) of the Federal Deposit Insurance Act (12 U.S.C. 1813);

17 CFR 240.16a-1

**(ix)** A church plan that is excluded from the definition of an investment company under section 3(c)(14) of the Investment Company Act of 1940 (15 U.S.C. 80a-3);

**(x)** A non-U.S. institution that is the functional equivalent of any of the institutions listed in paragraphs (a)(1)(i) through (ix) of this section, so long as the non-U.S. institution is subject to a regulatory scheme that is substantially comparable to the regulatory scheme applicable to the equivalent U.S. institution and the non-U.S. institution is eligible to file a Schedule 13G pursuant to § 240.13d-1(b)(1)(ii)(J); and

**(xi)** A group, provided that all the members are persons specified in § 240.16a-1 (a)(1)(i) through (x).

NOTE TO PARAGRAPH (A). Pursuant to this section, a person deemed a beneficial owner of more than ten percent of any class of equity securities registered under section 12 of the Act would file a Form 3 (§ 249.103), but the securities holdings disclosed on Form 3, and changes in beneficial ownership reported on subsequent Forms 4 (§ 249.104) or 5 (§ 249.105), would be determined by the definition of "beneficial owner" in paragraph (a)(2) of this section.

**(2)** Other than for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered under Section 12 of the Act, the term beneficial owner shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities, subject to the following:

**(i)** The term pecuniary interest in any class of equity securities shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.

**(ii)** The term indirect pecuniary interest in any class of equity securities shall include, but not be limited to:

**(A)** Securities held by members of a person's immediate family sharing the same household; provided, however, that the presumption of such beneficial ownership may be rebutted; see also § 240.16a-1(a)(4);

**(B)** A general partner's proportionate interest in the portfolio securities held by a general or limited partnership. The general partner's proportionate interest, as evidenced by the partnership agreement in effect at the time of the transaction and the partnership's most recent financial statements, shall be the greater of:

**(1)** The general partner's share of the partnership's profits, including profits attributed to any limited partnership interests held by the general partner and any other interests in profits that arise from the purchase and sale of the partnership's portfolio securities; or

**(2)** The general partner's share of the partnership capital account, including the share attributable to any limited partnership interest held by the general partner.

**(C)** A performance-related fee, other than an asset-based fee, received by any broker, dealer, bank, insurance company, investment company, investment adviser, investment manager, trustee or person or entity performing a similar function; provided, however, that no pecuniary interest shall be present where:

**(1)** The performance-related fee, regardless of when payable, is calculated based upon net capital gains and/or net capital appreciation generated from the portfolio or from the fiduciary's overall performance over a period of one year or more; and

**(2)** Equity securities of the issuer do not account for more than ten percent of the market value of the portfolio. A right to a nonperformance-related fee alone shall not represent a pecuniary interest in the securities;

**(D)** A person's right to dividends that is separated or separable from the underlying securities. Otherwise, a right to dividends alone shall not represent a pecuniary interest in the securities;

17 CFR 240.16a-1

**(E)** A person's interest in securities held by a trust, as specified in § 240.16a-8(b); and

**(F)** A person's right to acquire equity securities through the exercise or conversion of any derivative security, whether or not presently exercisable.

**(iii)** A shareholder shall not be deemed to have a pecuniary interest in the portfolio securities held by a corporation or similar entity in which the person owns securities if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio.

**(3)** Where more than one person subject to section 16 of the Act is deemed to be a beneficial owner of the same equity securities, all such persons must report as beneficial owners of the securities, either separately or jointly, as provided in § 240.16a-3(j). In such cases, the amount of short-swing profit recoverable shall not be increased above the amount recoverable if there were only one beneficial owner.

**(4)** Any person filing a statement pursuant to section 16(a) of the Act may state that the filing shall not be deemed an admission that such person is, for purposes of section 16 of the Act or otherwise, the beneficial owner of any equity securities covered by the statement.

**(5)** The following interests are deemed not to confer beneficial ownership for purposes of section 16 of the Act:

**(i)** Interests in portfolio securities held by any investment company registered under the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.); and

**(ii)** Interests in securities comprising part of a broad-based, publicly traded market basket or index of stocks, approved for trading by the appropriate federal governmental authority.

**(b)** The term call equivalent position shall mean a derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option position.

**(c)** The term derivative securities shall mean any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security, but shall not include:

**(1)** Rights of a pledgee of securities to sell the pledged securities;

**(2)** Rights of all holders of a class of securities of an issuer to receive securities pro rata, or obligations to dispose of securities, as a result of a merger, exchange offer, or consolidation involving the issuer of the securities;

**(3)** Rights or obligations to surrender a security, or have a security withheld, upon the receipt or exercise of a derivative security or the receipt or vesting of equity securities, in order to satisfy the exercise price or the tax withholding consequences of receipt, exercise or vesting;

**(4)** Interests in broad-based index options, broad-based index futures, and broad-based publicly traded market baskets of stocks approved for trading by the appropriate federal governmental authority;

**(5)** Interests or rights to participate in employee benefit plans of the issuer;

**(6)** Rights with an exercise or conversion privilege at a price that is not fixed; or

**(7)** Options granted to an underwriter in a registered public offering for the purpose of satisfying over-allotments in such offering.

**(d)** The term equity security of such issuer shall mean any equity security or derivative security relating to an issuer, whether or not issued by that issuer.

SPA-66

17 CFR 240.16a-1

**(e)** The term immediate family shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, and shall include adoptive relationships.

**(f)** The term "officer" shall mean an issuer's president, principal financial officer, principal accounting officer (or, if there is no such accounting officer, the controller), any vice-president of the issuer in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the issuer. Officers of the issuer's parent(s) or subsidiaries shall be deemed officers of the issuer if they perform such policy-making functions for the issuer. In addition, when the issuer is a limited partnership, officers or employees of the general partner(s) who perform policy-making functions for the limited partnership are deemed officers of the limited partnership. When the issuer is a trust, officers or employees of the trustee(s) who perform policy-making functions for the trust are deemed officers of the trust.

> NOTE: "Policy-making function" is not intended to include policy-making functions that are not significant. If pursuant to Item 401(b) of Regulation S-K (§ 229.401(b)) the issuer identifies a person as an "executive officer," it is presumed that the Board of Directors has made that judgment and that the persons so identified are the officers for purposes of Section 16 of the Act, as are such other persons enumerated in this paragraph (f) but not in Item 401(b).

**(g)** The term portfolio securities shall mean all securities owned by an entity, other than securities issued by the entity.

**(h)** The term put equivalent position shall mean a derivative security position that increases in value as the value of the underlying equity decreases, including, but not limited to, a long put option and a short call option position.

## Statutory Authority

Authority Note Applicable to 17 CFR Ch. II, Pt. 240

## History

[56 FR 7265, Feb. 21, 1991, as amended at 56 FR 19927, May 1, 1991; 61 FR 30376, 30391, June 14, 1996; 63 FR 2854, 2868, Jan. 16, 1998; 73 FR 60050, 60093, Oct. 9, 2008; 76 FR 71872, 71876, Nov. 21, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2025 All rights reserved.

End of Document