# 25-2728

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC.,

*Plaintiff-Appellant,*

v.

HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP,

*Defendants-Appellees.*

On Appeal from the U.S. District Court
for the Southern District of New York

### BRIEF OF DEFENDANTS-APPELLEES HBC INVESTMENTS LLC AND HUDSON BAY CAPITAL MANAGEMENT LP

James E. Tysse
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
jtysse@akingump.com

Douglas A. Rappaport
Kaitlin D. Shapiro
AKIN GUMP STRAUSS HAUER
  & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000
darappaport@akingump.com
kshapiro@akingump.com

*Counsel for Defendants-Appellees*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee HBC Investments LLC, by and through its undersigned counsel, respectfully represents that it is owned by Tech Opportunities LLC and by HB Fund LLC. No publicly held company owns 10% or more of HBC Investments LLC's stock. Hudson Bay Capital Management LP, by and through its undersigned counsel, respectfully represents that it has no parent corporation. Hudson Bay Capital GP LLC is the general partner of Hudson Bay Capital Management LP. No publicly held corporation owns 10% or more of its stock.

## **TABLE OF CONTENTS**

ISSUES PRESENTED FOR REVIEW ....................................................................1

INTRODUCTION ..............................................................................................2

STATEMENT OF THE CASE..............................................................................5

I.    STATUTORY AND REGULATORY BACKGROUND.................................5

II.   FACTUAL BACKGROUND ......................................................................8

     A.    The Parties.............................................................................8

     B.    Hudson Bay's BBBY Investment.............................................8

     C.    The Investment Documents and the Blockers....................................10

     D.    Hudson Bay and BBBY's Side Letter.......................................14

III.  PROCEDURAL HISTORY......................................................................16

SUMMARY OF ARGUMENT..............................................................................20

STANDARD OF REVIEW ..................................................................................24

ARGUMENT .....................................................................................................25

I.    THE BLOCKERS PREVENTED HUDSON BAY FROM BECOMING A STATUTORY INSIDER SUBJECT TO SECTION 16(b) LIABILITY ......................................................................................25

     A.    As This Court Recognized in *Levy*, Blockers are Enforceable..........25

     B.    The Blockers Here Are Stronger Than The *Levy* Blocker, And Unambiguously Prevented Hudson Bay From Acquiring More Than 10% Beneficial Ownership ........................................................28

     C.    Plaintiff Failed To Plausibly Plead That The Blockers Were Illusory or Ineffective.....................................................................32

          (i)    Plaintiff Failed to Plead That The Blockers Had Inadequate Enforcement Mechanisms ......................................33

   (ii) Plaintiff Failed to Plead That The Blockers Could Be Easily Waived or Amended..................................................38

   (iii) Plaintiff Failed to Plead That the Blockers Were Not Adhered to in Practice.................................................42

  D. The District Court Did Not Adopt a *Per Se* Rule...............................46

II. PLAINTIFF FAILED TO PLEAD THAT THE BLOCKERS WERE A "SCHEME TO EVADE" ...............................................................48

III. ACCEPTING PLAINTIFF'S ARGUMENTS WOULD OVERTURN BINDING PRECEDENT AND WREAK HAVOC ON THE MARKETS ..................................................................................52

CONCLUSION .........................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Applied Energetics, Inc. v. Newoak Cap. Mkts., LLC,*
    645 F.3d 522 (2d Cir. 2011) ................................................................40, 41

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................24, 25

*Avalon Holdings Corp. v. Gentile,*
    597 F. Supp. 3d 640 (S.D.N.Y. 2022) .....................................................44

*Beatty v. Guggenheim Expl. Co.,*
    122 N.E. 378 (N.Y. 1919) ........................................................................41

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................25

*Blau v. Lamb,*
    363 F.2d 507 (2d Cir. 1966) ......................................................................6

*Citadel Holding Corp. v. Roven,*
    26 F.3d 960 (9th Cir. 1994) ......................................................................39

*Connell v. Johnson,*
    No. 20-cv-1864, 2020 WL 2748439 (S.D.N.Y. May 27, 2020) ........................44

*Credit Suisse First Boston Corp. v. Pitofsky,*
    824 N.E.2d 929 (N.Y. 2005) ....................................................................41

*CSX Corp. v. Children's Investment Fund Management (UK) LLP,*
    654 F.3d 276 (2d Cir. 2011) ................................................................49, 51

*Decker v. Advantage Fund, Ltd.,*
    362 F.3d 593 (9th Cir. 2004) ...............................................................33, 39

*Flores v. Sessions,*
    No. 85-cv-4544, 2018 WL 4945000 (C.D. Cal. July 9, 2018) ........................41

*Florida Rock Indus., Inc. v. Escambia Sand & Gravel Co.,*
    No. 13-0499, 2014 WL 2557067 (S.D. Ala. June 6, 2014) ........................41, 42

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
  423 U.S. 232 (1976) ...................................................................................7

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*,
  No. 99-cv-342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) .................26, 31, 39

*Gollust v. Mendell*,
  501 U.S. 115 (1991) ...................................................................................7

*Greenberg v. Hudson Bay Master Fund Ltd.*,
  No. 14-cv-5226, 2015 WL 2212215 (S.D.N.Y. May 12, 2015) .......................47

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
  156 F.3d 305 (2d Cir. 1998) ....................................................................6, 7

*Kern Cnty. Land Co. v. Occidental Petroleum Corp.*,
  411 U.S. 582 (1973) ...................................................................................5

*Klawonn v. YA Glob. Invs., L.P.*,
  No. 10-cv-2108, 2011 WL 3502022 (D.N.J. Aug. 10, 2011) ................32, 33, 49

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*,
  115 F. Supp. 2d 440 (S.D.N.Y. 2000) ................................................26, 28, 31, 39

*Levner v. Prince Alwaleed*,
  61 F.3d 8 (2d Cir. 1995) .............................................................................39

*Levy v. Southbrook International Investments, Ltd.*,
  263 F.3d 10 (2d Cir. 2001) ...............................................................*passim*

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
  223 F. Supp. 2d 435 (S.D.N.Y. 2001) .................................. 26, 28, 31, 33, 39, 45

*Packer v. Raging Cap. Mgmt., LLC*,
  981 F.3d 148 (2d Cir. 2020) .........................................................................5

*Probility Media Corp. v. Isen*,
  No. 3:17-cv-2583, 2018 WL 1726626 (S.D. Cal. Apr. 10, 2018) .....................33

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) .......................................................................40

*Reliance Elec. Co. v. Emerson Elec. Co.*,
    404 U.S. 418 (1972)............................................................7, 48, 49

*Rosen v. Brookhaven Cap. Mgmt. Co.*,
    113 F. Supp. 2d 615 (S.D.N.Y. 2000) ....................................7

*Roth v. Solus Alt. Asset Mgmt. LP ("Solus I")*,
    124 F. Supp. 3d 315 (S.D.N.Y. 2015) .....................11, 37, 38, 47, 48

*Roth ex. rel. YRC Worldwide, Inc. v. Solus Alt. Asset Mgmt. LP
("Solus II")*,
    258 F. Supp. 3d 364 (S.D.N.Y. 2017) ...................................38, 39, 48

*Rubenstein v. International Value Advisers, LLC*,
    959 F.3d 541 (2d Cir. 2020).................................................5, 7

*Sabby Volatility Warrant Master Fund Ltd. v. Kiromic Biopharma,
Inc.*,
    638 F. Supp. 3d 393 (S.D.N.Y. 2022) .................................11

*Santos v. Kimmel*,
    154 F.4th 30 (2d Cir. 2025)..................................................24

*SEC v. Drexel Burnham Lambert Inc.*,
    837 F. Supp. 587 (S.D.N.Y. 1993) ......................................43

*SEC v. Wyly*,
    56 F. Supp. 3d 394 (S.D.N.Y. 2014) ...................................50

*Steel Partners II, L.P. v. Bell Indus., Inc.*,
    315 F.3d 120 (2d Cir. 2002) ................................................6

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)...............................................50

*United States v. G-I Holdings, Inc.*,
    369 B.R. 832 (D.N.J. 2007) .................................................41

**STATUTES AND REGULATIONS**

15 U.S.C.
    § 78p(a)(1) ............................................................................6
    § 78p(b)..............................................................................5, 6

17 C.F.R.

    § 240.13d-3(a) ........................................................................... 6, 43

    § 240.13d-3(b) ............................................................ 1, 4, 48, 49, 51

    § 240.13d-3(d)(1) ..................................................................... 7, 25

    § 240.16a-1(a)(1) ..................................................................... 6, 43

    § 242.200(b) ................................................................................ 46

Securities Exchange Act of 1934 Section 16(b) ............................... *passim*

**OTHER AUTHORITIES**

Bloomenthal & Wolff, *Who is subject to Section 16(b)?—Beneficial ownership and convertible securities—Conversion caps*, 3E SEC. & FED. CORP. LAW § 21:15.50 (2d ed.) (Jan. 2026) ................................ 11

Hirsch, Lauren & Jordyn Holman, *Investment Firm Backs Bed Bath & Beyond's Stock Offering*, N.Y. TIMES, Feb. 7, 2023 .......................... 52

Klein, Eleazer, *Fundamental PIPEs: Typical Structures and Transactions*, in PIPEs: A Guide to Private Investment in Public Equity (Steven Dresner, ed. 2006) ...................................................... 53

Letter from Brian V. Breheny, Deputy Dir., SEC Div. of Corp. Fin., as *Amicus Curiae*, to Hon. Lewis A. Kaplan, *CSX Corp. v. The Children's Inv. Fund Mgmt, L.L.P.*, No. 08-cv-2764 (S.D.N.Y. June 4, 2008), ECF No. 92-2 ...................................................................... 50

Romeo, Peter J. & Alan L. Dye, *Section 16 Treatise and Reporting Guide* (6th ed. 2024) .......................................................... 6, 25, 26

Simpson Thacher & Bartlett LLP, *Leveraged Finance 101: A Covenant Handbook* (2022) ............................................................ 53

S. Rep. No. 1455, 73d Cong., 2d Sess. 55 (1934) .............................. 26

Winter, Ralph K., *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 DUKE L.J. 945 (1993) .......................................................... 54

## ISSUES PRESENTED FOR REVIEW

1.    Did Plaintiff-Appellant 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("Plaintiff") fail to plausibly allege that Defendants-Appellees HBC Investments LLC and Hudson Bay Capital Management LP (together, "Hudson Bay") beneficially owned more than 10% of Bed Bath & Beyond Inc. ("BBBY") common stock ("Common Stock"), so as to make Hudson Bay a statutory insider subject to Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)")?

