# 25-2728

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

◆◆

20230930-DK-BUTTERFLY-1, INC., F/K/A BED BATH & BEYOND INC.,

*Plaintiff-Appellant,*

— *v.* —

HBC INVESTMENTS LLC AND HUDSON BAY CAPITAL MANAGEMENT LP,

*Defendants-Appellees.*

◆◆

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
THE HONORABLE MARY KAY VYSKOCIL,
UNITED STATES DISTRICT JUDGE

## REPLY BRIEF OF PLAINTIFF-APPELLANT

James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Phone: +1 (484) 275-2162
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff-Appellant
20230930-DK-Butterfly-1, Inc.,
f/k/a Bed Bath & Beyond Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... ii

ARGUMENT ........................................................................................1

I.     HUDSON BAY FAILS TO EXPLAIN THE SIDE LETTER........................2

II.    THE COMPLAINT ADEQUATELY PLED THAT THE
BLOCKERS WERE USED AS PART OF A SCHEME
TO EVADE SECTION 13(d) ...............................................................6

III.   HUDSON BAY FAILS IN CHALLENGING THE
COMPLAINT'S ALLEGATIONS UNDER THE SEC'S
MULTIFACTOR TEST ......................................................................11

     A.    Hudson Bay Misreads *Levy* on the Adequacy of Enforcement...........12

     B.    Hudson Bay Misstates New York's Law of Contract.........................13

     C.    Hudson Bay Ignores Both *Levy* and the Complaint's
Allegations in Calculating Its Beneficial Ownership........................13

IV.   THE BASELESS PROGNOSTICATIONS OF HUDSON BAY
AND ITS AMICUS TRANSGRESS RULE 12(b)(6)...................................15

CONCLUSION....................................................................................18

CERTIFICATE OF COMPLIANCE.............................................................19

i

# TABLE OF AUTHORITIES

## Cases

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001) ....................................................................15

*Beatty v. Guggenheim Exploration Co.*,
    122 N.E. 378 (N.Y. 1919) .......................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................6

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    562 F. Supp. 2d 511 (S.D.N.Y. 2008) ......................................................8

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    654 F.3d 276 (2d Cir. 2011) ..................................................................8, 9

*Greenberg v. Hudson Bay Master Fund Ltd.*,
    No. 14cv5226 (DLC), 2015 U.S. Dist. LEXIS 62236
    (S.D.N.Y. May 12, 2015) ........................................................................16

*Halebian v. Berv*,
    644 F.3d 122 (2d Cir. 2011) ....................................................................16

*Huppe v. WPCS Int'l Inc.*,
    670 F.3d 214 (2d Cir. 2012) ......................................................................6

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ................................................................................10

*Levy v. Southbrook Int'l Invs., Ltd.*,
    263 F.3d 10 (2d Cir. 2001) ...............................................................passim

*Levy v. Southbrook Int'l Invs., Ltd.*,
    No. 99 Civ. 1480 (NRB), 2000 U.S. Dist. LEXIS 6301
    (S.D.N.Y. May 8, 2000) .............................................................................7

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*,
    709 F.3d 109 (2d Cir. 2013) ......................................................................6

*Olagues v. Perceptive Advisors LLC*,
  902 F.3d 121 (2d Cir. 2018) ..................................................................10

*Roth v. Solus Alt. Asset Mgmt. LP*,
  124 F. Supp. 3d 315 (S.D.N.Y. 2015) ..............................................16

*SEC v. Drexel Burnham Lambert Inc.*,
  837 F. Supp. 587 (S.D.N.Y. 1993) ....................................................14

*SEC v. Wyly*,
  56 F. Supp. 3d 394 (S.D.N.Y. 2014) ...................................................8

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ...............................................................8

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ................................................................................5

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ..............................................................................15

## Statutes and Regulations

18 U.S.C. § 1001 ......................................................................................8

17 C.F.R. § 240.13d-3(a) ......................................................................8, 9

17 C.F.R. § 240.13d-3(b) ....................................................................8, 11

## Other Authorities

21 Moore's Federal Practice — Civil § 329.11 (2026) ...........................15

Peter J. Romeo & Alan L. Dye,
  Section 16 Treatise and Reporting Guide (6th ed. 2024) ...............6, 10

## ARGUMENT

Hudson Bay's[1] response underscores the unique nature of this case and why the District Court erred in not allowing it to proceed. If this complaint cannot pass a motion to dismiss, then in effect the Court will have replaced *Levy* with a per se rule enforcing every competently drafted blocker without regard to the blocker's effectiveness in practice.

