25-2728-cv
*20230930-DK-Butterfly-1 Inc. v. HBC Invs. LLC*

# United States Court of Appeals
# For the Second Circuit

August Term 2025

Argued:  June 23, 2026
Decided:  July 7, 2026

No. 25-2728

---

20230930-DK-BUTTERFLY-1, INC., f/k/a Bed Bath &
Beyond Inc.,

*Plaintiff-Appellant,*

*v.*

HBC INVESTMENTS LLC, HUDSON BAY CAPITAL
MANAGEMENT LP,

*Defendants-Appellees,*

---

Appeal from the United States District Court
for the Southern District of New York
No. 24-cv-00370, Mary Kay Vyskocil, *Judge*.

---

Before: CALABRESI, LYNCH, and SULLIVAN, *Circuit Judges*.

Plaintiff 20230930-DK-Butterfly-1 ("Butterfly") – the post-bankruptcy successor of retailer Bed Bath & Beyond ("BBBY") – appeals from a judgment of the United States District Court for the Southern District of New York (Vyskocil, *J.*) dismissing its claim under section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") for the disgorgement of short-term profits acquired by an investment manager and its client fund (collectively, "Hudson Bay").

Shortly before declaring bankruptcy, BBBY sold derivatives to Hudson Bay granting it the ability to acquire – at a discount – large amounts of BBBY's common stock. The power to buy up significant blocks of stock, however, comes with certain responsibilities. Specifically, section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b), strictly requires beneficial owners of more than ten percent of a public company's stock – including those who have the *right* to acquire such ownership – to disgorge all short-term profits. Looking to avoid this potential liability, Hudson Bay included so-called "blockers" in the contracts governing its derivatives. These clauses, on their face, prevented Hudson Bay from ever actually obtaining more than 9.99% of BBBY's common stock at any one time. With the blockers in place, Hudson Bay reaped large short-term profits by acquiring BBBY's stock, selling it, and then acquiring more – all the while keeping its ownership of BBBY's stock below ten percent.

Butterfly subsequently sued Hudson Bay, alleging that (i) the blockers were illusory; (ii) Hudson Bay effectively had the right to acquire more than ten percent of BBBY's common stock; and (iii) Hudson Bay thus faced strict liability and mandatory disgorgement of its short-term profits. The district court disagreed with Butterfly's first premise and dismissed the complaint, concluding that the blockers shielded Hudson Bay from section 16(b) liability. In resolving what is an issue of first impression in this Circuit, we agree with the district court and accordingly **AFFIRM** the judgment in full.

AFFIRMED.

> JAMES A. HUNTER, Law Office of James A. Hunter, Radnor, PA, *for Plaintiff-Appellant*.
>
> DOUGLAS A. RAPPAPORT (James E. Tysse, Akin Gump Strauss Hauer & Feld LLP, Washington,

D.C.; Kaitlin D. Shapiro, Akin Gump Strauss Hauer & Feld LLP, New York, NY, *on the brief*), Akin Gump Strauss Hauer & Feld LLP, New York, NY, *for Defendants-Appellees.*

Michael C. Keats, Fried, Frank, Harris, Shriver, & Jacobson LLP, New York, NY, *for Amicus Curiae Managed Funds Association in support of Defendants-Appellees*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiff 20230930-DK-Butterfly-1 ("Butterfly") – the post-bankruptcy successor of retailer Bed Bath & Beyond ("BBBY") – appeals from a judgment of the United States District Court for the Southern District of New York (Vyskocil, *J.*) dismissing its claim under section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") for the disgorgement of short-term profits acquired by an investment manager and its client fund (collectively, "Hudson Bay").