2.    Did Plaintiff fail to plausibly allege a "scheme to evade" reporting requirements under 17 C.F.R. § 240.13d-3(b) ("Rule 13d-3(b)")?

1

# **INTRODUCTION**

The central issue in this appeal is whether Plaintiff has plausibly alleged that Hudson Bay was a statutory "insider" subject to Section 16(b)'s strict liability regime for "short-swing" trading. Plaintiff has failed to do so. Hudson Bay was never a statutory insider.

Plaintiff is the post-bankruptcy wind-down entity of BBBY, which is now controlled by the senior creditors that helped drive the company into bankruptcy, including Sixth Street Specialty Lending, Inc. ("Sixth Street"). Plaintiff seeks the disgorgement of alleged short-swing profits from Hudson Bay under Section 16(b). Section 16(b) applies to three types of statutorily-defined insiders: directors, officers, and, as relevant here, beneficial owners of more than 10% of a company's securities. Because Hudson Bay was not an officer or director of BBBY, to plausibly state a Section 16(b) claim, Plaintiff needed to allege that Hudson Bay "beneficially owned"—i.e., had the power to vote or dispose of—more than 10% of BBBY Common Stock.

Plaintiff failed to do so. Provisions known as blockers unambiguously *prevented* Hudson Bay from ever crossing that 10% threshold. A blocker can prevent a holder from acquiring beneficial ownership of an issuer's securities above a specified threshold. When that threshold is 10% or lower, the blocker ensures that

the holder cannot become a greater-than-10% beneficial owner subject to Section 16(b).

Here, there is no dispute—below or on appeal—that the blockers in the parties' agreements (the "Blockers"), as written, unambiguously prevented Hudson Bay from becoming a greater-than-10% beneficial owner of BBBY's stock. Because Plaintiff failed to adequately plead that those Blockers were a "sham," illusory, or ever actually failed in practice, the district court correctly held that Plaintiff failed to state a claim.

This Court's decision in *Levy v. Southbrook International Investments, Ltd.*, 263 F.3d 10 (2d Cir. 2001) controls this case. In *Levy*, the Court found that a blocker provision effectively prevented the defendant from becoming subject to Section 16(b) liability as a greater-than-10% beneficial owner of securities. The Blockers here are even stronger than those this Court found effective in *Levy*. Among other things, the Blockers were self-effectuating, rendering any attempt to issue Hudson Bay Common Stock above the 9.99% cap "null and void," "treated as if never made," and "cancelled ab initio." The Blockers also stripped Hudson Bay of all voting and dispositive power (i.e., beneficial ownership) over any shares in excess of 9.99%, and required Hudson Bay to certify its compliance each time it converted its derivative securities into Common Stock.

3

Plaintiff does not, and cannot, dispute the district court's conclusion that the Blockers created a "clear prohibition" on Hudson Bay acquiring beneficial ownership above 9.99%. Instead, Plaintiff alleges that the Blockers were "illusory" because they supposedly: (1) lacked adequate enforcement mechanisms; (2) could easily be waived or amended; and (3) failed in practice. But the first two factors are foreclosed by *Levy*, which upheld a contractual blocker provision with even fewer enforcement mechanisms than the Blockers here. As to the third, Plaintiff's allegations that the Blockers "failed in practice" are implausible because they rely on counting Hudson Bay as the beneficial owner of shares it had already sold. Plaintiff cannot overcome the district court's commonsense conclusion that Hudson Bay cannot sell the same shares twice.

As a last gasp, Plaintiff argues that the Blockers were a "scheme to evade" under Rule 13d-3(b). This argument likewise ignores controlling law and defies common sense. As the Securities and Exchange Commission ("SEC") has explained and case law makes clear, "schemes to evade" are transactions that *conceal* an investor's power to direct the voting or disposition of securities. As this Court has recognized, that concept does not apply to transactions limited by provisions, like the Blockers, that prevent an investor from acquiring such power in the first place.

Accepting Plaintiff's arguments here would amount to a ruling that *any* challenge to a well-crafted blocker provision, no matter how infirm, can survive a

4

motion to dismiss and subject parties to costly litigation and discovery. That would effectively overrule *Levy* and wreak havoc in a marketplace that has long relied on blockers like the ones at issue here. It would also deprive companies of potential sources of financing by increasing the risk that investors relying on blockers will get ensnared in Section 16(b)'s harsh, strict liability regime.

For all of these reasons, the district court's decision should be affirmed.

## STATEMENT OF THE CASE

### I.   STATUTORY AND REGULATORY BACKGROUND

This case involves Section 16(b), which Congress enacted to "prevent[] the unfair use of information which may have been obtained" by statutory "insiders." 15 U.S.C. § 78p(b); *see also Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 592 (1973). In furtherance of this goal, Section 16(b) imposes "liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities." *Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 543 (2d Cir. 2020); *see also Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148, 150 (2d Cir. 2020) (citing 15 U.S.C. § 78p(b)).

Short-swing trading is "any purchase and sale, or any sale and purchase" of an issuer's equity securities "within any period of less than six months." 15 U.S.C. § 78p(b). Short-swing profits are the gains derived from a stock purchase and sale,

or losses avoided through a sale and purchase, within a six-month period. *See Blau v. Lamb*, 363 F.2d 507, 514-515 (2d Cir. 1966); *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123 (2d Cir. 2002).

To plead a claim under Section 16(b), a plaintiff must allege: (1) a purchase of equity securities; (2) a sale of equity securities; (3) by a statutory insider; (4) within less than six months; and (5) a profit resulting from such purchase and sale or sale and purchase. 15 U.S.C. § 78p(b); Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* (hereinafter, "Romeo & Dye") § 9.03[7][b] & n.237 (6th ed. 2024) (citations omitted); *see also Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). Section 16(b) does not apply if an investor is not a statutory insider, and courts must dismiss Section 16(b) claims under such circumstances. *Gwozdzinsky*, 156 F.3d at 308.

For purposes of Section 16(b), statutory insiders include traditional insiders, such as a company's directors and officers, as well as persons who beneficially own more than 10% of a company's stock. 15 U.S.C. § 78p(a)(1), (b). A person beneficially owns a security if that person has: "(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or (2) Investment power which includes the power to dispose, or direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a); *see also id.* § 240.16a-1(a)(1). Importantly, the beneficial ownership definition includes a security that the investor owns outright

and/or a security which the investor has the right to acquire within 60 days, such as through the conversion of a security or exercise of a warrant. *Id.* § 240.13d-3(d)(1). But a blocker prevents an investor from beneficially owning securities that it would otherwise have a right to acquire within 60 days if such acquisition would exceed the beneficial ownership cap established by the blocker. *Levy*, 263 F.3d at 15-17.

Given Section 16(b)'s strict liability regime, the Supreme Court has articulated that Section 16(b) liability must be confined within "narrowly drawn limits" and applied mechanically. *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976); *see also Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (courts are "reluctant to exceed a literal, 'mechanical' application of the statutory text in determining . . . liability"). Recognizing Section 16(b)'s potentially "harsh results," the Second Circuit and other courts have similarly held that, as a matter of policy, its short-swing profit rule should be construed as an "exclusion from liability, not a rule of inclusion." *Gwozdzinsky*, 156 F.3d at 310; *see also Rosen v. Brookhaven Cap. Mgmt. Co.*, 113 F. Supp. 2d 615, 624 (S.D.N.Y. 2000) (same). Indeed, this Court has recognized that "Section 16(b) addresses only a narrow class" of trading. *Rubenstein*, 959 F.3d at 547 (dismissing Section 16 claims). An investor may permissibly structure transactions with the purpose of avoiding or limiting Section 16(b) exposure. *See, e.g.*, *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418,

7

422 (1972) (no liability where investor structured sales to limit Section 16(b) exposure).

## II. FACTUAL BACKGROUND

### A. The Parties

Defendant Hudson Bay Capital Management LP is an SEC-registered investment manager that manages investments for its client funds, including Defendant HBC Investments LLC. (JA-13–14 ¶¶ 28-29.)

Plaintiff is BBBY's post-bankruptcy wind-down entity, seeking to recover assets for distribution to BBBY's creditors. (*In re Bed Bath & Beyond Inc. et al.*, Case No. 23-13359 (Bankr. D.N.J., Sept. 7, 2023) ("Bankr."), D.I. No. 2172 (Confirmation Order) ¶¶ 90-92.)

Plaintiff is controlled by a plan administrator and oversight committee appointed by former BBBY creditors, including Sixth Street. (Bankr. D.I. No. 2161 (Bankruptcy Plan Supplement) at Exs. A-B; Bankr. D.I. 25 (DIP Mot.) ¶¶ 2-4.)

### B. Hudson Bay's BBBY Investment

Prior to its bankruptcy, BBBY was a retail chain specializing in home goods. (JA-14 ¶ 30.) In 2022, BBBY faced liquidity challenges due to a failed strategy shift and fallout from the COVID-19 pandemic. (Bankr. D.I. 25 (DIP Mot.) ¶ 2.) To fund a turnaround plan, BBBY entered into an amended credit agreement with Sixth Street and another creditor, securing $500 million of new financing. (*Id.* ¶¶ 2-4.)

8

On January 13, 2023, BBBY defaulted on that debt, resulting in the debt's acceleration. (*Id.* ¶¶ 5-6.)

In January 2023, in an effort to avoid bankruptcy and offer BBBY runway to pursue a turnaround plan, BBBY's advisors entered into discussions with Hudson Bay to invest in a public offering (the "Public Offering"). (DIP Mot. ¶ 8.) Following "extensive and hard-fought negotiations" among the parties, the Public Offering closed on February 7, 2023. (*Id.*; *see also* Bankr. D.I. 10 (First Day Decl.) ¶¶ 53-58; Bankr. D.I. 36 (DIP Mot. Decl.) ¶¶ 17-21.)

Upon closing, the Public Offering was promptly disclosed to the market. (*See* Ex. 1 to Decl. of Kaitlin Shapiro in Support of Mot. to Dismiss (Feb. 10, 2023 BBBY Form 8-K/A), ECF No. 26-1 ("BBBY 8-K").) The Public Offering raised approximately $225 million for BBBY, with the potential to raise $800 million more through future issuances. (JA-20 ¶ 65.)