The complaint alleges an unprecedented trading program that in a matter of weeks netted Hudson Bay more than $300 million in profit from hundreds of thousands of stock sales and scores of conversions and exercises, some just minutes apart. This trading spree dumped 444 million new shares on the market, expanded BBBY's float fourfold, and cratered its stock price. Hudson Bay did all of this with no disclosure of its role or intentions, relying on an undisclosed side agreement that concealed its identity and gave it the right to acquire stock on demand. The upshot was devastating losses by thousands of mostly retail investors.

Hudson Bay's response does not mention many of these facts, much less challenge the adequacy of their pleading. The response even concedes, at last, that "*Levy* allows courts to conclude that a blocker is ineffective and therefore does not

---

[1] Capitalized terms in this reply have the same meanings they were given in BBBY's principal brief [Dkt. 18.1]. BBBY cites that brief as "BBBY Br." and cites Hudson Bay's response [Dkt. 21.1] as "HB Br." The amicus brief of the Managed Funds Association [Dkt. 23.1] is cited as "MFA Amicus Br."

1

prevent beneficial ownership above its capped threshold." HB Br. at 32. The only issue is whether Hudson Bay has met its burden of showing that the complaint failed to make any plausible claim that its blockers were ineffective. The response confirms that it has not.

*First*, the response fails to explain the Side Letter, which quietly undermined enforcement of Hudson Bay's blockers. *Second*, the arguments in the response collide head-on with Rule 13d-3(b), whose plain terms invalidate the blockers as a contract used in a scheme to evade disclosure under Section 13(d) of the Act. *Third*, Hudson Bay's scattershot application of the SEC's factors fails to show any implausibility in BBBY's claim that the blockers were illusory. *Fourth*, Hudson Bay's factual and market-based arguments overstep Rule 12(b)(6) and are belied by the history of Section 16(b) litigation in this Circuit.

## I. HUDSON BAY FAILS TO EXPLAIN THE SIDE LETTER

BBBY's brief asked the following questions in simple terms: "If the Side Letter did no more than handmaiden the other Transaction Documents, then what was the point of it? Why make it a secret? And why apply it *only* to Hudson Bay — the one investor out of 29 whose stake was large enough to implicate the blockers?" BBBY Br. at 35 (citation omitted). Not one of these "fairly obvious questions," *id.*, has been answered. None of Hudson Bay's shifting explanations for the Side Letter — that it "simply clarified the [conversion and exercise]

procedures," HB Br. at 35, or gave "certain participation rights and other protections [to] the anchor investor," *id.* at 14, or "worked collectively with [the other agreements] to form a unified transaction," *id.* at 15 — explains why Hudson Bay had to draft the agreement as a separate instrument, cut the co-investors out of it, and conceal it from the public.

Hudson Bay contends that the Side Letter "specifically *required* compliance with the Blockers." *Id.* at 51. That is not true. The Side Letter never mentions the Blockers, much less "specif[ies]" them for compliance. In the one place where the Side Letter even alludes to the blockers, it actually calls for them to be disregarded. *See* JA-220 § 2(h) (directing BBBY to maintain a sufficient reserve of shares for issuance to Hudson Bay "without regard to any limitations on the exercise of the Common Warrants" or "any limitations on the conversion of the Preferred Shares"); *cf.* JA-62–63 ¶ 313.