Shortly before declaring bankruptcy, BBBY sold derivatives to Hudson Bay granting it the ability to acquire – at a discount – large amounts of BBBY's common stock. The power to buy up significant blocks of stock, however, comes with certain responsibilities. Specifically, section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b), strictly requires beneficial owners of more than ten percent of a public company's stock – including those who have the *right* to acquire such ownership – to disgorge all short-term profits. Looking to avoid this potential liability,

3

Hudson Bay included so-called "blockers" in the contracts governing its derivatives. These clauses, on their face, prevented Hudson Bay from ever actually obtaining more than 9.99% of BBBY's common stock at any one time. With the blockers in place, Hudson Bay reaped large short-term profits by acquiring BBBY's stock, selling it, and then acquiring more – all the while keeping its ownership of BBBY's stock below ten percent.

Butterfly subsequently sued Hudson Bay, alleging that (i) the blockers were illusory; (ii) Hudson Bay effectively had the right to acquire more than ten percent of BBBY's common stock; and (iii) Hudson Bay thus faced strict liability and mandatory disgorgement of its short-term profits. The district court disagreed with Butterfly's first premise and dismissed the complaint, concluding that the blockers shielded Hudson Bay from section 16(b) liability. In resolving what is an issue of first impression in this Circuit, we agree with the district court and accordingly affirm the judgment in full.

## I. BACKGROUND

BBBY was founded in 1971 and eventually grew into a "nationally[ ]known retailer of home goods." J. App'x at 14. But by the early 2020s, it had hit hard times, as "pandemic-related store closures, supply disruptions, and management

missteps" led it to the brink of financial ruin. *Id.* In "desperate need of cash," BBBY turned to the capital markets to issue "three new classes of derivative securities" – (i) convertible preferred stock; (ii) preferred-stock warrants; and (iii) common-stock warrants. *Id.* at 14–15. In a nutshell, those derivatives enabled investors to obtain common stock at a potential discount by either converting their preferred stock to common stock, exercising their warrants to acquire preferred stock (and then converting it), or simply exercising their warrants to obtain common stock. Ultimately, Hudson Bay bought up almost all these derivatives, "anchor[ing]" the public offering in return for "the right to buy heavily discounted, freely tradable BBBY common stock." *Id.* at 15, 20 (internal quotation marks omitted).

Hudson Bay did not, however, want to exercise *too much* control over BBBY. That is because federal securities laws would require Hudson Bay to take on certain regulatory responsibilities, including possible "disclosure and disgorgement obligations," if it "beneficially own[ed]" – or had the ability to acquire – at least ten percent of BBBY's common stock at any given moment. *Id.* at 30. "In an attempt to suppress [its] beneficial ownership," Hudson Bay therefore

added contractual provisions known as "blockers" to the terms of its derivatives. *Id.* (internal quotation marks omitted).

These blockers prohibited Hudson Bay from ever "beneficially own[ing] in excess of 9.99%" of BBBY's common stock. *Id.* at 31 (internal quotation marks omitted). Indeed, they expressly provided that any preferred-stock conversion or warrant exercise would "be null and void and treated as if never made" if it brought Hudson Bay over the 9.99% threshold, and that Hudson Bay would "not have the power to vote or transfer" any shares issued in excess of that percentage. *Id.* at 31, 88, 154 (internal quotation marks omitted). And every time it sought to convert its preferred stock or exercise its warrants, Hudson Bay was also required to certify that upon execution of the requested conversion or exercise, it would not "have beneficial ownership. . . of a number of shares of [BBBY] Common Stock [that] exceed[ed]" 9.99%. *Id.* at 275, 278.

Hudson Bay and BBBY supplemented these contracts with a letter agreement (the "Side Letter"), which provided, as relevant here, that (i) the public-offering documents "set forth the totality of the procedures required of [Hudson Bay] in order to exercise" its warrants and convert its preferred shares; (ii) BBBY would not "require" Hudson Bay to produce additional "information or

6

instructions" when Hudson Bay attempted to invoke those rights; and (iii) BBBY would instead "honor" Hudson Bay's requests for stock "in accordance with the terms" of the public-offering documents. *Id.* at 212, 221–22. The Side Letter also made clear that its terms neither superseded nor in any way altered the public-offering documents. *Id.* at 225.