Through the Public Offering, Hudson Bay acquired: (1) Preferred Stock; (2) warrants to purchase Preferred Stock (the "Preferred Stock Warrants"); and (3) warrants to purchase shares of Common Stock (the "Common Stock Warrants"). (*See* JA-15 ¶ 36.) Hudson Bay could convert the Preferred Stock or exercise the Warrants at any time by sending BBBY a conversion or exercise notice, respectively. (JA-82–83 § 4(c)(i) (Cert. of Inc.); JA-124–125 § 1(a) (Preferred Stock Warrant); JA-148–150 § 1(a) (Common Stock Warrant).) Upon BBBY's receipt of a notice,

Hudson Bay was deemed to own the converted or exercised shares, subject to the Blockers' 9.99% beneficial ownership limitations. (JA-86–88 § 4(d); JA-153–154 § 1(f).)

Ultimately, the infusion of rescue capital from the Public Offering did not provide BBBY with enough runway to turn its business around. As BBBY later explained in court filings, it lacked enough liquidity to implement management's turnaround plan because its creditors, including Sixth Street, required BBBY to use proceeds from the Public Offering to repay BBBY's debts. (Bankr. D.I. 25 (DIP Mot.) ¶¶ 8-9; Bankr. D.I. 10 (First Day Decl.) ¶ 56.) After BBBY repaid these obligations, Sixth Street moved into position as BBBY's senior lender. (Bankr. D.I. 25 (DIP Mot.) ¶ 9.)

When Sixth Street later refused to approve BBBY's budget, BBBY was "no longer eligible to seek an additional injection of capital" from Hudson Bay under the terms of Sixth Street's agreements with BBBY. (*Id.*) BBBY continued to burn cash and suffer sales declines, ultimately filing for bankruptcy on April 23, 2023. (Bankr. D.I. 10 (First Day Decl.) ¶ 61.)

## C.     The Investment Documents and the Blockers

Hudson Bay's ability to acquire Common Stock upon the conversion of its Preferred Stock was governed by the terms of BBBY's Certificate of Incorporation. (JA-79–122.) Hudson Bay's ability to acquire Common Stock upon the exercise of

its Common Stock Warrants was governed by the terms of the Warrant itself. (JA-148–177.) These governing documents included the beneficial ownership limitations known as Blockers. (JA-86–88 § 4(d); JA-153–154 § 1(f).)

Blockers are commonly used contractual provisions that prevent holders of derivative securities from exceeding certain beneficial ownership thresholds. Investors and companies utilize blockers for various reasons. As relevant here, one common use of blockers is to prevent investors from acquiring beneficial ownership above thresholds that would subject them to Section 16(b)'s disclosure and liability regime. *See Roth v. Solus Alt. Asset Mgmt. LP* ("*Solus I*"), 124 F. Supp. 3d 315, 323 (S.D.N.Y. 2015) ("A conversion cap, or 'blocker,' is one permissible way of avoiding section 16(b) liability."); Bloomenthal & Wolff, *Who is subject to Section 16(b)?—Beneficial ownership and convertible securities—Conversion caps*, 3E Sec. & Fed. Corp. Law § 21:15.50 (2d ed.) (Jan. 2026) ("Usually, conversion caps are designed to prevent beneficial ownership that would require the holder to file a Schedule 13D, or become subject to Section 16."). Companies also use blockers to prevent holders from building control positions by limiting the amount of voting stock the investor can receive. *See, e.g.*, *Sabby Volatility Warrant Master Fund Ltd. v. Kiromic Biopharma, Inc.*, 638 F. Supp. 3d 393, 395 n.3 (S.D.N.Y. 2022) (noting that securities were "subject to customary beneficial ownership blockers at 9.99% so that there is no prospect of a change in control").

By their plain language, the Blockers precluded Hudson Bay from converting its Preferred Stock or exercising its Common Stock Warrants if such conversion or exercise would cause Hudson Bay to beneficially own more than 9.99% of the outstanding Common Stock. (JA-86–88 § 4(d); JA-153–154 § 1(f).) These provisions were both cumulative and self-executing.

Specifically, the Blockers provided:

> The Company *shall not effect* the [conversion/exercise] of any [Preferred Shares/Common Stock Warrant], and such Holder *shall not have the right to* [convert Preferred Shares/exercise the Common Stock Warrant] . . . and any such [conversion/exercise] *shall be null and void and treated as if never made*, to the extent that after giving effect to such [conversion/exercise], such Holder together with the other Attribution Parties collectively would beneficially own in excess of 9.99% (the "Maximum Percentage") of the shares of Common Stock outstanding immediately after giving effect to such [conversion/exercise].

(JA-86–87 § 4(d) (emphasis added); JA-153 § (1)(f) (same).)[1]

As further assurance that Hudson Bay could not and would never beneficially own more than 9.99% of BBBY's outstanding shares, even inadvertently, the Blockers provided that any attempt to convert or exercise shares in excess of 9.99%

---

[1] "Attribution Parties" included not only Hudson Bay and its affiliates, but "any Person acting or who could be deemed to be acting as a Group" with Hudson Bay or any of its affiliates. (JA-112 § 31(g); JA-168 § 19(d).)

would automatically be rendered null and void and would be cancelled from inception:

> In the event that the issuance of shares of Common Stock to a Holder upon [conversion of Preferred Shares/exercise of the Common Stock Warrant] results in [the] Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock. . . , the number of shares so issued . . . (the "Excess Shares") *shall be deemed null and void and shall be cancelled ab initio* . . . .

(JA-87–88 § 4(d) (emphasis added); JA-154 § (1)(f) (similar).)

To eliminate any doubt, the Blockers also provided that Hudson Bay "*shall not have the power to vote or to transfer*" shares issued above the Maximum Percentage. (JA-88 § 4(d) (emphasis added); JA-154 § 1(f) (same).) "For purposes of clarity," the Blockers provided that any Excess Shares "*shall not be deemed to be beneficially owned by [the] Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act*." (*Id.* (emphasis added).)

The Blocker in BBBY's Certificate of Incorporation further provided that any Excess Shares resulting from a conversion of Preferred Stock would "be held in abeyance until such time as the delivery of such Blocked Shares would not result in such Holder and the other Attribution Parties exceeding the Maximum Percentage." (JA-88 § 4(d).)

13

The Blockers could "not be amended or waived" by either Hudson Bay or BBBY, and were binding on any successors. (JA-111 § 30(b); *see also* JA-164 § 11 (Blocker provision could not be amended); JA-88 § 4(d) (Blocker "may not be waived and shall apply to a successor holder" of the security); JA-154 § 1(f) (same).)

Finally, with each conversion or exercise request, Hudson Bay was obligated to certify to BBBY that, "after giving effect to the conversion [or exercise]," Hudson Bay and its affiliates "will not have beneficial ownership . . . of a number of shares of Common Stock which exceeds" 9.99%. (*See, e.g.*, JA-275 (Series A Conversion Notice); JA-278 (Common Warrant Exercise Notice) (same); *see also* SPA-7.)

### D.    Hudson Bay and BBBY's Side Letter

In connection with the Public Offering, Hudson Bay and BBBY also entered into an ancillary agreement, the "Side Letter." (JA-212–233.) As is evident on its face, the Side Letter's purpose was to give Hudson Bay certain participation rights and other protections as the anchor investor that provided the vast majority of the financing for the Public Offering. Specifically, the Side Letter placed restrictions on the timing and types of future offerings BBBY could pursue, and gave Hudson Bay notice, participation, consent, and other rights in connection with future offerings. (JA-213–221 §§ 1, 2(g), 2(i), 2(j).)

The Side Letter also required BBBY to promptly publicly disclose all material terms of the Public Offering. (JA-217–218 §2(f).) This was a protection for Hudson

Bay, to cleanse it of material non-public information about the Public Offering that could restrict it from trading under the securities laws. (*Id.*) It was up to BBBY and its counsel, Kirkland & Ellis, to determine what information was sufficiently "material" to require disclosure. (*Id.*) The Side Letter required BBBY to obtain Hudson Bay's consent before publicly revealing Hudson Bay's *identity*, but nothing in the Side Letter required its substantive terms to be kept a "secret." (*Id.*) To the contrary, if BBBY and its counsel deemed those terms to be material, the Side Letter *required* BBBY to publicly disclose them. (*Id.* (permitting BBBY to issue "any press release or other public disclosure with respect to" the "transactions contemplated" by the Side Letter "without the prior approval of" Hudson Bay, in "substantial conformity" with its SEC filing announcing the Public Offering).)

As most relevant here, the Side Letter fully preserved the parties' rights and obligations under the terms of Hudson Bay's derivative securities, including the Blockers. The Side Letter made clear that it did not supersede those documents, but worked collectively with them to form a unified transaction. (JA-225 § 4(e).) It specifically, expressly required BBBY to "honor" exercises and conversion requests and "deliver" shares "in accordance with the terms, conditions and time periods set forth in the Certificate of Amendment, Preferred Warrants and Common Warrants," including the Blockers. (JA-221–222 § 2(n).)

15

The Side Letter also provided that the forms of conversion and exercise notices Hudson Bay sent would "set forth the totality of the procedures required of the Investor in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares" and that "[n]o legal opinion, other information or instructions shall be required of the Investor to exercise their Preferred Warrants or Common Warrants or convert their Preferred Shares." (JA-221–222 § 2(n).) These provisions clarified that Hudson Bay could exercise or convert its securities simply by submitting the required notice, without additional procedures. (*Id.*) To facilitate such conversions and exercises, the Side Letter also required BBBY to instruct its transfer agent to issue stock "in such amounts as specified from time to time" by Hudson Bay in its conversion or exercise notices. (JA-221–222 § 3(b).)

None of these provisions in any way altered or "superseded" BBBY's firm obligation to act "in accordance with" the terms of the other transaction documents, including the Blockers. (JA-221–222 § 2(n); JA-225 § 4(e).) Accordingly, nothing in the Side Letter prohibited BBBY from seeking information or taking any other steps necessary to comply with its unambiguous contractual obligations, including under the Blockers.

## III.  PROCEDURAL HISTORY

On May 2, 2024, Plaintiff filed a complaint against Hudson Bay alleging a single claim for relief under Section 16(b).  Plaintiff sued only after Hudson Bay

16

provided extensive pre-suit discovery to Plaintiff, including Hudson Bay's trading records. Although Plaintiff's complaint acknowledged that Hudson Bay's BBBY securities were subject to the Blockers and attached the relevant documents evidencing the Blockers, Plaintiff alleged that they were illusory based on various factors set forth in an amicus brief the SEC filed in *Levy*. (JA-35–36 ¶¶ 153-155.) Hudson Bay moved to dismiss on July 11, 2024. (*See* JA-5 (ECF No. 24).)