The Side Letter generically required compliance with the "terms, conditions and time periods" of the various agreements, but only from BBBY. JA-221–22 § 2(n). Hudson Bay drafted itself out of this compliance obligation, an omission noted in BBBY's brief and ignored in Hudson Bay's response. *See* BBBY Br. at 34. BBBY's brief also observed that the District Court's construction of the Side Letter, which elevated the contract's general obligations over specific conversion

3

and exercise procedures, inverted the canon that the specific governs the general. *Id.* Having no response to that argument, Hudson Bay ignores it too.

Far from serving as a "means of compliance," the Side Letter thwarted any attempt to monitor Hudson Bay's beneficial ownership. JA-40–41 ¶¶ 183–184. The Side Letter obligated BBBY to issue stock "in such amounts as specified from time to time by [Hudson Bay]." JA-222 § 3(b). It declared the submission of a conversion or exercise request to be "the totality of the procedures" for acquiring stock. JA-221 § 2(n). And it denied BBBY the right to any "other information" about an acquisition. *Id.* It is hard to imagine a clearer and more blunt statement that BBBY had no right to enforce compliance with the blockers. Hudson Bay fails to explain how BBBY was supposed to meet its "unambiguous obligation to comply with [the blockers]," HB Br. at 35, while sealed in this airtight information vacuum of Hudson Bay's manufacture.

The best Hudson Bay can suggest is a polite request. *See id.* at 36 (insisting that nothing "barred BBBY from seeking information"). Yes, BBBY personnel might have come "seeking information" from Hudson Bay, which is exactly why Hudson Bay barred them from getting it. The Side Letter gave Hudson Bay, alone of all 29 investors, the exclusive right to acquire BBBY stock "simply by submitting the required notice," *id.* at 16, as well as an exclusive exemption from any demand for other information, JA-221 § 2(n).

4

The inference that the Side Letter undermined the blockers is strengthened by the agreement's concealment. Hudson Bay argues that nothing obligated anyone to hide the Side Letter, and that BBBY in fact had a duty to disclose any terms that were "sufficiently material." HB Br. at 36. That is a nonsequitur wrapped in a deflection, as Hudson Bay owed the same duty.[2] The point is that Hudson Bay *chose* to draft the Side Letter separately from the public documents, despite having no obligation to do so. JA-10 ¶ 11; JA-15 ¶ 37. A plausible, indeed obvious inference is that the Side Letter was meant to be kept from disclosure.

Hudson Bay resorts to blaming BBBY for the blockers' failure, since BBBY had a "firm obligation" to enforce them. HB Br. at 16. This recrimination overlooks again that BBBY never knew how much stock Hudson Bay held, had no way to find out (thanks to the Side Letter), and thus could not determine whether any given acquisition exceeded the 9.99% cap. It also overlooks the complaint's allegation that BBBY, in its desperate need for cash, could not afford to cross its chief financier. *See* JA-38–40 ¶¶ 168–177.

But even if Hudson Bay's accusations were supported by the facts, they would fail on the law. Because the purpose of Section 16(b) is to deter insider trading by confiscating its fruits, courts have universally ordered disgorgement in

---

[2] If Hudson Bay ever received BBBY's material nonpublic information, the law forced it to "disclose or abstain from trading." *E.g.*, *United States v. O'Hagan*, 521 U.S. 642, 661 (1997). Since Hudson Bay was evidently unwilling to abstain, it had no other choice but to disclose the Side Letter's terms if they were material.

spite of an issuer's awareness of, connivance in, or even active participation in the trades. *See Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 n.3 (2d Cir. 2012) ("We think that as a matter of law, the language and purpose of the statute preclude an estoppel based upon instigation by or benefit to the corporation whose shares are traded." (internal quotation marks omitted, cleaned up)); Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 9.04 at 978 (6th ed. 2024) ("While many of the arguments for estoppel may be appealing on the surface, the courts predictably have not been moved by any of them.").

In short, the combination of the Side Letter and Hudson Bay's high-volume, high-frequency trading raises at least a plausible inference that the blockers Hudson Bay now wants enforced were effectively unenforceable. Hudson Bay has failed to displace that reasonable inference with an alternative explanation for the Side Letter, much less an "obvious" one. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Under Rule 12(b)(6), that reasonable inference must be drawn in BBBY's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013).