With these agreements in place, BBBY received its cash infusion. But it was, in the end, not enough: BBBY continued to spiral downward and ultimately filed for bankruptcy in April 2023. Even as BBBY teetered on the brink of bankruptcy, however, Hudson Bay "reaped . . . profit[s] of over $300 million" by rapidly acquiring newly issued BBBY stock at a discount and then reselling it at market value. *Id.* at 13. In May 2024, Butterfly (BBBY's successor) sued Hudson Bay, alleging that the blockers were "illusory," that Hudson Bay consistently owned more than ten percent of BBBY, and that Hudson Bay was "strictly liable to account for and repay" all its short-term profits under section 16(b). *Id.* at 10, 13.

The district court disagreed, concluding that Butterfly did not sufficiently plead that "the blocker provisions were illusory or a sham." Sp. App'x at 32. Butterfly timely appealed.

## II. DISCUSSION

"We review *de novo* a district court's dismissal for failure to state a claim, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Knapp v. Barclays PLC*, 171 F.4th 166, 170 (2d Cir. 2026) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

### A. Contractual Blockers Shield Investors from Section 16(b) Liability.

Section 16(b) of the Exchange Act is a "blunt instrument": to categorically "remove any temptation . . . to engage in" insider trading, it imposes "strict liability" on corporate insiders who have profited from buying and selling securities within a six-month period. *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320–21 (2d Cir. 1998) (citing 15 U.S.C. § 78p(b)). Those insiders include both a public company's directors and officers and its powerful shareholders – namely, those who "directly or indirectly" are "the beneficial owner[s] of more than [ten] percent of any class of any equity security." 15 U.S.C. § 78p(a). Furthermore, even *potential* beneficial ownership qualifies; so long as the insider "has the right to

8

acquire beneficial ownership" of the underlying security, 17 C.F.R. 240 § 13d–3(d)(1)(i); *see also* 17 C.F.R. § 240.16a–1(a)(1), it will be subject to section 16(b)'s strict-liability ban on short-swing profits.

Sometimes, however, investors want to hold large numbers of options, warrants, or convertible securities without navigating the perils of section 16(b). To do so, they employ so-called "blocker[s]" or "conversion cap[s]," *Roth v. Solus Alternative Asset Mgmt. LP*, 124 F. Supp. 3d 315, 323 (S.D.N.Y. 2015) – contractual provisions that "den[y] an investor the right to acquire more than [ten percent] of the underlying equity securities of an issuer[] at any one time," *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 12 (2d Cir. 2001). In other words, blockers allow investors to retain the ability to *cumulatively* acquire hefty amounts of an issuer's stock over a short-term period, without ever having the power to obtain more than ten percent at any given instant. *See id.* at 16 ("[B]eneficial ownership is determined at any one time, not cumulatively"). By thus extinguishing "the right to acquire beneficial ownership," 17 C.F.R. 240 § 13d–3(d)(1)(i), these blockers are designed to shield investors from section 16(b).

Because Hudson Bay will thus face section 16(b) liability only if its blockers were defective, Butterfly attempts to undermine them, arguing first that they were

illusory, and second that Hudson Bay used them in an improper attempt to evade regulatory reporting requirements.  We disagree on both fronts.