On September 30, 2025, the district court granted Hudson Bay's motion to dismiss. The district court held that Plaintiff failed to state a claim under Section 16(b) because it failed to allege that Hudson Bay was ever a greater-than-10% beneficial owner of BBBY Common Stock. (*See* SPA-32.)

The district court first acknowledged that "binding Second Circuit precedent," including *Levy*, "has enforced blockers like any other contract." (SPA-15 (citations omitted).) Analyzing the Blockers' text, the district court held that, on their face, they constituted "clear prohibition[s]" on Hudson Bay's right to acquire more than 9.99% of BBBY's Common Stock. (SPA-19.) In fact, Plaintiff effectively conceded this point, as it did "not argue that the blockers . . . do not prohibit ownership greater than 9.99%," but rather "argue[d] that several other *Levy* SEC factors weigh in favor of a finding that the blockers were illusory." (SPA-21.)

Turning to those factors, the district court acknowledged that the SEC's factors were "non-exclusive" and that it was not "*bound* by an *amicus* submission

filed in a different case." (SPA-17.) Nonetheless, "considering the dearth of case law in this Circuit on the issue of sham or illusory blockers," it chose to consider those factors "to the extent they are persuasive and applicable," "in addition of course to textual analysis of the contract." (*Id.*)

Analyzing those factors, the district court held that Plaintiff "fail[ed] to plausibly allege that the subject blockers are a sham." (SPA-18.) First, the district court held that Plaintiff failed to establish that the parties could have easily waived or amended the Blockers. (SPA-21–23.) The district court noted that the text of the governing documents expressly prohibited waiver or amendment of the blocker provisions. (SPA-22–23.) The district court deemed Plaintiff's core waiver argument "nonsensical," dismissing Plaintiff's contention that "simply because parties could amend a contract," the contract's provisions are "'easily waivable' such that they are illusory." (SPA-22.) The district court also noted that "the Second Circuit [in *Levy*] and courts in this district have found that blockers were binding when included in contracts between the security issuer and the security holder, rather than in the issuer's certificate of incorporation." (*Id.*)

Second, the district court rejected Plaintiff's argument that the Blockers lacked adequate enforcement mechanisms. The district court explained that: (1) the Blockers included numerous enforcement mechanisms (self-effectuating and otherwise), some of which were stronger than those this Court found adequate in

*Levy*; and (2) regardless of whether BBBY had any interest or ability to enforce the Blockers, *Levy* established that "the proper analysis clearly focuses on whether enforcement mechanisms were included in the text of the blockers, not whether the issuer was interested in using them," and that "an issuer need not have an independent ability to enforce a conversion cap for a blocker to be binding." (SPA-23–26.)

The district court also rejected Plaintiff's attempt to characterize the Side Letter as undermining the Blockers. Citing, among other things, the Side Letter's language requiring BBBY to honor conversion and exercise requests "in accordance with" the terms of the Transaction Documents, the district court held that, contrary to Plaintiff's arguments, the Side Letter was "not written to supersede and extinguish the [Blockers], but rather to work in conjunction with them." (SPA-27–28.)

Third, the district court held that Plaintiff did not plausibly allege that the Blockers were not adhered to in practice. (SPA-26–32.) The district court reiterated that the Blockers, on their face, prevented Hudson Bay from having the "right to acquire" Common Stock above the 9.99% threshold, and explained that the Side Letter only reinforced that limitation. (SPA-26–29.) The district court also observed that Plaintiff's calculations of Hudson Bay's beneficial ownership were not only "inconsistent," but incorrectly included shares that Hudson Bay had already sold to third parties. (SPA-8 n.4, 39.) It found that those shares should not have been

19

included as a matter of law, because "[a]ccording to relevant case law, the moment [Hudson Bay] sold shares, they lost any dispositive power over those shares." (SPA-29–32.)  The Court further noted that "the Complaint concedes" that if shares Hudson Bay "had already sold to third parties are deducted from Plaintiff's" beneficial ownership calculation, Hudson Bay "would remain under 10% beneficial ownership of outstanding BBBY common stock." (SPA-29.)  Thus, the district court found that Plaintiff failed to plausibly allege that Hudson Bay's beneficial ownership ever exceeded 10%.  (SPA-32.)

Regarding several other factors Plaintiff relied on—including whether blockers relate to another regulatory scheme or are the product of bona fide negotiations—the district court found that Plaintiff's arguments were "not persuasive because the SEC stated only that [those factors] 'may indicate that a cap is binding,'" and "[i]t does not follow, and the SEC never indicated, that the absence of those factors suggests a conversion cap was illusory." (SPA-32 n.8.)

In sum, because Plaintiff failed to plausibly allege that the Blockers were illusory or a sham, the district court granted Hudson Bay's motion to dismiss.  (SPA-31–32.)  This appeal followed.

## SUMMARY OF ARGUMENT

**I.** Under long-established precedent, blockers are a valid means of preventing holders of derivative securities from acquiring beneficial ownership above the

applicable cap. Blockers that prevent investors from beneficially owning more than 10% of an issuer's equity securities therefore prevent investors from becoming liable as "insiders" under Section 16(b).

As the district court correctly found, the Blockers governing Hudson Bay's BBBY securities—which, among other things, rendered conversions or exercises above the 9.99% cap "null and void," "treated as if never made," and "cancelled ab initio"—constituted a "clear prohibition" on Hudson Bay becoming a greater-than-10% beneficial owner subject to Section 16(b). Plaintiff does not—and cannot—dispute the district court's textual analysis, either below or on appeal.

Plaintiff instead relies on various "factors" that it claims render the Blockers an illusory "sham," notwithstanding their text. Those factors, however, only *support* the Blockers' effectiveness. Plaintiff failed to articulate any well-pleaded facts suggesting that the Blockers were illusory or ever failed in practice. After carefully considering and analyzing these factors, that is precisely what the district court found.

First, Plaintiff argues that the Blockers lacked adequate enforcement mechanisms. But *Levy* squarely disposes of that argument. In *Levy*, this Court found a blocker effective where the only "enforcement mechanism" was the investor's *option* to revoke a conversion request that would cause it to exceed the blocker, and the issuer had no independent means of enforcing the blocker. By contrast, the

21

Blockers' various and interconnected enforcement mechanisms are much stronger here. Plaintiff's arguments amount to speculation that the parties *could have* ignored those mechanisms. But the mere fact that a party can *theoretically* breach a contract, as it can in any contract case, obviously does not render the contract itself a "sham."

Plaintiff also relies heavily on the so-called Side Letter, which Plaintiff claims prevented BBBY from enforcing the Blockers. But as the district court correctly found, the Side Letter does exactly the opposite: it explicitly *required* the parties to adhere to all the terms and conditions governing Hudson Bay's BBBY securities, including the Blockers. In other words, far from *undermining* the Blockers, the Side Letter *reinforced* them. This makes sense because, contrary to Plaintiff's characterization, the Side Letter was not directed to, and did not affect, the Blockers. Rather, on its face, the Side Letter protected Hudson Bay's investment by securing certain rights and covenants as the Public Offering's anchor investor.

Second, Plaintiff argues that the Blockers in the Common Stock Warrants could have been easily waived or amended because they were included in a contract, rather than the issuer's certificate of incorporation. Once again, this argument is foreclosed by *Levy*, in which this Court found a "purely contractual" blocker—not found in the issuer's certificate of incorporation—to nonetheless be valid and effective. Here, again, the Blockers contain even stronger, binding contractual provisions that *specifically forbade* the parties from waiving or amending the

22

Blockers.  Plaintiff does not plead that the parties even tried to evade those bars.  Plaintiff's argument that the mere *possibility* that the parties could amend a contract renders it an illusory "sham" is, in the district court's words, "nonsensical."

Third, Plaintiff asserts that Hudson Bay exceeded the Blockers' beneficial ownership cap in practice.  But, as the district court correctly recognized, Plaintiff's beneficial ownership calculations improperly treat Hudson Bay as the beneficial owner of shares it already sold.  Because Hudson Bay obviously cannot sell the same shares twice, Plaintiff's calculations are wrong as a matter of law.  Once that fatal legal error is corrected, the complaint indisputably fails to plead that Hudson Bay ever exceeded the greater-than-10% threshold.

Finally, and as the foregoing discussion makes clear, Plaintiff's claim fails because it pleaded no facts showing that the Blockers were a sham or failed in practice, not because the district court believed all similarly-written blockers are *per se* valid.

**II.** Plaintiff's attempt to salvage its complaint by claiming that the Blockers constituted a "scheme to evade" is similarly infirm.  Courts and the SEC have made clear that the legal concept of "scheme to evade" applies to a party's attempt to *conceal* its ability to exercise voting or dispositive power over securities.  In other words, a "scheme to evade" is a scheme that allows the party to effectively acquire a control position in secret.  As this Court correctly recognized in *Levy*, this concept

23

does not apply to blockers, which prevent an investor from *acquiring* beneficial ownership in the first place. Holding otherwise would fly in the face of Supreme Court and Circuit precedent holding that attempts to structure a transaction to avoid Section 16 disclosure and potential liability are entirely permissible, and that blockers are a perfectly legitimate means of accomplishing those objectives.

**III.** Given the utter lack of any well-pleaded allegations supporting Plaintiff's claim, allowing this case to proceed past a motion to dismiss would amount to overruling *Levy*. Such a result would subject parties to costly litigation and discovery every time a well-crafted blocker provision is alleged to be a sham. It would also create mass uncertainty for issuers and investors. Blockers offer a path for investors to provide significant financing, including to distressed companies, without subjecting themselves to Section 16(b)'s broad disclosure requirements and strict liability disgorgement regime. Choking off that path, as Plaintiff seeks to do, will lead to less financing and, consequently, more failed businesses.

For these reasons, the district court's decision should be affirmed.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal of a complaint de novo. *Santos v. Kimmel*, 154 F.4th 30, 33 (2d Cir. 2025). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## ARGUMENT

### I. THE BLOCKERS PREVENTED HUDSON BAY FROM BECOMING A STATUTORY INSIDER SUBJECT TO SECTION 16(b) LIABILITY

#### A. As This Court Recognized in *Levy*, Blockers are Enforceable

As this Court has long recognized, beneficial ownership limitations such as blockers effectively prevent holders of derivative securities from beneficially owning more than an applicable ownership cap. *See Levy*, 263 F.3d at 15-17 (blockers prevented holder from acquiring beneficial ownership above the specified threshold).