## II. THE COMPLAINT ADEQUATELY PLED THAT THE BLOCKERS WERE USED AS PART OF A SCHEME TO EVADE SECTION 13(d)

Hudson Bay is correct that "*Levy* summarily *rejected* challenges to a blocker as a 'scheme to evade.'" HB Br. at 49. What Hudson Bay omits is that the challenges were rejected only because the defendant in *Levy*, unlike Hudson Bay,

made no effort to conceal its investment. *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 13–14, 18 (2d Cir. 2001). This Court, the district court, and the SEC all pointed to that omission as the missing piece of the *Levy* claim. *See id.* at 13–14; *Levy v. Southbrook Int'l Invs., Ltd.*, No. 99 Civ. 1480 (NRB), 2000 U.S. Dist. LEXIS 6301, at *16 (S.D.N.Y. May 8, 2000); SEC Amicus Br. at 24–25 n.11.

The complaint here supplies that missing piece, alleging in exquisite detail the steps Hudson Bay took, through the Side Letter and otherwise, to conceal its role in the financing. JA-32–35 ¶¶ 132–150. The complaint also details the devastating effect this blackout had on ordinary investors, who purchased stock without knowing that Hudson Bay was set to flood the open market with 444 million new shares. JA-12–13 ¶¶ 21–25. Hudson Bay has no answer to these glaring distinctions from *Levy*, so once again it ignores them.

Relying on the missive of a single SEC staff member, Hudson Bay construes Rule 13d-3(b) to curb only arrangements that "create a 'false appearance' that [investors] lack voting and dispositive power . . . when they in fact have such power." HB Br. at 50. That construction withers under scrutiny because it makes surplusage of the rule. If a "scheme to evade" could arise only when an investor

7

had voting or dispositive power "in fact," then the investor would be a beneficial owner under Rule 13d-3(a), and paragraph (b) would be unnecessary.[3]

The only case addressing Hudson Bay's interpretation of the rule squarely rejected it for that reason. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 550 (S.D.N.Y. 2008) ("An appearance of non-ownership cannot be false unless one in fact is at least a beneficial owner. That beneficial ownership would satisfy Rule 13d-3(a), thus making Rule 13d-3(b) superfluous."). While vacating the judgment in *CSX*, this Court left undisturbed the district court's reasoning on that point, which remains sound. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 282 (2d Cir. 2011). Hudson Bay cannot cite a single case to support its countertextual, "false appearance" gloss on Rule 13d-3(b), because there are none.[4]

---

[3] The same straightforward reasoning explodes the novel argument of amicus that "Rule l3d-3(b) does not apply where beneficial ownership does not already exist." MFA Amicus Br. at 3. The plain terms of the rule dictate that anyone who uses a "contract, arrangement, or device" in the manner described "shall be deemed" a beneficial owner. 17 C.F.R. § 240.13d-3(b). If an investor could be *deemed* a beneficial owner only if he *were* a beneficial owner, the rule would be a pointless tautology.

[4] The two opinions Hudson Bay passes as "'scheme to evade' cases" neither use the phrase "scheme to evade" nor cite Rule 13d-3(b). HB Br. at 50 (citing *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991); and *SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014)). *Bilzerian* decided whether misstatements on Schedule 13D could be prosecuted under Section 10(b) of the Act and 18 U.S.C. § 1001. *See* 926 F.2d at 1289 ("This appeal addresses the propriety of enforcing the complained of trading methods through these general fraud and false statement

8

Hudson Bay argues that Judge Winter's nonbinding concurrence in *CSX* supports its defense, HB Br. at 49, but the complaint's allegations about the Side Letter easily satisfy Judge Winter's standard. Through the Side Letter, Hudson Bay took "steps that 'stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner.'" *Id.* (quoting *CSX*, 654 F.3d at 305–06 (Winter, J., concurring)). The plain terms of the Side Letter gave Hudson Bay a secret right, unique among its investor cohort, to acquire stock peremptorily. BBBY was required to issue stock "in such amounts as specified from time to time by [Hudson Bay]." JA-222 § 3(b). The request forms alone supplied "the totality of the procedures" for conversion or exercise. JA-221 § 2(n). And Hudson Bay had the right to block any search for "other information." *Id.*

This was stock on demand, beneficial ownership "vest[ing] at the signal of the would-be owner." *CSX*, 654 F.3d at 305 (Winter, J., concurring). Even assuming, therefore, that Judge Winter's opinion requires something beyond the unambiguous text of Rule 13d-3(b), the complaint adequately pleaded it.