### B.      Hudson Bay's Blockers Were Not Illusory.

Courts disregard "sham" or "illusory" blockers.  *Levy*, 263 F.3d at 17 n.4.  As the district court recognized, there is a "dearth of case[l]aw" regarding when a blocker qualifies as "sham or illusory."  Sp. App'x at 17.  That said, *Levy* – our seminal case on blockers – suggests three relevant (and commonsense) factors to be considered in assessing the viability of the blocker in question:  whether (i) the acquiring party may waive the blocker "in its sole discretion," 263 F.3d at 17; (ii) the blocker lacks "a means of ensuring compliance," *id*.at 18; and (iii) as a practical reality, the investor has "ever exceeded the conversion cap," *id.* at 12.[1]

All three factors indicate that the blockers at issue here are not illusory.  *First*, the blockers here are solid contractual provisions, not phantom clauses that

---

[1] While some courts have relied on an amicus brief that the Securities and Exchange Commission (the "SEC") filed in *Levy* – which listed several factors that might influence whether a blocker qualifies as illusory, *see* Br. for SEC as Amicus Curiae Supporting Appellees, *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001) (No. 00-7630), 2001 WL 34120374 ("SEC Amicus Br.") – "[m]ost courts" have "not expressly applied the criteria set forth in the SEC's amicus brief," Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide*, § 2.03[5][l][ii] at 163 (6th ed. 2024). Furthermore, the three factors that *Levy* identified largely overlap with three of the SEC's proposed factors.  *See* SEC Amicus Br., 2001 WL 34120374, at *24–25 (analyzing whether the blocker (i) "lacks an enforcement mechanism," (ii) is "easily waivable," and (iii) "has not been adhered to in practice," among other possible concerns); Butterfly Br. at 25–41 (arguing those three factors).

Hudson Bay could quietly waive without BBBY's consent. Remarkably, Butterfly contends that the blockers were wafer-thin because they could have been "waived or amended like any other contract." Butterfly Br. at 30. But the mere fact that the parties could theoretically amend a contractual clause is not enough to make it illusory; to hold otherwise would render virtually *every* clause of every contract a sham. That explains why *Levy* focused on whether the alleged beneficial owner could have waived or nullified the clause in "its sole discretion" – not on whether the parties could have bilaterally changed their contract (as parties can always do with any contract). 263 F.3d at 17; *see also Lend Lease (US) Const. LMB v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (2017) ("[A]n illusory contract . . . is[] an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." (internal quotation marks omitted and alteration adopted)).

*Second*, they contain "a means of ensuring compliance," *id.* at 18; indeed, under the blockers, any acquisition of securities above ten percent is *automatically* "null and void and treated as if never made," J. App'x at 31 (internal quotation marks omitted). And while Butterfly insists that "[e]nforcement of the blockers depended entirely on self-policing by Hudson Bay," and that the Side Letter –

11

which required BBBY to honor Hudson Bay's conversion and exercise requests without demanding additional information – "actively disable[d]" BBBY's ability to "monitor[]" Hudson Bay's compliance with the blockers, Butterfly Br. at 26, 30, we have never found that a contractual clause is illusory simply because one party cannot actively audit the other's compliance in real time. On the contrary, *Levy* (i) simply examined whether the contract at issue included mechanisms that would prevent the investor from acquiring more than ten percent of the company's stock, and (ii) concluded that the investor's *own* "ability to revoke a requested conversion to the extent that full exercise would exceed the cap" sufficed. *See* 263 F.3d at 18. Here, the blockers go one step further than those in *Levy*, since they *automatically* nullify any above-the-threshold acquisition. Finally, every time that Hudson Bay attempted to exercise a warrant or convert preferred stock, it certified that it was not amassing more than 9.99% of BBBY's common stock.

*Finally*, the Complaint does not plausibly allege that Hudson Bay ever actually exceeded the ten-percent cap. Indeed, the trading records attached to the complaint suggest that Hudson Bay's end-of-day beneficial ownership always stayed below that threshold. To be sure, Butterfly engages in some dubious math to suggest otherwise by calculating Hudson Bay's percentage of ownership to

12

include shares that Hudson Bay had "already agreed to sell" but still technically held. Butterfly Br. at 36. But that methodology ignores the definition of beneficial ownership, which turns on whether the party in question enjoys "[i]nvestment power . . . to dispose, or direct the disposition of, [a] security." *See* 17 C.F.R. 240 § 13d–3(a)(2); *id.* at § 240.16a–1(a)(1).[2] Here, Hudson Bay clearly lacked the "power to dispose" of securities that it had *already sold*. *See, e.g.*, *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 650–51 (S.D.N.Y. 2022) ("[I]t is the moment the trading decision is made, instead of the technicalities of stock transfers, such as the passing of title or the exchange of the shares, that governs the construction of [section] 16(b)." (internal quotation marks omitted)).