Specifically, a blocker prevents a holder of a derivative security, like convertible preferred stock or a warrant, from beneficially owning shares they could otherwise acquire within 60 days through conversion or exercise of that derivative security. *Levy*, 263 F.3d at 15-17; 17 C.F.R. § 240.13d-3(d)(1). Thus, "a blocker provision prevents a holder" of derivative securities "from being the beneficial owner [of shares], for purposes of the ten percent owner calculation." Romeo & Dye § 2.03[5][ii].

This precedent makes sense. Investors who cannot acquire more than 10% of an issuer's outstanding shares through a derivative security like the Preferred Stock or the Common Stock Warrants neither fall within Section 16(b)'s terms nor fit the rationale for Section 16(b). The purpose of blocker provisions is to prevent investors from gaining such a large position that "their control over the corporation and their consequent access to confidential information are such that they are the equivalent of directors," which would bring them within Section 16(b)'s ambit. Romeo & Dye § 2.03 (citing S. Rep. No. 1455, 73d Cong., 2d Sess. 55 (1934)). When an investor never obtains such power, courts have properly excluded them from Section 16(b)'s reach. *See, e.g.*, *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448 (S.D.N.Y. 2001) (blocker was "clearly written and enforceable as a matter of law"); *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 115 F. Supp. 2d 440, 443 (S.D.N.Y. 2000) (blocker "proves" that plaintiff's allegations of 10% beneficial ownership were "insufficient as a matter of law"); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99-cv-342, 1999 WL 544708, at *15-16 (S.D.N.Y. July 27, 1999) (similar).

In *Levy*, on appeal from a decision granting a motion to dismiss, this Court considered a blocker which provided that the holder "may not" convert preferred stock or exercise warrants "to the extent that such conversion or exercise would result in the [holder] owning more than 4.9%" of the issuer's common stock. 263

26

F.3d at 17. The *Levy* court held that "where a binding conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities." 263 F.3d at 12. Interpreting the blocker "as a whole," the *Levy* court found that it was valid, binding and effectuated "a clear prohibition" on the investor's "ability to convert shares to the extent that conversion would result in it owning in excess of 4.9%" of the issuer's common stock. *Id.* at 17-18. This Court accordingly affirmed dismissal.[2]

---

[2] The full text of the *Levy* blocker reads: "The Purchaser may not use its ability to convert Shares hereunder or under the terms of the Vote Certificates or to exercise its right to acquire shares of Common Stock under the Warrants to the extent that such conversion or exercise would result in the Purchaser owning more than 4.9% of the outstanding shares of the Common Stock. The Company shall, promptly upon its receipt of a Holder Conversion Notice tendered by the Purchaser (or its sole designee) under the Vote Certificates, and upon its receipt of a notice of exercise under the terms of any of the Warrants, notify the Purchaser by telephone and by facsimile of the number of shares of Common Stock outstanding on such date and the number of Underlying Shares and Warrant Shares which would be issuable to the Purchaser (or its sole designee, as the case may be) if the conversion requested in such Conversion Notice or exercise requested in such exercise notice were effected in full, whereupon, notwithstanding anything to the contrary set forth in the Vote Certificates or the Warrants, the Purchaser may within one Trading Day of its receipt of the Company notice required by this Section by telephone or by facsimile revoke such conversion or exercise to the extent that it determines that such conversion or exercise would result in the Purchaser owning in excess of 4.9% of such outstanding shares of Common Stock." *Id.*; *see also* Ex. 2 to Decl. of Kaitlin Shapiro in Support of Mot. to Dismiss (Nov. 8, 1996 Immunogen, Inc., Form 10-Q, Ex. 10.34 § 3.10), ECF No. 26-2 ("*Levy* blocker").

Other cases in this Circuit, both before and since *Levy*, have held likewise. *See, e.g.*, *Log On Am.*, 223 F. Supp. 2d at 448 (similar blocker was "clearly written and enforceable as a matter of law"); *Schaffer*, 115 F. Supp. 2d at 443 (blocker "proves" that plaintiff's allegations of 10% beneficial ownership were "insufficient as a matter of law").

Plaintiff attempts to distinguish *Levy*, arguing that it involved a "categorical" challenge that sought to "invalidate[] essentially every blocker with the same language." (Plaintiff's Br. at 21-22.) But as discussed below, Plaintiff's challenges to the Blockers here are no less "categorical" than those in *Levy*. Like the *Levy* plaintiff, most of Plaintiff's arguments would apply to *any* provision drafted like the Blockers here, and Plaintiff has not adequately pled any facts showing that the Blockers were violated in practice. (*See* Section I.C below.) Therefore, *Levy*—and the numerous cases since that have upheld blockers at the motion to dismiss stage— dictates dismissal here.

### B. The Blockers Here Are Stronger Than The *Levy* Blocker, And Unambiguously Prevented Hudson Bay From Acquiring More Than 10% Beneficial Ownership

Tellingly, Plaintiff has never disputed that the *text* of the Blockers, on their face, unambiguously prevented Hudson Bay from becoming a greater than 10% beneficial owner. (*See* SPA-21 ("Plaintiff d[id] not argue that the blockers . . . do not prohibit ownership greater than 9.99%").) That concession makes sense, as the

28

Blockers here are even more robust than those approved by courts in *Levy* and its progeny.

Like the blockers in these other cases, the Blockers here provided that BBBY "shall not effect," and Hudson Bay "shall not have the right to," any conversion or exercise that would cause Hudson Bay to "beneficially own in excess of 9.99%" of the outstanding Common Stock. (JA-86–87 § 4(d); JA-153 § (1)(f).) As courts have found time and again when addressing similar language, these terms provided "a clear prohibition" on Hudson Bay's ability to become a greater than 10% beneficial owner of Common Stock. *See Levy*, 263 F.3d at 17-18.

The Blockers here, however, went considerably further than the *Levy* blocker. In unambiguous terms, the Blockers explicitly:

- Specified that any conversion or exercise that would take Hudson Bay above the 9.99% threshold "shall be null and void and treated as if never made";

- Precluded the exercise of voting or investment power—the hallmarks of beneficial ownership—in excess of the 9.99% threshold, expressly providing that Hudson Bay "shall not have the power to vote or to transfer" any such shares; and

- Stated that such Excess Shares "shall not be deemed to be beneficially owned by [Hudson Bay] for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act."

JA-86–88 § 4(d); JA-153–154 § 1(f).

These provisions were self-effectuating—they did not depend on any action or inaction by BBBY or Hudson Bay. Instead, on their face, they plainly barred Hudson Bay from ever acquiring voting or investment power, and thus beneficial

ownership, over more than 9.99% of the outstanding Common Stock through conversions or exercises. They therefore reflect the parties' mutual, clear intent that Hudson Bay could not, under any circumstance, beneficially own more than 9.99% of the outstanding Common Stock as a result of any exercise or conversion. (*Compare* JA-40–41 ¶¶ 178-185, *with* JA-86–88 § 4(d), JA-153–154 § 1(f).)

The Blocker in the Certificate of Incorporation, which governed conversions of Preferred Stock, further provided that any Excess Shares "shall be held in abeyance until such time as" their delivery "would not result in" Hudson Bay exceeding the 9.99% threshold. (JA-88 § 4(d).)

Additionally, with each conversion or exercise request, Hudson Bay was required to represent that the conversion or exercise would not cause it to exceed the Blockers' limitation. (JA-275 (Series A Conversion Notice); JA-278 (Common Warrant Exercise Notice) (same); *see also* SPA-7.)

The parties also added *additional* protections to ensure that there was no way to evade the Blockers' strict limitations by waiving or amending them, transferring ownership to other entities, or coordinating with other investors.

*First*, the Blockers by their terms could not be waived or amended by either Hudson Bay or BBBY. (JA-111 § 30(b) (Blocker "may not be amended or waived"); JA-164 § 11 (Blocker provision could not be amended); *see also* JA-88 § 4(d) ("[t]he

limitation contained in this paragraph may not be waived and shall apply to a successor holder" of the security); JA-154 § 1(f) (same).)

*Second*, the Blockers made clear that the calculation of the Maximum Percentage of Common Stock Hudson Bay could receive included not only shares of Common Stock held by Hudson Bay and its affiliates, but also shares held by any other "Attribution Party." (JA-87 § 4(d) (9.99% limit applies "collectively" to Hudson Bay "and the other Attribution Parties"); JA-153 § 1(f) (same).) An Attribution Party included any person "whose beneficial ownership of [BBBY's] Common Stock would or could be aggregated with," Hudson Bay's and its affiliates' beneficial ownership. (JA-112 § 31(g) (defining "Attribution Parties"); JA-168 § 19(d) (same).)

Put simply, the Blockers, on their face, were *even stronger* than those courts routinely uphold as valid and effective. The district court agreed, finding that, as in *Levy* and numerous other cases upholding blockers, the Blockers were "clear prohibition[s]" on Hudson Bay's right to acquire more than 9.99% of BBBY's Common Stock. (SPA-18–21 (citing *Levy*, 263 F.3d at 18; *Log On Am.*, 223 F. Supp. 2d at 448; *Schaffer*, 115 F. Supp. 2d at 443; *Global Intellicom*, 1999 WL 544708, at *16).) Plaintiff has no answer to the district court's textual analysis, and does not challenge it on appeal.

### C. Plaintiff Failed To Plausibly Plead That The Blockers Were Illusory or Ineffective

Unable to attack the Blockers' plain terms, Plaintiff's case rests entirely on the premise that the Blockers were an illusory "sham" that failed to constrain Hudson Bay's beneficial ownership in practice. While *Levy* allows courts to conclude that a blocker is ineffective and therefore does not prevent beneficial ownership above its capped threshold, it is clear that Plaintiff failed to plead that the Blockers here suffer from any such infirmity.

Plaintiff's arguments to the contrary draw heavily on an amicus brief the SEC submitted in *Levy*, which proposed a non-exhaustive list of factors that the SEC posited could suggest that a blocker is illusory. Plaintiff cites three of those factors—whether the Blockers: (1) lacked adequate enforcement mechanisms; (2) were easily waivable or amendable; or (3) were adhered to in practice.[3]

As an initial matter, these "factors" have no precedential significance. As Plaintiff concedes, the Court in *Levy* "did not apply the SEC's factors at all." (Plaintiff's Br. at 27); *see also Klawonn v. YA Glob. Invs., L.P.*, No. 10-cv-2108, 2011

---

[3] Plaintiff relied on several other factors below, but the district court found that Plaintiff's arguments on those factors were "not persuasive because the SEC stated only that they 'may indicate that a cap is binding,'" and "[i]t does not follow, and the SEC never indicated, that the absence of those factors suggests a conversion cap was illusory." (SPA-32 n.8.) Thus, Plaintiff's assertion that the district court "appeared to agree" that the Blockers did not satisfy these factors is an obvious mischaracterization. (Plaintiff's Br. at 15.) In any event, Plaintiff does not challenge the district court's finding or raise any other arguments about these factors on appeal.