---

provisions."). *Wyly* featured a garden-variety case of beneficial ownership under Rule 13d-3(a), not a "scheme to evade" under Rule 13d-3(b). *See* 56 F. Supp. 3d at 411 ("The jury found that the Wylys were beneficial owners of the Issuer securities . . . because the Wylys, directly or indirectly, had or shared voting and/or investment power over these securities." (footnote omitted)).

Rule 13d-3(b) also scotches Hudson Bay's novel argument that an investor may "structur[e] around" Section 13(d)'s reporting requirements. HB Br. at 49–50. BBBY has never contested that an investor enjoys wide latitude to structure around Section 16. *See* JA-35 ¶¶ 151–152. But no court has ever extended that latitude to evasion of Section 13(d)'s reporting requirements, and any deviation in that direction would break with the plain text of the rule. The leading treatise, cited more than once by Hudson Bay, *see* HB Br. at 6, 25, 26, unequivocally rejects such "structuring":

> **[d] Unacceptable Structuring Methods**
>
> . . . [T]he courts have ruled that none of the following can be used to avoid liability:
>
> \*   \*   \*
>
> - Creating or using a trust, proxy, power of attorney, pooling arrangement or other contract, arrangement or device that has the purpose or effect of evading beneficial ownership under Section 13(d) or 13(g) of the 1934 Act and preventing the application of Section 16 to a person who otherwise would be a ten percent owner.

Romeo & Dye, *supra*, § 9.01 at 861–62 (citing Rule 13d-3(b)).

This Court "still begin[s] with the text of the regulation and go[es] no further unless an ambiguity in the language so requires." *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 129 (2d Cir. 2018). The Supreme Court has been hammering this point, admonishing that an unambiguous regulation "just means what it

means — and the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). Rule 13d-3(b) says what it means, and means what it means: A person who uses a "contract, arrangement, or device with the purpose of . . . preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security." 17 C.F.R. § 240.13d-3(b).

Hudson Bay did exactly what the unambiguous text of the rule forbids. BBBY asks only that "the court give [the rule] effect, as the court would any law."

## III. HUDSON BAY FAILS IN CHALLENGING THE COMPLAINT'S ALLEGATIONS UNDER THE SEC'S MULTIFACTOR TEST

Hudson Bay takes a piecemeal approach to the SEC's factors, casting the complaint as a "categorical" attack that would automatically invalidate every comparable blocker because of one factor or another. HB Br. at 28. But BBBY has never argued that an issuer "'need[s] [to] have an independent ability to enforce a conversion cap for a blocker to be binding.'" *Id.* at 34–35 (quoting SPA-25–26). Or that "the mere *possibility* that the parties could amend a contract renders it an illusory 'sham.'" *Id.* at 23. Those are straw men.

What BBBY has argued is that a blocker was *plausibly* illusory when the issuer had no interest in enforcing it; had no way to enforce it; was stripped of any means of enforcement through a secret side agreement drafted by the investor at

the eleventh hour; desperately needed cash and had to sell as much stock as possible to survive; could agree with the investor at any time to amend the contractual blockers; would have gladly amended them to keep the investor buying (as it gladly amended a related contract to keep the investor buying); was inundated by the investor with over 100 conversion or exercise requests, some just minutes apart; had an actual obligation to deliver to the investor (who had a corresponding right to acquire) more than 9.99% of the issuer's stock at 4 p.m. on February 7, 8, and 9, and March 21, 2023; fulfilled each of those obligations, voiding none of the requests and holding no shares "in abeyance"; and thereby delivered the investor more than 9.99% of shares outstanding on multiple occasions, with 10.1% known to be sitting in the investor's brokerage account on the morning of February 10, 2023. *See* JA-37–56 ¶¶ 160–270.