Butterfly nevertheless asserts that "at 9:27 a.m. on February 10, 2023, Hudson Bay had 10.1% of BBBY's outstanding common stock just sitting in its brokerage account." Butterfly Br. at 36; *see* J. App'x at 58. But where shares happen to be "just sitting" is not the test for determining beneficial ownership. Rather, as discussed above, we must look to whether Hudson Bay had already sold any of this stock, regardless of whether the shares were still briefly transiting through its

---

[2] An investor's voting power can also establish its beneficial ownership. *See* 17 C.F.R. 240 § 13d–3(a)(1). But Butterfly does not argue that Hudson Bay had the ability to vote any shares in excess of 9.99% of BBBY's common stock. Nor could it, because the blockers expressly stripped it of that power.

account. And Butterfly's complaint clearly alleges that Hudson Bay was continuously selling shares to offset its acquisitions. Indeed, Butterfly concedes that Hudson Bay's "exercise requests" leading up to the February snapshot "were staggered with intervening sales." J. App'x at 58; *see id.* at 281–82 (chart tracking "[a]dvance [s]ales" of millions of shares).

On a more fundamental level, Butterfly repeatedly faults the district court for overly-focusing on the "blockers' text." Butterfly Br. at 25. Pointing to a single sentence of dicta in a footnote in *Levy* – which explained that "[t]he commercial substance of the transaction rather than its form must be considered" to "guard against sham transactions," 263 F.3d at 18 n.4 (internal quotation marks omitted) – Butterfly contends that we have endorsed a substance-over-form, multi-factor standard that focuses less on the text of the blocker, and more on how it functioned "in practice," Butterfly Br. at 18.

But that is not what *Levy* held. For starters, the footnote highlighted by Butterfly was quoting another case – *Bershad v. McDonough* – which was itself simply explaining the uncontroversial principle that "an insider" may not "disguise[] the effective transfer of stock" via artifices like shell companies or proxies. 428 F.2d 693, 697 (7th Cir. 1970); *see infra* Part II.C. Moreover, the Supreme

14

Court has repeatedly underscored that section 16(b) "imposes liability without fault [only] within its narrowly drawn limits," *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976), and that courts should not "exceed a literal, mechanical application of the statutory text in determining who may be subject to liability," *Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (internal quotation marks omitted). In light of that guidance, we will not abandon the plain text of the public-offering documents – which defines and limits Hudson Bay's "right to acquire beneficial ownership," 17 C.F.R. 240 § 13d–3(d)(1)(i) – for an uncertain standard focused on how the blockers *could* have functioned ineffectively in practice, absent specific allegations that they in fact did so.

Not surprisingly, we have interpreted and assessed contracts by looking to their text. *See Levy*, 263 F.3d at 17–18. And while Butterfly criticizes the district court for engaging in analysis that would "give[] a free pass to essentially any competently drafted blocker," Butterfly Br. at 18, a comprehensive and legally binding blocker *should* generally insulate a defendant from section 16(b) liability. It is only when the parties have ignored the terms of their contract and allowed the investor to "exceed[] the conversion cap" that we will look beyond the otherwise binding language of the blocker. *Levy*, 263 F.3d at 12. Thus, to survive

15

a motion to dismiss, a plaintiff must allege that a facially unambiguous and self-executing blocker *has in fact* failed in practice – not merely speculate that the parties could hypothetically waive the blocker or that the investor could breach the contract without the other knowing about it until after the fact.