WL 3502022, at *4 (D.N.J. Aug. 10, 2011) (noting that there is no indication "that the Second Circuit paid any attention to the SEC's list of factors," and that they "appear[ed] to have played no role in the Second Circuit's decision"). Neither have most courts since. *See, e.g.*, *Log On Am.*, 223 F. Supp. 2d at 448 (analyzing blocker without relying on amicus factors); *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 596-597 (9th Cir. 2004) (same); *Probility Media Corp. v. Isen*, No. 3:17-cv-2583, 2018 WL 1726626, at *2 (S.D. Cal. Apr. 10, 2018) (same). Even the district court, which applied the factors "to the extent they are persuasive and applicable," acknowledged that the factors were "non-exclusive" and that it was not "bound" by them. (SPA-17–18.)

Setting that aside, judicial review of these factors only confirms the wisdom of the district court's decision. As the district court held, all three relevant factors *support* the Blockers' effectiveness. As discussed below, the first two factors are controlled by *Levy*, in which this Court concluded that blockers with weaker enforcement mechanisms and which were more "easily waivable" than the Blockers here were effective. As to the third factor, Plaintiff failed to plausibly allege that Hudson Bay ever exceeded the Blockers' limitations in practice.

### (i) Plaintiff Failed to Plead That The Blockers Had Inadequate Enforcement Mechanisms

Plaintiff's argument that the Blockers lacked adequate enforcement mechanisms conflicts with well-established Circuit law.

In *Levy*, this Court found a blocker valid and effective where its only enforcement mechanism was to *allow*, but not *require,* the derivative holder to revoke a conversion request that would cause it to exceed the cap. *Levy*, 263 F.3d at 17-18; *see also Levy* blocker. As the district court here recognized, the Blockers' enforcement mechanisms here, self-effectuating and otherwise, were substantially more robust. (SPA-23–24.) As discussed above, among other things, the Blockers: (1) rendered any exercises or conversions above the cap "null," "void" and "cancelled ab initio"; (2) stripped Hudson Bay of any voting or dispositive power over securities issued above the cap; (3) required the parties to hold any excess shares resulting from conversion of the Preferred Stock in abeyance; and (4) *required*—not merely *allowed*—Hudson Bay to affirm compliance with the Blockers in each conversion and exercise request. (*See* Section I.B above*.*)[4]

Plaintiff's primary argument is that this plethora of interconnected enforcement mechanisms was ineffective because the Side Letter supposedly prevented BBBY from monitoring Hudson Bay's true beneficial ownership. But as *Levy* "makes clear," and as the district court correctly explained, "an issuer need not have an independent ability to enforce a conversion cap for a blocker to be binding."

---

[4] Plaintiff's confusing and nonsensical attempt to distinguish between the SEC's terminology ("enforcement mechanism") and *Levy*'s ("means of ensuring compliance") draws a distinction without a difference. (*See* Plaintiff's Br. at 28.) Both *Levy* and the SEC focused on whether blockers have mechanisms to ensure that they are not mere "shams," which the Blockers here clearly do.

(SPA-25–26.)  To the contrary, *Levy* "affirmed an opinion granting a motion to dismiss, finding a blocker was binding where the duty of enforcement rested entirely with the derivative holder."  (SPA-26.)

In any event, Plaintiff mischaracterizes the Side Letter.  As the district court found, the Side Letter was designed to "work in conjunction with" the Blockers, not undermine them.  (SPA-27–28; *see also* JA-221–222 § 2(n) (Side Letter required BBBY to "honor exercises . . . and conversions . . . *in accordance with the terms, conditions and time periods* set forth in" the Transaction Documents, including the Blockers) (emphasis added).)

Plaintiff's attempt to portray the Side Letter as the center of some sort of conspiracy to evade the Blockers is nonsense.  On its face, the Side Letter's purpose was to provide Hudson Bay with participation rights in future offerings and other protections as the Public Offering's anchor investor.  (*See* Statement of the Case, Section II.D above.)  Nothing in the Side Letter affected the Blockers.  To the contrary, it *reinforced* BBBY's unambiguous obligation to comply with them.  (*Id.*)  Plaintiff hones in on, takes out of context, and misconstrues several Side Letter provisions that simply clarified the procedures by which Hudson Bay could convert or exercise its securities, and by which BBBY was to facilitate those conversions and exercises through its transfer agent.  (*Id.*)  Neither of those provisions, nor anything else in the Side Letter, altered BBBY's unambiguous contractual

obligations—including under the Blockers—or barred BBBY from seeking information or taking other necessary steps to comply with them. (*Id.*)

Plaintiff's repeated, conspiratorial description of the Side Letter as "secret" is equally disingenuous. (Plaintiff's Br. at 2, 8, 9, 17, 21, 26, 28, 30, 34, 35, 45, 49.) The Side Letter specifically required BBBY to promptly and publicly disclose all material terms of its transactions with Hudson Bay. (JA-217–218 §2(f).) While BBBY could not publicly reveal Hudson Bay's identity without Hudson Bay's consent, BBBY and its sophisticated counsel—not Hudson Bay—had the authority and the obligation to determine which substantive terms were sufficiently material to require disclosure. (*Id.*) Thus, had BBBY determined that the Side Letter's substantive terms were material, it was required to publicly disclose them. (*Id.* (permitting BBBY to make public disclosures concerning the Side Letter without Hudson Bay's approval).) BBBY apparently determined they were not. Given that choice, BBBY's successor cannot turn around and accuse *Hudson Bay* of keeping the Side Letter a "secret."

Unable to credibly distinguish *Levy*, Plaintiff resorts to speculation and hypotheticals. Plaintiff's arguments boil down to an assertion that the Blockers' enforcement mechanisms were inadequate because the parties *hypothetically could have* disregarded them: that is, Hudson Bay *could have* misrepresented its

36

compliance with the Blockers when making conversion or exercise requests, or BBBY *could have* ignored its obligations not to deliver shares above 9.99%.

But as discussed below, Plaintiff offers no well-pleaded allegations that the Blockers ever failed in practice, i.e. that any of those things *actually happened*. (*See* Section I.C.iii below.) As such, Plaintiff's arguments that the Blockers' enforcement mechanisms *could have* been evaded would apply to *every* similarly crafted blocker provision. But the mere possibility that the parties hypothetically *could have* breached their contract and evaded its enforcement mechanisms does not render that contract, or those enforcement mechanisms, illusory. Holding otherwise would render *every* blocker provision—and, indeed, every contract—illusory, a clearly absurd result. As the district court correctly explained, "Plaintiff cites no authority supporting the assertion that a lack of interest in enforcement renders a blocker illusory." Rather, "the proper analysis clearly focuses on whether enforcement mechanisms were included in the text of the blockers, not whether the issuer was interested in using them." (SPA-24–25.)

Plaintiff's attempt to analogize this case to *Solus I*, 124 F. Supp. 3d 315 (S.D.N.Y. 2015) misses the mark. (Plaintiff's Br. at 29.) *Solus I* concerned a provision that was "not really a 'blocker' (or 'cap') at all," but a "one-time divestment mechanism" that "purport[ed] to *eliminate*" greater than 10% beneficial ownership "rather than *preventing* [the investor] from attaining" it. *Id.* at 323

37

(emphases in original). Notably, even with that key difference—which the *Solus I* court found highly relevant—on summary judgment, the court found the provision to be valid and binding and dismissed the Section 16 claim. *See Roth ex. rel. YRC Worldwide, Inc. v. Solus Alt. Asset Mgmt. LP* ("*Solus II*"), 258 F. Supp. 3d 364, 369-371 (S.D.N.Y. 2017).

In contrast, the Blockers here are actual blockers that *prevented* Hudson Bay from acquiring insider status. Contrary to Plaintiff's suggestion, the mere fact that they were negotiated as part of a rescue financing, as many blockers are, does not make them remotely analogous to *Solus I's* unusual fact pattern.

### (ii) Plaintiff Failed to Plead That The Blockers Could Be Easily Waived or Amended

Plaintiff concedes that the Blockers applicable to the Preferred Stock were "embedded in BBBY's charter documents and not easily waived." (Plaintiff's Br. at 14.) But it argues that the Blockers in the Common Stock Warrants could be easily waived or amended because they were included in a contract between BBBY and Hudson Bay. That argument is meritless.

Plaintiff acknowledges, as it must, that specific and clear contractual provisions *barred* the Blockers' waiver or amendment. (Plaintiff's Br. at 14; SPA-22–23; *see* JA-164 § 11 (Blocker provision could not be amended); JA-154 § 1(f) ("[t]he limitation contained in this paragraph may not be waived and shall apply to

38

a successor holder" of the security).)  Plaintiff did not allege that the parties ever attempted to amend or waive the Blockers in violation of these provisions.

Instead, Plaintiff again asks this Court to disregard the Blockers' text based on a convoluted *hypothetical* amendment.  Specifically, Plaintiff posits that, because the Warrants were contracts, the parties theoretically *could have* amended them to remove the anti-amendment provisions, and *then* amended or waived the Blockers. (Plaintiff's Br. at 31-33.)

Yet again, Plaintiff's argument is precluded by *Levy* and its progeny.  The blockers *Levy* upheld were "purely contractual," like the ones here, and unlike the ones here, did not even include an anti-amendment provision.  *See Levy* blocker. Numerous district courts both before and since *Levy* have similarly upheld "purely contractual" blockers as valid and effective.  *See, e.g.*, *Schaffer*, 115 F. Supp. 2d at 443; *Log On Am.*, 223 F. Supp. 2d at 448; *Decker*, 362 F.3d at 596-597; *Levner v. Prince Alwaleed*, 61 F.3d 8, 9-10 (2d Cir. 1995); *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 967-968 (9th Cir. 1994); *Global Intellicom*, 1999 WL 544708, at *16 & n.12.  Even Plaintiff's banner case rejected an argument strikingly similar to the one Plaintiff presses here.  *Solus II*, 258 F. Supp. 3d at 369-370 (finding that an "irrevocable" agreement not to convert notes was effective notwithstanding that it was only reflected in an "extraneous contract" between the issuer and the investor).