These allegations rise head and shoulders above anything in Hudson Bay's precedents, and indeed have no precedent. They allow at least a plausible inference that the blockers did not place a genuine constraint on Hudson Bay's acquisitions of BBBY stock. Hudson Bay has little to offer in response, and we address only a few of its points.

### A.    Hudson Bay Misreads *Levy* on the Adequacy of Enforcement

Hudson Bay repeats the canard that the *Levy* blocker's "only enforcement mechanism was to *allow*, but not *require*, the derivative holder to revoke [an

excessive] conversion request." HB Br. at 34. *Levy* rejected that interpretation of the blocker, concluding that revocation was not optional under the terms of the agreement. *See* 263 F.3d at 17–18. The *Levy* plaintiff never challenged the adequacy of enforcement, and that question was not before the Court.

**B.** **Hudson Bay Misstates New York's Law of Contract**

Hudson Bay concedes that *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378 (N.Y. 1919) (Cardozo, J.), applied New York law to an "anti-amendment provision" but insists that the Court "declined to enforce the provision on other grounds." HB Br. at 41. This is wrong. The Court could not have been clearer:

> Those who make a contract, may unmake it. The clause which forbids a change, may be changed like any other. The prohibition of oral waiver, may itself be waived. ***Every such agreement*** is ended by the new one which contradicts it.

*Beatty*, 122 N.E. at 381 (internal quotation marks omitted, emphasis added). *Beatty* settles New York law: parties may freely amend their contract even after agreeing not to do so.

**C.** **Hudson Bay Ignores Both *Levy* and the Complaint's Allegations in Calculating Its Beneficial Ownership**

Hudson Bay asserts it was dutybound to use the BBBY shares it acquired to close out pending sales. *See* HB Br. at 44 ("'Defendants were required to deliver the shares to the buyer . . . .'" (quoting SPA-30)). That assertion is false and contradicts the complaint's well-pleaded allegations. Hudson Bay had the right to

13

settle its sales by any means, including open-market purchases or third-party assignment. *See* JA-50 ¶ 239. None of the shares Hudson Bay requested was earmarked; BBBY had to put them wherever Hudson Bay directed, whether that meant delivering them to Hudson Bay, to Hudson Bay's buyers, or to whomever else Hudson Bay designated. *See* JA-276, JA-278–279; JA-82–83 § 4(c)(i); JA-149 § 1(a); *cf. SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) ("[Beneficial ownership] focuses on any relationship that, *as a factual matter*, confers on a person a significant ability to affect how voting power or investment power will be exercised . . . ." (internal quotation marks omitted)). These deliveries were not "mere administrative act[s]" or "technicalities." HB Br. at 44, 43. They resulted from the full and free exercise of Hudson Bay's dispositive power over shares it had the right to acquire from BBBY.

Nor did that dispositive power end with the submission of a conversion or exercise request. By their terms (and unlike their counterparts in *Levy*), Hudson Bay's requests were not "fixed and irrevocable." *Id.* at 43; JA-275–276, JA-278–279; *cf. Levy*, 263 F.3d at 18 ("[T]he vote certificates provide that a conversion notice, once given, is irrevocable."). In the case of the conversion requests, Hudson Bay had the express right to revise them. JA-47 ¶¶ 221–223; JA-82 § 4(c)(1). Hudson Bay actually exercised this right of revision on 11 occasions to adjust the number of shares requested. JA-48 ¶ 225. In two of those cases,

14

Hudson Bay simply changed its mind about how much stock it wanted. *Id.* ¶ 224. If Hudson Bay had second thoughts about where it wanted stock delivered, it could revise a conversion request to reduce the number of deliverable shares, and then submit a new request to have the remaining shares delivered somewhere else.