## C. The Blockers Were Not Part of an Evasive Scheme.

In a last-ditch effort to invalidate the blockers, Butterfly turns to SEC Rule 13d-3(b). *See* 17 C.F.R. § 240.13d-3(b). That Rule kicks in whenever an investor "plan[s] or scheme[s] to evade" various statutory "reporting requirements," *see* 15 U.S.C. §§ 78m(d) & (g), which are triggered by beneficial ownership above certain percentages. To thwart such schemes, the Rule treats "[a]ny person" who uses "any . . . contract, arrangement, or device" to "prevent[] the vesting of" beneficial ownership as, in fact, enjoying such ownership. Pointing to this Rule, Butterfly contends that Hudson Bay used the blockers to "execute a comprehensive plan of disclosure evasion," and that Hudson Bay should thus be deemed the beneficial owner of BBBY's common stock. Butterfly Br. at 19.

But Butterfly confuses "plan[s] or scheme[s]," 17 C.F.R. § 240.13d-3(b), that *conceal* a defendant's effective ownership with contractual provisions that *prevent* an investor from owning a security in the first place. That difference figured

16

prominently in Judge Winter's lengthy concurrence in *CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 654 F.3d 276 (2d Cir. 2011) – which both parties cite approvingly, *see, e.g.*, Butterfly Br. at 48; Hudson Bay Br. at 49. There, Judge Winter explained that Rule 13d-3(b) applies only when "the transaction . . . [involves a] *substantial equivalence* of the rights of ownership relevant to control, or include[s] steps that stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner." *CSX Corp.*, 654 F.3d at 305 (Winter, *J.*, concurring) (emphasis added). Not surprisingly, Judge Winter focused on secret side deals, informal arrangements with straw buyers, and similar "sham[s]" designed to obscure an investor's control and contravene the Rule. *Id.* at 304. Judge Winter distinguished those nefarious transactions from benign arrangements in which "the underlying transaction does not provide the party with the substantial equivalence of the rights of ownership relevant to control." *Id.* at 305.

Judge Winter's view aligns with Supreme Court precedent, which expressly allows "investor[s] [to] structure[] . . . transaction[s] with the intent of avoiding liability under [section] 16(b)." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). And we ourselves have blessed the use of effective blockers. *See Levy*,

263 F.3d at 12.  An investor is thus clearly free to *limit* its ownership rights so as not to take on regulatory responsibility; what it may *not* do is "conceal[] the vesting of ownership" to *evade* its duties.  *CSX Corp.*, 654 F.3d at 305.

Recognizing this problem, Butterfly makes one final bid to save its complaint by arguing that Hudson Bay *was* hiding such *de facto* ownership rights. In Butterfly's telling, the Side Letter secretly superseded the terms of the public-offering documents, giving Hudson Bay the unlimited "right to acquire" as much stock as it wanted – despite the blockers' ten-percent cap.  Butterfly Br. at 49 (noting that Side Letter "said something very different" from public-offering documents).  But that is simply not what the Side Letter did:  that ancillary contract (i) expressly required BBBY to "honor" Hudson Bay's requests to exercise its warrants or convert its preferred stock only "*in accordance with the terms*" of the public-offering documents (including the blockers); and (ii) noted that its terms did not supersede or in any way alter the public-offering documents.  J. App'x at 221–22, 225 (emphasis added).  So, while the Side Letter required BBBY to hand over its common stock "in such amounts as [Hudson Bay] specified," that term was clearly subject to BBBY's and Hudson Bay's other agreements.  *Id.* at 222.

18

In short, far from covertly poking a hole in the blockers, the Side Letter expressly preserved them. And because these blockers prevented Hudson Bay from ever enjoying "the substantial equivalence" of beneficial ownership, *CSX Corp.*, 654 F.3d at 305, Rule 13d-3(b) plays no role here.

### III.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court dismissing Butterfly's claim.