In short, binding and persuasive precedent establishes that a Blocker is not "illusory" just because the parties could hypothetically amend a contract.

This precedent makes good sense. As with its arguments on enforcement mechanisms, Plaintiff's arguments would apply to *every* so-called "purely contractual" blocker. Taking Plaintiff's argument seriously would mean that blockers included in contracts can *never* be effective, since the parties can always theoretically amend the contract to remove or change them. Worse still, Plaintiff's argument implies that contracts *in general* can never be treated as effective, binding or enforceable, since parties can always amend them. As the district court correctly found, the law on both points is obviously to the contrary. (*See* SPA-22 ("It is nonsensical to assert that simply because parties could amend a contract, that the contract's provision[s] are 'easily waivable' such that they are illusory." (citations omitted)).)

In any event, the anti-amendment provision, like any contractual provision, is enforceable according to its terms. Indeed, Plaintiff does not, and cannot, cite a single case suggesting that parties are free to disregard an anti-amendment provision like the one here. Of the cases Plaintiff cites, only one even involved an anti-amendment provision at all, and several did not even apply New York law. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (not involving an anti-amendment provision); *Applied Energetics, Inc. v. Newoak Cap. Mkts., LLC*,

645 F.3d 522, 526 (2d Cir. 2011) (same); *Credit Suisse First Boston Corp. v. Pitofsky*, 824 N.E.2d 929, 932 (N.Y. 2005) (same); *United States v. G-I Holdings, Inc.*, 369 B.R. 832, 838 n.12 (D.N.J. 2007) (not involving an anti-amendment provision or applying New York law); *Florida Rock Indus., Inc. v. Escambia Sand & Gravel Co.*, No. 13-0499, 2014 WL 2557067, at *1-3 (S.D. Ala. June 6, 2014) (same); *Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000, at *1 (C.D. Cal. July 9, 2018) (not involving an anti-amendment provision or New York law). In the only one that did involve an anti-amendment provision, *Beatty v. Guggenheim Expl. Co.*, 122 N.E. 378 (N.Y. 1919), the Court did *not* find the provision illusory. Rather, it declined to enforce the provision on other grounds, including that: (1) the plaintiff-employee had relied on the defendant-employer's oral consent to the transaction at issue; (2) it was "too late, years afterward" to invoke the anti-amendment provision to "nullify" that consent; and (3) the anti-amendment provision did "not apply" because the defendant-employer's consent was not an "amendment" or "waiver" at all. *Id.* at 387-389.

In fact, Plaintiff's authority only confirms the essential principle, described above, that "[a] contract does not lose its legally binding character merely because it may be waived or modified." *Pitofsky*, 824 N.E.2d at 934; *see also G-I Holdings, Inc.*, 369 B.R. at 838 n.12 ("The possibility that the parties may" amend a contract "does not render the original agreement either 'legally indefinite' or

'unenforceable.'"); *Florida Rock Indus.*, 2014 WL 2557067, at *9 (the possibility that parties could amend or modify a contract "in no way rendered the [original contract provisions] ambiguous, uncertain, illusory, or . . . incapable of ascertainment"). That is particularly true where, as here, the contracts include a specific anti-amendment provision.

In short, the law is clear: just because blockers are contained in a contract that could *theoretically* be waived or amended does not make them ineffective, invalid, or a "sham."

### (iii) Plaintiff Failed to Plead That the Blockers Were Not Adhered to in Practice

Plaintiff finally alleges that the Blockers were ineffective in practice. But Plaintiff's allegations relied on a legally flawed methodology: counting shares Hudson Bay *had already sold* as shares it *still owned*. As the district court explained, "the Complaint concedes" that if that fatal flaw in Plaintiff's calculations is corrected, Hudson Bay "would remain under 10% beneficial ownership." (SPA-29.) Because Plaintiff's calculations are flawed as a matter of law, its allegations are not well-pleaded, and it has not plausibly alleged that Hudson Bay ever became a greater-than-10% beneficial owner in practice.

As noted, a person beneficially owns a security if that person has: "(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or (2) Investment power which includes the power to dispose, or direct the

disposition of, such security."  17 C.F.R. § 240.13d-3(a); *see also id.* § 240.16a-1(a)(1).  Plaintiff has conceded that the Blockers prevented Hudson Bay from exercising *voting* power above 9.99%.  (Plaintiff's Br. at 41 (not contesting that "the [B]lockers stopped Hudson Bay from voting more than 9.99% of BBBY's stock"); SPA-31 (explaining Plaintiff "[did] not argue [before the district court] that Defendants retained residual *voting power*" over BBBY stock above 9.99%) (emphasis added).)  Indeed, the plain terms of the Blockers unambiguously prevented Hudson Bay from exercising voting power above 9.99%.  (JA-88 § 4(d) (providing that Hudson Bay "shall not have the power to vote" any shares in excess of 9.99%); JA-154 § 1(f) (same); SPA-31 (district court concluding same).)

The only question, then, is whether Plaintiff plausibly alleged that Hudson Bay ever had *dispositive* power above 10%.  It has not.

Beneficial ownership "does not turn on who owns legal title to the stock, or who is the registered owner," but "instead . . . focuses on any relationship that, *as a factual matter*, confers on a person a significant ability to affect how voting power or investment power will be exercised."  *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (emphasis in original).  It is thus well established that, "for [Section] 16(b) purposes," a "sale" is completed when "the investors' rights bec[o]me fixed and irrevocable," and "technicalities" like "[s]ettlement of the contracts[] or delivery of the shares" are "of no import" to determine when a sale

43

occurs. *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 651-652 (S.D.N.Y. 2022) (first alteration in original) (citation omitted); *see also Connell v. Johnson*, No. 20-cv-1864, 2020 WL 2748439, at *2 (S.D.N.Y. May 27, 2020) ("[T]he critical moment in the initial 'purchase' or 'sale,' for the purpose . . . of § 16(b), is that point at which the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor.").

Thus, as the district court explained, "the moment Defendants sold shares, they lost any dispositive power over those shares." (SPA-29.) The timing of the mere administrative act of transferring the sold shares from BBBY's account to Hudson Bay's and then to the buyer's is irrelevant. As the district court further explained:

> [O]nce Defendants sold BBBY common stock to a third-party buyer, that buyer became the owner of the shares, and Defendants were restrained in their actions regardless of the physical location of the shares and Defendants were required to deliver the shares to the buyer . . . Defendants could not instead decide to vote the shares already sold or dispose of them differently by selling them for a second time to another buyer.

(SPA-30 (citations to case law referenced above omitted).) Put simply, Hudson Bay could not sell the same shares twice.

Plaintiff's methodology violates this well-established principle. As Plaintiff readily concedes, its daily calculations include shares Hudson Bay had already sold,

but that had not yet settled.  (Plaintiff's Br. at 36-38.)  In contrast to the district court, Plaintiff does not, and cannot, cite a *single case* holding that "dispositive power" encompasses the mere administrative act of physically delivering the shares to settle a sale.  The law above makes clear it does not.

Plaintiff invokes *Levy's* holding that beneficial ownership must be calculated at a single point in time, rather than cumulatively.  (Plaintiff's Br. at 37-38.)  But that is exactly what the district court did—it calculated Hudson Bay's beneficial ownership as of a single time, properly excluding shares Hudson Bay had already sold.  (SPA-29–32.)  It is *Plaintiff* that violates *Levy's* rule, by viewing all conversions and exercises in a day cumulatively and failing to account for intervening *sales* that occurred during the day.  (Plaintiff's Br. at 37-38.)

Plaintiff's argument about the "purpose" of Rule 13d-3 is similarly off-base. (Plaintiff's Br. at 38-41.)  Plaintiff posits yet another hypothetical, in which Hudson Bay, through serial exercises, conversions and sales, could sell an 80%-stake in BBBY's Common Stock to a single buyer in a single day.  Of course, Plaintiff does not allege that anything like that happened.  And even if it did, *Levy*—as the district court recognized—*expressly held* that Rule 13d-3 would permit the alleged approach of "selling common stock before requesting additional shares in order to remain below the conversion cap."  (SPA-29 (citing *Levy*, 263 F.3d at 15)); *see also Log On Am.*, 223 F. Supp. 2d at 448.

Regardless, if Plaintiff's hypothetical were to come to pass, the *buyer* (who would not be subject to the Blockers) would be "deemed to" beneficially own the shares following the sale, and would be required to make any corresponding SEC disclosures. *See* 17 C.F.R. § 242.200(b). That makes sense: the Blockers prevented Hudson Bay from acquiring a voting or investment position above the threshold that Congress determined gives investors power to influence or control the company so as to justify disclosure. But that would not be true of the buyer, who has no such restrictions, *is* able to acquire a control position, and thus *would* have to make those disclosures. Rule 13d-3's disclosure purpose would be fully satisfied.

Because Plaintiff's beneficial ownership calculations are flawed as a matter of law, Plaintiff has failed to plausibly allege that the Blockers failed in practice.

### D. The District Court Did Not Adopt a *Per Se* Rule

Unable to effectively contest the district court's conclusions that the Blockers were not illusory and had never failed in practice, Plaintiff attempts to cast the district court as effectively adopting a *per se* rule that blockers are always valid. (*See* Plaintiff's Br. at 41-43; *see also id.* at 25 (arguing the district court "went beyond considering 'what' [the Blockers] said and overstepped to 'prov[ing] the[ir] truth'") (second and third alterations in original).)

Even a cursory analysis of the district court's opinion makes clear that it did not adopt a *per se* rule. To the contrary, the district court specifically *rejected* any

46

such "rule." (SPA-15–16.) Rather, as the district court's decision and the foregoing discussion makes clear, the district court carefully and thoroughly analyzed both the Blockers' text *and* Plaintiff's allegations about them. (*See* SPA-18–32.) It found not only that the Blockers were valid and effective on their face, but *also* that Plaintiff failed to plead any facts suggesting they failed in practice. (*Id.*) In other words, the district court based its decision on Plaintiff's own pleading failures, not a *per se* rule about blockers.