BBBY made good on every request, no matter how much stock Hudson Bay had the right to acquire. JA-55 ¶ 268. In one case, Hudson Bay had 10.1% of BBBY's common stock just sitting in its brokerage account. JA-58 ¶ 286. BBBY's brief asked, "If Hudson Bay had no right to acquire more than 9.99% of BBBY's stock, then how did it wind up with 10.1% of it? And if Hudson Bay had no power to dispose of these excess shares, then how did it manage to dispose of them?" BBBY Br. at 36. Hudson Bay never answers these simple, direct questions because it can't.

## IV. THE BASELESS PROGNOSTICATIONS OF HUDSON BAY AND ITS AMICUS TRANSGRESS RULE 12(b)(6)

Hudson Bay foretells of "havoc in a marketplace" and other catastrophes if this case is allowed to proceed. Amicus does the same.[5] These wild speculations, already discredited by precedent, defy Rule 12(b)(6) and lack merit.

---

[5] Amicus also makes arguments not raised by Hudson Bay. These include the novel proposition that "if a blocker denies any right to acquire beneficial ownership in excess of some threshold, the contract is 'binding' as a matter of law and the inquiry ends." MFA Amicus Br. at 8. Not only does this argument defy *Levy*, 263 F.3d at 17 n.5, but it contradicts Hudson Bay's own position. *See* HB

A court deciding a motion under Rule 12(b)(6) should confine its review to the pleading (including any documents attached to, integral to, or incorporated by reference into it) and any matters capable of judicial notice. *See, e.g.*, *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011). Judicial notice does not extend to prophetic forecasts of "havoc on the market," HB Br. at 53, "deterr[ed] investment," *id.* at 54, "the unnecessary failure of more companies," *id.*, and "destruction of more jobs," *id.* This is unsworn expert testimony at best, and at worst crystal balling. Either way it has no place under Rule 12(b)(6).

The Court should be especially skeptical in light of this Circuit's experience. Hudson Bay and its amicus write as if no challenge to a blocker has ever passed the pleading stage since *Levy*, yet the Southern District advanced two such cases over a decade ago. *See Roth v. Solus Alt. Asset Mgmt. LP*, 124 F. Supp. 3d 315 (S.D.N.Y. 2015); *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14cv5226

---

Br. at 32 ("*Levy* allows courts to conclude that a blocker is ineffective and therefore does not prevent beneficial ownership above its capped threshold . . . .").

An amicus "generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d Cir. 2001) (internal quotation marks omitted); *see also* 21 Moore's Federal Practice — Civil § 329.11 (2026) ("[A]micus curiae ordinarily cannot expand the scope of the appeal by implicating or raising issues that have not been presented by the parties."). This rule is more than prudential; it preserves the unique role of the Third Branch as arbiter of cases and controversies rather than an organ of third-party lobbying. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (invoking the "principle of party presentation" to vacate a judgment founded on an amicus argument). Because amicus gives no reason for parting with this venerable rule, its officious claims should be ignored.

16

(DLC), 2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015). The same doomsday calls could have been made in the wake of *Solus* and *Greenberg*, but the apocalypse never came. Hudson Bay was even a defendant in *Greenberg* — did that experience swear it off blockers? Amicus can trawl the SEC's files for "more than 400 disclosed blocker references" just in the last six months, but it cannot find a single deal in the decade since *Solus* and *Greenberg* — not *one* — that drew a "strike suit[]." MFA Amicus Br. at 3–4.

No strike suits will follow this one either, because this case has never been about a "categorical" attack on blockers. HB Br. at 28. It is about the grotesque and abusive facts of the Hudson Bay financing and the outsized losses that financing helped inflict on retail investors. The facts are unprecedented, and the result is easily confined to those facts. Those facts make out a plausible claim for relief under *Levy*, Rule 13d-3, and the SEC's guidance. BBBY asks only that this sound law be enforced.

## CONCLUSION

The judgment of the District Court should be vacated and the case remanded for further proceedings.

Dated: March 25, 2026

Respectfully submitted,

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Phone: +1 (484) 214-4697
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*

18

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,421 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  March 25, 2026

/s/ James A. Hunter
James A. Hunter