Plaintiff complains that the district court failed to distinguish "adverse precedent," i.e. the only two outlier cases in which a challenge to blockers survived a motion to dismiss. But the first, *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14-cv-5226, 2015 WL 2212215 (S.D.N.Y. May 12, 2015), involved blockers that failed to account for alleged "group" conduct beyond the holder and its "affiliates," which is not at issue here. Unlike the blockers in *Greenberg*, the Blockers here *do* account for group activity by extending their reach beyond "affiliates" to *any* person acting as a "group" with Hudson Bay. (JA-112 § 31(g) (defining "Attribution Parties"); JA-168 § 19(d) (same); JA-275 (requiring Hudson Bay to affirm compliance with the "Maximum Percentage"); JA-278 (same); JA-87 § 4(d) ("Maximum Percentage" includes "Attribution Parties"); JA-153 § (1)(f) (same).)

As noted previously, the second case, *Solus I*, concerned a one-time divestment mechanism that was "not really a 'blocker' (or 'cap') at all" and

"purport[ed] to *eliminate*" insider status "rather than *prevent[]*" it, a distinction that that court found dispositive when evaluating it on a motion to dismiss. *Solus I*, 124 F. Supp. 3d at 323. As that court subsequently recognized, "[t]he Supreme Court has endorsed the practice of designing financial transactions specifically to avoid disgorgement under § 16(b)," and blocker "arrangements have been upheld in the Second Circuit" as permissible means of doing so. *Solus II*, 258 F. Supp. 3d at 369 (citing *Reliance* and *Levy*). On summary judgment, the *Solus* court found that the provision at issue was in fact a permissible transaction, despite its differences from a traditional blocker. *Solus II*, 258 F. Supp. 3d at 369-71.

Neither of those unusual situations applies here. As discussed throughout, *Levy* controls this case and requires dismissal.

## II. PLAINTIFF FAILED TO PLEAD THAT THE BLOCKERS WERE A "SCHEME TO EVADE"

Plaintiff's last-ditch argument is that the Blockers were a "scheme to evade" reporting requirements under Rule 13d-3(b). (Plaintiff's Br. at 44-45.) This Hail Mary falls short.

Plaintiff's core argument is that the Blockers were a "scheme to evade" simply because they allowed Hudson Bay to avoid making certain regulatory filings it would have needed to make had it acquired greater-than-10% beneficial ownership. That argument is foreclosed by binding precedent. As noted, "structur[ing] [a] transaction with the intent of avoiding liability under § 16(b)" is entirely permissible,

and blockers are a perfectly legitimate, acceptable way to do that. *Reliance Elec. Co.*, 404 U.S. at 422; *Levy*, 263 F.3d at 16-17. In fact, this Court in *Levy* summarily *rejected* challenges to a blocker as a "scheme to evade." *See id.* at 13-14, 18; *see also Klawonn*, 2011 WL 3502022, at *5 (finding plaintiff's conclusory assertion that intent of the relevant conversion "caps was, in part, to help [Defendant] not make the disclosures that would otherwise be required" insufficient to support plaintiff's theory that there was "a plan or scheme to evade reporting requirements"). Accepting Plaintiff's argument here would thus amount to an overruling of *Levy*, and contradict longstanding Supreme Court and Circuit precedent.

Judge Winter's concurrence in *CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 654 F.3d 276 (2d Cir. 2011)—on which Plaintiff bases its argument—only reinforces this conclusion. Judge Winter made clear that, in his view, conduct "fully intended to avoid disclosure" does not violate Rule 13d-3(b) unless it: (1) includes a "substantial equivalence of the rights of ownership relevant to control," or (2) comprises steps that "stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner" in order to disguise an investor's control over securities. *Id.* at 305-306 (Winter, J., concurring). Neither of these factors are present here.

The SEC agrees. In an amicus letter submitted in *CSX Corp.*, the SEC explained Rule 13d-3(b) is not meant to prohibit *any* method for structuring around

reporting requirements. Rather, its purpose is to prevent investors from entering into arrangements that are intended to create a "false appearance" that they lack voting and dispositive power over securities, when they in fact have such power. *See* Letter from Brian V. Breheny, Deputy Dir., SEC Div. of Corp. Fin., as *Amicus Curiae*, to Hon. Lewis A. Kaplan at 3, *CSX Corp. v. The Children's Inv. Fund Mgmt, L.L.P.*, No. 08-cv-2764 (S.D.N.Y. June 4, 2008), ECF No. 92-2. As such, absent "unusual circumstances," "taking steps with the motive of avoiding reporting and disclosure generally is not a violation of Section 13(d) unless the steps create a false appearance." *Id.*

Consistent with these principles, "scheme to evade" cases typically involve defendants' attempts to use fraudulent means to conceal their true level of voting and investment power over an issuer's securities. *See generally, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) (involving "parking" scheme in which a broker purchased stock in its own account to conceal the fact that defendant exercised actual control over those securities); *SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014) (involving "scheme to hide beneficial ownership" in which defendants held and traded securities through offshore trusts that they secretly retained control over).

The Blockers here have none of those qualities. The Blockers did not *conceal* the fact that Hudson Bay had voting and dispositive power above 9.99%—the "rights

to ownership relevant to control." Rather, they *prevented Hudson Bay from obtaining* that power in the first place. Plaintiff's attempt to expand the concept of "scheme to evade" to reach the Blockers here is precisely the "extraordinarily expansive" interpretation of Rule 13d-3(b) that Judge Winter *rejected*. *CSX Corp*, 654 F.3d at 305-306.

Plaintiff's attempt to cast nefarious, but entirely unfounded, aspersions do not change this analysis. Plaintiff again focuses heavily on the Side Letter. (Plaintiff's Br. at 49.) But as discussed above, that Side Letter specifically *required* compliance with the Blockers. (*See* Section I.C.i above.) As also discussed above, Hudson Bay did not require BBBY to keep the Side Letter's terms "secret"; rather, it specifically required BBBY to publicly disclose *all* material terms of its transactions with Hudson Bay, including the Blockers. (*Id.*; *see also* JA-217 §2(f); BBBY 8-K.) In short, the Side Letter was the precise *opposite* of a scheme to "conceal." *See, e.g.*, *Levy*, 263 F.3d at 13-14, 18 (affirming no scheme to evade where the relevant conversion caps were legitimate and there was no allegation that defendant failed to disclose any aspects of the relevant transaction).

Plaintiff makes much of the fact that the Side Letter required BBBY to obtain Hudson Bay's consent before publicly disclosing Hudson Bay's identity. (Plaintiff's Br. at 45-47.) But Plaintiff fails to convincingly explain why that matters, given that the transactions' substantive terms that BBBY deemed material—including the

Blockers—were fully disclosed. In any event, notwithstanding this provision of the Side Letter, Hudson Bay's identity and role in the Public Offering was reported by the news media on the very day the Public Offering closed. *See, e.g.*, Lauren Hirsch & Jordyn Holman, *Investment Firm Backs Bed Bath & Beyond's Stock Offering*, N.Y. TIMES, Feb. 7, 2023.

The simple reality is that the Blockers were a permissible way to avoid becoming a greater-than-10% beneficial owner that this Circuit has long accepted. They did not "conceal" Hudson Bay's beneficial ownership—they prevented Hudson Bay from acquiring it in the first place. And the Blockers were fully disclosed to the market. For all these reasons, Plaintiff's "scheme to evade" argument fails.

## III. ACCEPTING PLAINTIFF'S ARGUMENTS WOULD OVERTURN BINDING PRECEDENT AND WREAK HAVOC ON THE MARKETS

In the end, Plaintiff challenges Blockers that, on their face, are among the strongest on the market, without alleging that they ever failed in practice. Given that, allowing Plaintiff's case to proceed past a motion to dismiss would create a precedent that challenges to blockers can *never* be resolved on a motion to dismiss. Any allegation that blockers are illusory or ineffective, no matter how threadbare the allegation or how well-crafted the blocker, would subject the parties to litigation and costly discovery. That would amount to an overruling of *Levy*, and directly

undermine Supreme Court precedent permitting investors to structure transactions to avoid Section 16 liability.

Such a result would also wreak havoc on the market. Investors and issuers have long relied on *Levy* and its progeny when crafting blocker provisions, which are very common in the market. *See* Eleazer Klein, *Fundamental PIPEs: Typical Structures and Transactions*, in PIPEs: A Guide to Private Investment in Public Equity 129, 147-48 (Steven Dresner, ed. 2006) (explaining that "most transactions are structured" with blockers "so that the investors will not be subject to Section 16"). That is especially true for distressed issuers. Blockers can provide an investor with a path to provide significant rescue financing without rendering itself an "insider," obtaining a control position, or subjecting itself to Section 16(b)'s blunt strictures. Those protections, in turn, clear a path for distressed issuers to obtain rescue financing in the significant amounts they need; particularly for issuers that may otherwise be limited by change-of-control covenants that many debt documents are subject to. *See* Simpson Thacher & Bartlett LLP, *Leveraged Finance 101: A Covenant Handbook* 14-15 (2022), https://bit.ly/3XeAWJy (describing change-of-control covenants).

Subjecting blockers to routine litigation, as Plaintiff seeks to do, would choke off this path. It would undermine the certainty and predictability investors have long relied on, depriving investors and issuers of the assurance that the protections they

bargained for through blockers will be upheld. Moreover, investors would be forced to price in the increased risk of meritless Section 16(b) litigation, raising the cost of capital and deterring investment. *See* Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 DUKE L.J. 945, 948 (1993) (describing how "[u]nnecessary civil or criminal liability diminishes the return to, and increases the cost of, capital") Ultimately, that may deter investors from providing rescue financing in the first place, leading to the unnecessary failure of more companies and destruction of more jobs.

This Court need not, and should not, endorse such an egregious result. Rather, this Court need simply follow *Levy*'s core principle: to survive a motion to dismiss, a Plaintiff challenging a blocker provision must plausibly allege *facts* suggesting that blockers were an ineffective "sham." Plaintiff failed to do so here, and the district court correctly dismissed its complaint.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Douglas A. Rappaport*

James E. Tysse
AKIN GUMP STRAUSS HAUER & FELD
LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
jtysse@akingump.com

Douglas A. Rappaport
Kaitlin D. Shapiro
AKIN GUMP STRAUSS HAUER & FELD
LLP
One Bryant Park
New York, NY 10036
(212) 872-1000
darappaport@akingump.com
kshapiro@akingump.com

*Counsel for Defendants-Appellees*

February 23, 2026

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 12,669 words as determined by Microsoft Word, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rule of Appellate Procedure, and thus complies with the typeface, typestyle, and type-volume requirements set forth in Rule 32(a)(5)-(7)(B) of the Federal Rules of Appellate Procedure.

*/s/ Douglas A. Rappaport*
Douglas A. Rappaport

February 23, 2026